No. 24-4471

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT
_____

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

UMAR FAROOQ CHAUDHRY,
*Defendant/Appellant*.
_____

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)
_____

BRIEF OF THE APPELLANT
_____

Geremy C. Kamens
Federal Public Defender for the
  Eastern District of Virginia
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Geremy_Kamens@fd.org

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ iii

Statement of Jurisdiction........................................................................................1

Statement of the Issue ............................................................................................2

Statement of the Case.............................................................................................2

    A.    Pakistan Secured Convictions on False Charges of a Conspiracy to Attack Pakistani Military Targets. ....................................................3

    B.    The United States Failed to Make Any Meaningful Effort to Obtain Custody of Mr. Chaudhry—a Dual Citizen of the U.S. and Pakistan—for Ten Years. ..............................................................7

    C.    Procedural History.............................................................................10

Summary of Argument..........................................................................................12

Standard of Review...............................................................................................13

Argument...............................................................................................................14

    The District Court Erred in Denying Mr. Chaudhry's Motion to Dismiss Because the Government's Deliberate Decision to Wait More Than a Decade Before Seeking His Extradition Violated His Sixth Amendment Right to a Speedy Trial .....................................................................................14

    A.    The More Than Ten-Year Delay Between the Filing of Federal Charges and the Request for Extradition Was Presumptively Prejudicial and Uncommonly Long. ..................................................15

        1.    The Right to Speedy Trial Was Triggered by the Criminal Complaint, Arrest Warrant, and International Red Notice. ......16

        2.    The Delay Between the 2009 Complaint and the 2024 Trial Date Was Presumptively Prejudicial................................18

i

B.    The Government's Decision to Forgo Formal Extradition Proceedings for Over a Decade Was Negligent at Best and Deliberately Dilatory at Worst. ...........................................................19

    1.    Delay Due to Pakistan's Fraudulent Prosecution .....................20

    2.    The Government's Two Requests in 2010 for Mr. Chaudhry to Be Deported Were Entirely Futile Because He Is a Dual Citizen of the United States and Pakistan............25

    3.    Neither Article 4 of the Extradition Treaty Nor a Domestic Pakistani Court Order Excuse the Government's Failure to Pursue Extradition....................................................................29

C.    Mr. Chaudhry's Failure to Assert His Speedy Trial Rights While Incarcerated in Pakistan Cannot Be Held Against Him Given His Lack of Knowledge of the U.S. Charges.............................................35

D.    The Extraordinary Length of Delay Establishes Presumptive Prejudice, and Mr. Chaudhry Suffered Actual Prejudice....................38

Conclusion ...............................................................................................41

Request for Oral Argument.......................................................................42

Certificate of Compliance

# TABLE OF AUTHORITIES

## Cases

*Barker v. Wingo*, 407 U.S. 514 (1972) .............................. 12, 14, 19, 20, 24, 35, 38

*Beukes v. Pizzi*, 888 F. Supp. 465 (E.D.N.Y. 1995) ................................31

*Charlton v. Kelly*, 229 U.S. 447 (1913) ....................................................26

*Dickey v. Florida*, 398 U.S. 30 (1972)......................................................21

*Doggett v. United States*, 505 U.S. 647 (1992)....... 15, 16, 18, 19, 35, 38, 39, 40, 41

*Fong Yue Ting v. United States*, 149 U.S. 698 (1893)............................................25

*Guan v. Barr*, 925 F.3d 1022 (9th Cir. 2019) ..........................................8

*Haxhiaj v. Hackman*, 528 F.3d 282 (4th Cir. 2008) .........................................26, 34

*Hoxha v. Levi*, 465 F.3d 554 (3d Cir. 2006) ............................................32

*Kasi v. Angelone*, 300 F.3d 487 (4th Cir. 2002) .....................................10

*Ng Fung Ho v. White*, 259 U.S. 276 (1922)...............................................25

*Prince v. State of Ala.*, 507 F.2d 693 (5th Cir. 1975) ...........................29, 39, 40, 41

*Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191 (2008) .........................................15

*Simmons v. United States*, 390 U.S. 377 (1968)......................................36

*Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980)......................................32

*Smith v. Hooey*, 393 U.S. 374 (1969) ...................................... 20-21, 23, 33, 34, 40

*Trop v. Dulles*, 356 U.S. 86 (1958)........................................................25

*United States v. Battis*, 589 F.3d 673 (3d Cir. 2009)................................34

*United States v. Bergfeld*, 280 F.3d 486 (5th Cir. 2002) .......................19

*United States v. Burgess*, 684 F.3d 445 (4th Cir. 2012) ..........................17

*United States v. Cardona*, 302 F.3d 494 (5th Cir. 2002)..........................19

*United States v. D'Anjou*, 16 F.3d 604 (4th Cir. 1994) ..........................15

*United States v. Diacolios*, 837 F.2d 79 (2d Cir. 1988)..........................27

*United States v. Ewell*, 383 U.S. 116 (1966) ..........................15

*United States v. Fernandes*, 618 F. Supp. 2d 62 (D.D.C. 2009) ..........................22

*United States v. Garcia*, 59 F.4th 1059 (10th Cir. 2023)..........................36

*United States v. Garner*, 32 F.3d 1305 (8th Cir. 1994) ..........................17

*United States v. Gomez*, 67 F.3d 1515 (10th Cir. 1995)..........................38

*United States v. Grimmond*, 137 F.3d 823 (4th Cir. 1998)..........................22, 23, 40

*United States v. Henson*, 945 F.2d 430 (1st Cir. 1991) ..........................17

*United States v. Heshelman*, 521 F. App'x 501 (6th Cir. 2013)..........................22, 29, 30

*United States v. Johnson*, 325 F.3d 205 (4th Cir. 2003)..........................16-17

*United States v. Knotek*, 925 F.3d 1118 (9th Cir. 2019)..........................26

*United States v. Lozano*, 962 F.3d 773 (4th Cir. 2020) ..........................36

*United States v. MacDonald*, 456 U.S. 1 (1982) ..........................16

*United States v. Marion*, 404 U.S. 307 (1971) ..........................15, 16

*United States v. McConahy*, 505 F.2d 770 (7th Cir. 1974) ..........................22

*United States v. Molina-Solorio*, 577 F.3d 300 (5th Cir. 2009) ..........................19

*United States v. Pomeroy*, 822 F.2d 718 (8th Cir. 1987)..........................22, 29, 30, 32, 33

*United States v. Richardson*, 780 F.3d 812 (7th Cir. 2015)..........................18

*United States v. Robinson*, 55 F.4th 390 (4th Cir. 2022)..........................13

iv

*United States v. Rodriguez*, 2023 WL 5740493 (D.D.C. Sept. 6, 2023) .................26

*United States v. Seltzer*, 595 F.3d 1170 (10th Cir. 2010) .....................14, 23, 24, 36

*United States v. Terrack*, 515 F.2d 558 (9th Cir. 1975) ..........................................17

*United States v. Thomas*, 55 F.3d 144 (4th Cir. 1995) ...................17, 22, 23, 24, 36

*United States v. Valencia-Quintana*, 136 F. App'x 707 (5th Cir. 2005) ................27

*United States v. Velazquez*, 749 F.3d 161 (3d Cir. 2014) ...........................19, 28, 37

*United States v. Walton*, 814 F.2d 376 (7th Cir. 1987) ..........................................27

*United States v. White*, 443 F.3d 582 (7th Cir. 2006).............................................38

*United States v. Woolfolk*, 399 F.3d 590 (4th Cir. 2005)..................................17, 19

<u>Constitutional Provisions, Statutes, Rules, and Treaties</u>

U.S. Const. amend. VI .............................................................................................14

18 U.S.C. § 3161 .......................................................................................................10

18 U.S.C. § 3231 .........................................................................................................1

28 U.S.C. § 1291 .........................................................................................................1

Fed. R. App. P. 4 .........................................................................................................1

Fed. R. Crim. P. 3.......................................................................................................16

Fed. R. Crim. P. 4.......................................................................................................16

Constitution of the Islamic Republic of Pakistan, Art. 15.......................................26

Extradition Treaty between the United States and the United Kingdom, U.S.-
U.K., Dec. 22, 1931, 47 Stat. 2212............................................................10, 31

*Arrest of five Americans*, Daily the Pak Banker (Dec. 11, 2009) ............................4

I.M. Bassiouni, II International Extradition (2d ed. 1987) ......................................32

*Black's Law Dictionary* (10th ed. 2014) ..................................................................16

Ian Brownlie, *Principles of Public International Law* (6th ed. 2003) .....................25

Thomas Joscelyn, *Admiral Mullen: Pakistani ISI Sponsoring Haqqani attacks*, Long War Journal (Sept. 22, 2011) ..........................................................5

*Obama accepts Nobel peace prize, but rest of the world debates if he deserves it or not*, CNN International (Dec. 10, 2009) ................................................... 3-4

*Pakistan arrests five men believed missing in the U.S.*, Wall Street Journal Asia, at 4 (Dec. 10, 2009) ......................................................................................3

Jane Perlez, Salman Masood, & Waqar Gillani, *5 U.S. Men Arrested in Pakistan Said to Plan Jihad*, N.Y. Times (Dec. 10, 2009) ...................................3

U.N. Secretary-General, Torture and Other Cruel, Inhuman or Degrading Punishment: Note by the Secretary-General, U.N. Doc. A/66/268 (Aug. 5, 2011) ......................................................................................................................6

*Webster's Third New Int'l Dictionary* (1993) ...........................................................16

Wright & Leipold, *Fed. Prac. & Proc. Crim.* (4th ed. 2008) ...................................16

No. 24-4471

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH COURT

_____

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

UMAR FAROOQ CHAUDHRY,
*Defendant/Appellant*.

_____

On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)

_____

BRIEF OF THE APPELLANT

_____

## STATEMENT OF JURISDICTION

This appeal challenges the district court's denial of Appellant Umar Chaudhry's motion to dismiss the indictment for violation of his Sixth Amendment right to a speedy trial. The district court had jurisdiction over this federal criminal case pursuant to 18 U.S.C. § 3231. That court entered the order of judgment and conviction on August 14, 2024. J.A. 315. Mr. Chaudhry filed his notice of appeal on August 28, 2024. J.A. 321; *see* Fed. R. App. P. 4(b)(1), (b)(6). Therefore, this Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court erred in denying Mr. Chaudhry's motion to dismiss the indictment where the government waited over ten years to seek his extradition from Pakistan, during which time he was imprisoned there on false charges, resulting in prejudice to his defense and mental health, culminating in the deprivation of his Sixth Amendment right to a speedy trial.

## STATEMENT OF THE CASE

Born in Sargodha, Pakistan in 1985, Umar Chaudhry is a naturalized U.S. citizen who came to the United States with his family when he was six years old. In 2009, during the escalating conflict in Afghanistan involving the United States and the Taliban, he and four childhood friends from Northern Virginia decided to travel to Afghanistan overland from Pakistan, ostensibly to help oppressed Muslims in Afghanistan and fight against American soldiers there if necessary. None had any military background or experience.

At the time, Umar was six credits shy of graduating from college with a bachelor's degree in business and marketing, but he was lured by three close friends and former classmates, Ahmed Minni, Aman Yemer, and Waqar Khan, who persuaded him to join their plan to travel to Afghanistan via Pakistan. J.A. 256. Minni and Yemer had been communicating online with an English-speaking Taliban contact who went by the name "Saifullah," and they agreed to "travel[] to

Afghanistan to engage in violent *jihad*." J.A. 255-256. After Umar signed on to the plan, a fifth former classmate, Ramy Zamzam, also agreed to join them. J.A. 255-256. Of the five, Umar and Waqar Khan are also citizens of Pakistan, and Umar has family in Sargodha. J.A. 262.

Prior to departing the United States, the five made an 11-minute long "Final Message" video to be uploaded to YouTube after their departure that contained images of U.S. soldiers and photographs of civilian casualties, and described the obligation of Muslims to engage in jihad, or struggle, to defend Muslim land from invaders. J.A. 259.

### A. Pakistan Secured Convictions on False Charges of a Conspiracy to Attack Pakistani Military Targets.

The five Americans never made it to Afghanistan. Family members concerned about the safety of the five young men alerted authorities, and the group was arrested in Sargodha, Pakistan on December 9, 2009, within two weeks of their arrival.

The arrests made international news. *See* Jane Perlez, Salman Masood, & Waqar Gillani, *5 U.S. Men Arrested in Pakistan Said to Plan Jihad*, N.Y. Times (Dec. 10, 2009) (noting U.S. reports that the five "from the suburbs of Washington" were en route for training and to "fight American troops in Afghanistan"); *Pakistan arrests five men believed missing in the U.S.*, Wall Street Journal Asia, at 4 (Dec. 10, 2009). Even then-President Obama was asked about the arrests. *Obama accepts Nobel peace prize, but rest of the world debates if he deserves it or not*, CNN

3

International (Dec. 10, 2009) (noting comment by Pres. Obama that five Americans arrested in Pakistan would face investigation).

The case was also widely publicized in Pakistan. *See* J.A. 294. But the coverage was decidedly different, and suggested that evidence obtained following the arrest of "the five dangerous American nationals … revealed [a] mind-boggling record of their activities and future plans to bomb [] *innocent Pakistanis*." *Arrest of five Americans*, Daily the Pak Banker (Dec. 11, 2009) (emphasis added). To be clear, none of the evidence in this case—notably including the "Final Message" video, emails, and YouTube posts quoted in the Statement of Facts, *see* J.A. 254-260— provide any basis for the conclusion that the five sought to attack Pakistanis or Pakistani military installations.

Nonetheless, Pakistan swiftly brought criminal charges against all five Americans, alleging that they conspired to attack *Pakistani* targets. J.A. 324-325. Pakistani authorities charged that the five Americans "landed in Pakistan and hatched [a] criminal conspiracy to resort to acts of terrorism with an intention to target sensitive installations in Pakistan like [Pakistani Air Force] Bases Mianwali, Sargodha, and Chashma Barrage Mianwali." J.A. 387. Moreover, Pakistani law enforcement purportedly recovered evidence of five individual receipts, one for each defendant, reflecting prohibited donations to "Jash-e-Mohammad Hyderabad City." J.A. 351-352. The Pakistani court even asserted that it was "unbelievable that [the]

accused were to arrange for their journey to Afghanistan" because the five had not applied for travel visas. J.A. 383. On June 24, 2010, the five were quickly convicted in a show trial based on such falsified evidence. J.A. 292-294.

Pakistani intelligence officials manufactured criminal charges against the five Americans as propaganda to counter U.S. accusations that Pakistan supported terrorist attacks against the U.S.-backed government in Afghanistan. J.A. 294. Specifically, the United States had accused Pakistan's intelligence service, the ISI, of supporting "attacks in Afghanistan against Afghan government, ISAF, and Indian targets." Thomas Joscelyn, *Admiral Mullen: Pakistani ISI Sponsoring Haqqani attacks*, Long War Journal (Sept. 22, 2011) (describing leaked 2008 State Department cable detailing US accusations against ISI). The ISI supported insurgent attacks in Afghanistan because it preferred the Taliban over the U.S.-backed government which was aligned with India, Pakistan's enemy. Consequently, "the way Pakistan sees it, ensuring the Afghan Taliban a prominent place in the post-U.S. Afghanistan landscape prevents India from building a powerful alliance with Kabul." Alex Rodriguez, *Cables Reveal U.S. Misgivings About Pakistan*, L.A. Times (Dec. 2, 2010).

Pakistani officials thus used the trial of the five Americans to purportedly demonstrate that American terrorists had come to Pakistan to attack Pakistani targets. J.A. 294. As already noted, none of the discovery provided in this case

supports any of the Pakistani charges. The statement of facts in support of the plea agreement contains no statements providing any support to the Pakistani charges. *See* J.A. 254-264. And the U.S. has never denied Mr. Chaudhry's claim that the Pakistani allegations that he sought to attack Pakistani targets are entirely false.

Following his conviction in June 2010, Mr. Chaudhry endured the next decade in prison in Pakistan, over four years of which were spent in a high-security Pakistani prison reserved for convicted terrorists. As the government has acknowledged, the conditions of confinement in Pakistan were "exceedingly harsh." J.A. 301. Indeed, for the years he was imprisoned in a high-security prison, Mr. Chaudhry was held in solitary confinement in an 8 by 6-foot cell for 23 hours a day, and handcuffed during the remaining hour outside his cell.[1] The district court aptly observed that Mr. Chaudhry and his four co-defendants "paid an incredible price" in Pakistan, the effects of which were "catastrophic." J.A. 303.

One of the five, Aman Yemer, in fact suffered such a severe mental breakdown that the government dismissed all U.S. charges against him when he was deported to the U.S. at the conclusion of his sentence. *See* D. Ct. Docket ECF 104

---

[1] As noted by the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Punishment, "prolonged solitary confinement, in excess of 15 days, should be subject to an absolute prohibition" as a violation of Article 1 of the Convention Against Torture. U.N. Secretary-General, Torture and Other Cruel, Inhuman or Degrading Punishment: Note by the Secretary-General, ¶ 88, U.N. Doc. A/66/268 (Aug. 5, 2011).

(defendant Yemer's motion to dismiss); ECF 157 (government's motion to dismiss indictment against Yemer); ECF 158 (order dismissing charges against Yemer). Although Mr. Chaudhry was competent when he returned to the United States, his father described him as "emotionally broken" by the end of his prison sentence. J.A. 283.

For over a decade while Mr. Chaudhry served a sentence in Pakistan on false charges, the United States did nothing to obtain his custody, and instead simply waited until he had completed his term of imprisonment. At the conclusion of the 10-year prison term, the U.S. again requested that Pakistan deport Mr. Chaudhry. Again, Pakistan told the U.S. to file a request for his extradition, as Mr. Chaudhry is a Pakistani citizen. J.A. 160.

Ultimately, after the U.S. finally sought Mr. Chaudhry's extradition in November 2020, he was extradited from Pakistan to the United States on December 6, 2023. J.A. 163. Within 30 days of his arraignment, he promptly filed a motion to dismiss the indictment based upon the government's violation of his Sixth Amendment right to a speedy trial.

### B. The United States Failed to Make Any Meaningful Effort to Obtain Custody of Mr. Chaudhry—a Dual Citizen of the U.S. and Pakistan—for Ten Years.

On December 23, 2009, shortly after Mr. Chaudhry's arrest in Pakistan, the United States government filed a criminal complaint against him for conspiracy and

attempt to provide material support to a designated terrorist organization, in violation of 18 U.S.C. § 2339B. J.A. 23. An arrest warrant was also issued on that date. J.A. 24. The charges alleged that Mr. Chaudhry had conspired to travel to Afghanistan to participate in the conflict there against the United States.

On December 24, 2009, the district court authorized an unsealing of the case so that the FBI could seek the issuance of a "red notice" from Interpol, the international law enforcement organization. J.A. 26-27. A "red notice" "is the closest instrument to an international arrest warrant in use today." *Guan v. Barr*, 925 F.3d 1022, 1030 n.2 (9th Cir. 2019) (citation omitted).

The government also sought an unsealing order to request Pakistan to deport Mr. Chaudhry and his co-defendants. J.A. 27. As early as December 15, 2009, however, Pakistani authorities explicitly invited the U.S. government to follow "the formal extradition process," and requested that "the USG should initiate a formal request soon." J.A. 114; J.A. 217.

But after filing federal charges against the five and obtaining an international arrest warrant in December 2009, the U.S. refused to seek extradition. Instead, on December 24, 2009, the United States advised Pakistan's ministry of the interior that it sought custody of the five and could facilitate their transport within 72 hours of notification. J.A. 120. Thereafter, the U.S. made two official communications requesting that Pakistan deport the five defendants:

- On January 15, 2010, the United States sent a diplomatic note that acknowledged that Mr. Chaudhry "is a dual US-Pakistani national," but requested that Pakistan "consider suspending or otherwise deferring its criminal proceedings against the defendants and deporting or expelling them as soon as possible to the United States." J.A. 157-158; J.A. 408; J.A. 410.

- On June 23, 2010, the U.S. legal attaché sent a letter referencing a conversation of June 5-6 between the U.S. ambassador and a Pakistani minister about the five Americans, and reiterating that the United States could arrive to transfer "those who are deported out of Pakistan." J.A. 165.

"Deportation was [] the method that the U.S. government had asked Pakistan to employ in its formal request to obtain custody of all five defendants in June 2010." J.A. 88. "Because all five defendants were U.S. citizens, the government did not seek extradition." J.A. 84.

Thereafter, the Legal Attaché simply inquired as to when the defendants would complete their sentences. J.A. 159. To be sure, the Legal Attaché did send a letter in March 2013 stating that the U.S. was interested in "discussing a number of pending requests for extradition of individuals in Pakistan to the United States, such as [the five named defendants]," J.A. 169—but the five Americans were not subject to a request for extradition at that time.

On November 16, 2017, shortly before the expiration of the statute of limitations, a grand jury in the Eastern District of Virginia issued an indictment charging Mr. Chaudhry and his four co-defendants with material support offenses. J.A. 28-32. Still, the U.S. did not seek extradition.

Following Mr. Chaudhry's release from prison in Pakistan in 2020, Pakistani authorities sent the U.S. embassy a diplomatic note dated June 22, 2020, reiterating that the United States must file a formal request for his extradition because of his Pakistani citizenship. J.A. 160. Extradition between the U.S. and Pakistan is governed by the 1931 Extradition Treaty between the United States and the United Kingdom, Pakistan's former colonial sovereign. *See* J.A. 154; J.A. 172-178 (treaty); *Kasi v. Angelone*, 300 F.3d 487, 493 & n.2 (4th Cir. 2002).

Finally, more than a decade after Mr. Chaudhry was charged with criminal offenses in the United States, the U.S. government presented a formal extradition request to Pakistan on November 12, 2020. J.A. 161. Pursuant to those extradition proceedings, Mr. Chaudhry was ultimately transferred to U.S. custody, made an initial appearance before a magistrate judge on December 7, 2023, and was arraigned on December 12, 2023. J.A. 18; J.A. 61.

### C.    Procedural History

The Speedy Trial Act specifies that trial should occur within 70 days of Mr. Chaudhry's appearance before a judicial officer in the charging district, which in this case was February 15, 2024. 18 U.S.C. § 3161(c)(1). Prior to Mr. Chaudhry's arraignment, the government had moved to certify the case as complex for purposes of the Speedy Trial Act, and the district court agreed to that certification. J.A. 34-45. Given that certification, at Mr. Chaudhry's arraignment, the parties requested a trial

date of May 6, 2024. J.A. 62-63. The district court also queried Mr. Chaudry about his waiver of his rights under the Speedy Trial Act to a trial within 70 days of the arraignment. J.A. 64-65.

Within one month of his arraignment, Mr. Chaudhry moved to dismiss the indictment on the ground that the government's decade-long delay in seeking his extradition violated his Sixth Amendment right to a speedy trial. J.A. 68-79. The district court denied the motion, finding that: (1) the delay was attributable to Mr. Chaudhry's incarceration in Pakistan and the U.S. made reasonably diligent efforts to obtain his transfer to the United States; (2) Mr. Chaudhry did not timely assert his speedy trial rights because he initially contested extradition and agreed to extend the Speedy Trial Act trial deadline by several weeks at his arraignment; and (3) Mr. Chaudhry failed to demonstrate prejudice from the delay. J.A. 211-215 (oral ruling); J.A. 218 (order); J.A. 266-282 (memorandum opinion).

Mr. Chaudhry entered a conditional guilty plea to providing material support in violation of 18 U.S.C. § 2339B that preserved his right to appeal the denial of his motion to dismiss the indictment. J.A. 225; J.A. 231; J.A. 249. In accordance with a joint sentencing recommendation, the district court sentenced him to time served followed by twenty years of supervised release. J.A. 302; J.A. 305; J.A. 316-317. This appeal followed.

## SUMMARY OF ARGUMENT

The government's deliberate decision to wait more than a decade before seeking Mr. Chaudhry's extradition from Pakistan violated his Sixth Amendment right to a speedy trial. All four factors under *Barker v. Wingo*, 407 U.S. 514 (1972), demonstrate this constitutional violation.

First, the delay between the 2009 federal charges and the 2020 extradition request was extraordinary—spanning over ten years before trial was scheduled for 2024. This delay far exceeds the one-year threshold for presumptive prejudice and is "uncommonly long" by any measure.

Second, the government's failure to pursue formal extradition proceedings for over a decade was, at minimum, negligent and potentially deliberately dilatory. Pakistan explicitly told U.S. officials to pursue formal extradition, yet the government ignored this clear directive for over a decade. While Mr. Chaudhry was imprisoned in Pakistan on fraudulent charges, the government made only two futile requests for deportation in 2010, despite knowing that deportation was impossible given his dual citizenship status. The mere possibility that Pakistan could have invoked its discretionary authority to defer extradition under Article 4 of the extradition treaty did not excuse the government from its constitutional duty to make a diligent, good-faith effort to bring Mr. Chaudhry to trial.

Third, Mr. Chaudhry's failure to assert his speedy trial rights while incarcerated cannot be held against him, as he was unaware of the pending U.S. charges during his decade-long imprisonment in Pakistan. Once arraigned in federal court, he promptly asserted his Sixth Amendment rights by filing a motion to dismiss within 30 days.

Finally, the extraordinary length of delay establishes presumptive prejudice that the government cannot rebut. Mr. Chaudhry also suffered actual prejudice: he lost the opportunity to serve concurrent sentences, endured incredibly harsh conditions of confinement in Pakistan on fraudulent charges, and his ability to mount a defense was impaired by the decade-long delay. Under these circumstances, dismissal is required to vindicate Mr. Chaudhry's constitutional right to a speedy trial.

## **STANDARD OF REVIEW**

The Court reviews de novo the district court's denial of the motion to dismiss the indictment based upon a violation of the Sixth Amendment right to a speedy trial. *United States v. Robinson*, 55 F.4th 390, 399 (4th Cir. 2022).

**ARGUMENT**

THE DISTRICT COURT ERRED IN DENYING MR. CHAUDHRY'S MOTION TO DISMISS BECAUSE THE GOVERNMENT'S DELIBERATE DECISION TO WAIT MORE THAN A DECADE BEFORE SEEKING HIS EXTRADITION VIOLATED HIS SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. This fundamental right protects against "oppressive pretrial incarceration," minimizes the "anxiety and concern of the accused," and limits the possibility that delay will impair the accused's defense. *Barker v. Wingo*, 407 U.S. 514, 532 (1972). "[I]t is the prosecution's burden (and ultimately the court's) and not the defendant's responsibility to assure that cases are brought to trial in a timely manner." *United States v. Seltzer*, 595 F.3d 1170, 1175-76 (10th Cir. 2010).

To determine whether a defendant's speedy trial right has been violated, courts consider four factors: (1) the length of delay; (2) the reason for delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530. These factors must be considered together and balanced in light of the circumstances of each case. *Id.* at 533. Here, all four factors demonstrate that the government's excessive and unjustified decade-long delay in seeking Mr. Chaudhry's extradition violated his constitutional right to a speedy trial.

**A.    The More Than Ten-Year Delay Between the Filing of Federal Charges and the Request for Extradition Was Presumptively Prejudicial and Uncommonly Long.**

Although the Sixth Amendment guarantees an "accused" both the "right to a speedy and public trial" and "the assistance of counsel," the time at which the Constitution guarantees these rights is not identical. Counsel is required at "critical stages" of adversarial criminal proceedings. *See Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 212 (2008). "Unlike the speedy trial right," the right to counsel "does not attach upon arrest." *See Doggett v. United States*, 505 U.S. 647, 664 n.2 (Thomas, J., dissenting); *accord United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir. 1994).

By contrast, the right to a speedy trial is triggered by an arrest because the Sixth Amendment's speedy trial guarantee is designed to prevent "undue and oppressive incarceration prior to trial." *United States v. Ewell*, 383 U.S. 116, 120 (1966). The speedy trial right is also designed "to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." *Id.* For this reason, a criminal charge that makes a person "the subject of public accusation" imposes a burden on an accused that the speedy trial right is designed to mitigate. *United States v. Marion*, 404 U.S. 307, 321 (1971).

1. **The Right to Speedy Trial Was Triggered by the Criminal Complaint, Arrest Warrant, and International Red Notice.**

The constitutional right to a speedy trial thus attaches when a defendant is "indicted, arrested, or *otherwise officially accused*[.]" *United States v. MacDonald*, 456 U.S. 1, 6 (1982) (emphasis added); *Doggett*, 505 U.S. at 655 (speedy trial right "triggered by arrest, indictment, or other official accusation"); *see also Marion*, 404 U.S. at 316-17 & n.10 (noting that speedy trial right attached "after a person has been accused of a crime" and citing, inter alia, Second Circuit rule requiring trial within six months of earliest of arrest, service of summons, filing of complaint, or unsealing of indictment).

An "accused" is someone against whom criminal proceedings have been commenced. *See Webster's Third New Int'l Dict.* 14 (1993) (defining "accused" as "one charged with an offense; esp: the defendant in a criminal case"). A federal complaint consists of "a written statement of the essential facts constituting the offense charged," Fed. R. Crim. P. 3; authorizes the issuance of an arrest warrant, Fed. R. Crim. P. 4; and constitutes "[a] formal charge accusing a person of an offense," *Black's Law Dictionary* 344 (10th ed. 2014) (citing Fed. R. Crim. P. 3). The complaint is an official accusation that serves as "the typical way for a criminal proceeding to be instituted in federal court." 1 Wright & Leipold, *Fed. Prac. & Proc. Crim.* § 41 at 33 (4th ed. 2008); *accord United States v. Johnson*, 325 F.3d 205, 209

16

(4th Cir. 2003) (noting that filing of complaint commences criminal "proceeding before a court").

It is therefore well-settled in this Circuit that the Sixth Amendment right to a speedy trial is triggered by the filing of a federal complaint and an arrest warrant. *See United States v. Woolfolk*, 399 F.3d 590, 597 (4th Cir. 2005) (noting that filing of detainer, warrant, and complaint triggered defendant's Sixth Amendment speedy trial rights); *United States v. Thomas*, 55 F.3d 144, 149 (4th Cir. 1995) (the "combination of the criminal complaint, the arrest warrant, and the federal detainer were sufficient to implicate the speedy trial provision of the Sixth Amendment"); *see also United States v. Burgess*, 684 F.3d 445, 452 (4th Cir. 2012) (citing *Woolfolk* and noting that federal detainer, arrest warrant, complaint, or indictment triggers Sixth Amendment speedy trial right); *United States v. Henson*, 945 F.2d 430, 437 (1st Cir. 1991) (analyzing Sixth Amendment speedy trial act claim based on delay between federal complaint and trial); *United States v. Garner*, 32 F.3d 1305, 1310 (8th Cir. 1994) (affirming district court's conclusion that defendant "was not 'accused' until the federal complaint was filed" for purposes of Sixth Amendment speedy trial claim); *United States v. Terrack*, 515 F.2d 558, 559 (9th Cir. 1975) (stating that "the filing of a criminal complaint, or indictment where there is no complaint, marks the inception of the speedy trial guarantee of the Sixth

Amendment").[2] The 2009 federal complaint, arrest warrant, and red notice constituted a public accusation against Mr. Chaudhry of his commission of a federal crime, and therefore triggered his Sixth Amendment right to a speedy trial.

### 2. The Delay Between the 2009 Complaint and the 2024 Trial Date Was Presumptively Prejudicial.

The threshold question in evaluating Mr. Chaudhry's claim under the Sixth Amendment speedy trial right is whether the post-accusation delay until his trial date was "presumptively prejudicial." *Doggett*, 505 U.S. at 651-52. This threshold is crossed when a delay between a formal criminal accusation and a trial "approaches one year." *Id.* at 652 n.1. Once this threshold is met, courts must then consider whether the total delay was "uncommonly long" because "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Id.* at 651-52.

The delay in this case far exceeds the one-year threshold. The government filed charges against Mr. Chaudhry in December 2009 but did not seek his extradition until 2020, and trial was scheduled for 2024—a delay of well over ten years. This extraordinary delay is presumptively prejudicial and thus requires the

---

[2] Other courts disagree that the federal criminal complaint implicates the Sixth Amendment right to a speedy trial. *See United States v. Richardson*, 780 F.3d 812, 814 (7th Cir. 2015) (stating that criminal complaint "signals an investigation rather than a prosecution"); *but cf. id.* at 821 (Hamilton, J., concurring in judgment) ("A complaint, especially when followed by an arrest warrant and detainer, is not merely a sign of a pending investigation, as my colleagues contend. It makes a quite specific, quite official accusation of a federal crime.").

Court to weigh the remaining *Barker* factors. *See Woolfolk*, 399 F.3d at 597-98 (finding eight-month delay presumptively prejudicial in simple drug case).

The delay here was "uncommonly long" by any measure. The Supreme Court has described as "extraordinary" a delay of eight and a half years. *Doggett*, 505 U.S. at 652; *see also United States v. Molina-Solorio*, 577 F.3d 300, 305 (5th Cir. 2009) (finding delay of "nearly ten years" to "weigh heavily" in defendant's favor). In fact, delays that are less than half as long as in this case between the filing of charges and trial have been considered substantial enough to strongly weigh in the defendant's favor. *Barker*, 407 U.S. at 533 (addressing delay of over five years); *see also United States v. Velazquez*, 749 F.3d 161, 174 (3d Cir. 2014) (describing six-year delay as "extraordinary"); *United States v. Bergfeld*, 280 F.3d 486, 489 (5th Cir. 2002) (delay of over five years weighs "heavily" in defendant's favor); *United States v. Cardona*, 302 F.3d 494, 497 (5th Cir. 2002) (finding an "extraordinary delay of over five years," to weigh heavily in defendant's favor). The delay in this straightforward material-support case was plainly excessive and weighs strongly in favor of finding a constitutional violation.

### B.   The Government's Decision to Forgo Formal Extradition Proceedings for Over a Decade Was Negligent at Best and Deliberately Dilatory at Worst.

The second *Barker* factor examines "whether the government or the criminal defendant is more to blame for [the] delay." *Doggett*, 505 U.S. at 651. Different

weights are assigned to different reasons for delay. *Barker*, 407 U.S. at 531. A deliberate attempt by the government to delay trial weighs heavily against it, while more neutral reasons like negligence weigh less heavily. *Id.* Valid reasons, such as a missing witness, justify appropriate delay. *Id.* In this case, the government's failure to request Mr. Chaudhry's extradition from Pakistan for over a decade after charging him in the United States falls somewhere between negligence and deliberate delay—either of which weighs against the government.

The district court found that this factor weighed in favor of the government because: (1) waiting "until defendant completed his sentence in Pakistan 'is without question a valid reason for delay,'" J.A. 276; (2) the U.S. requested that Pakistan deport Mr. Chaudhry several times, and seeking extradition is not required to establish reasonable diligence, J.A. 276-277; and (3) the extradition treaty authorized deferral of extradition until the completion of a domestic prison sentence, J.A. 277. None of these rationales support the government's refusal to seek extradition for a decade, as it was the only mechanism by which Mr. Chaudhry's custody could be obtained from Pakistan given his status as a dual citizen.

### 1.     Delay Due to Pakistan's Fraudulent Prosecution

In the context of defendants who are either voluntarily or involuntarily outside of the charging district, the prosecution has "a constitutional duty to make a diligent, good-faith effort to bring [the defendant] before the [charging] court for trial." *Smith*

*v. Hooey*, 393 U.S. 374, 383 (1969); *accord Dickey v. Florida*, 398 U.S. 30, 37 (1972). In *Smith*, a defendant serving a federal prison sentence faced a pending theft charge in Texas and requested a speedy trial. 393 U.S. at 375. For six years, however, Texas "took no steps to obtain the petitioner's appearance in the [Texas] trial court." *Id.* Moreover, the Texas Supreme Court ruled that because the defendant was "confined in a federal prison" outside of the state's jurisdiction, Texas was "totally absolved from any duty" to seek the defendant's presence for trial in accordance with the Sixth and Fourteenth Amendments. *Id.* at 377.

The Supreme Court reversed. It explained that the purposes of the speedy trial right are implicated even when a person is being held by another sovereign because undue delay may result in the potential loss of the ability to serve sentences concurrently, result in harsher prison conditions, and impair a person's ability to defend against the pending charges. *Id.* at 378-79. The Court also emphasized that the anxiety and concern that accompany being charged with a crime weigh as heavily on an incarcerated person as on a person who is not. *Id.*

Consequently, for defendants held by another sovereign, the Supreme Court held that the Sixth Amendment obligates the prosecution to make a "diligent, good-faith effort" to obtain a transfer to the charging district, even if the other jurisdiction is unlikely to release custody of the defendant. *Id.* at 383. As the Supreme Court has

noted, "the possibility of a refusal is not the equivalent of asking and receiving a rebuff." *Id.* at 382 (citation omitted).

The government is equally obligated "to seek extradition of an accused incarcerated in a foreign state when a treaty exists under which the accused could be extradited." *United States v. Pomeroy*, 822 F.2d 718, 720 (8th Cir. 1987). As such, "[i]n cases such as this one—where a defendant is located abroad for much of the delay—the hallmark of government diligence is extradition." *United States v. Fernandes*, 618 F. Supp. 2d 62, 69 (D.D.C. 2009); *see also United States v. Heshelman*, 521 F. App'x 501, 507 (6th Cir. 2013) ("The government is obligated to act diligently even when the defendant is located in a foreign country."); *United States v. McConahy*, 505 F.2d 770, 773 (7th Cir. 1974) (noting that "the rule of *Smith v. Hooey*" applies "when the defendant is incarcerated by a foreign government" as much as "the United States or one of its states").

To be sure, "waiting for another sovereign to finish *prosecuting* a codefendant is a valid reason for delay." *United States v. Grimmond*, 137 F.3d 823, 829 (4th Cir. 1998) (emphasis added). In particular, delaying efforts to obtain custody until the other jurisdiction issues its sentence may be warranted to allow the federal government to decide whether obtaining custody of the defendant is worth the candle. *See United States v. Thomas*, 55 F.3d 144, 150 (4th Cir. 1995) (noting that delay was justified "to discover what [the defendant's] state sentence was going to

be" because "the State's punishment [may] satisfy the government's penal concerns without any further prosecution").

But it is not a blank check that absolves the government of its constitutional obligation to seek custody of a person accused of a crime. *Thomas*, 55 F.3d at 150 & n.6 (citing *Smith*, 393 U.S. at 378). As the Tenth Circuit has explained, "awaiting the completion of another sovereign's prosecution may be a plausible reason for delay in some circumstances, but that does not necessarily mean that it is a justifiable excuse in every case." *United States v. Seltzer*, 595 F.3d 1170, 1178 (10th Cir. 2010). On the contrary, it remains "the government's burden to explain why such a wait was necessary in a particular case." *Id.*

Furthermore, contrary to the district court's assertion that *Grimmond* authorizes the government to wait "until [the] defendant *completed his sentence* in Pakistan," J.A. 276 (emphasis added), *Grimmond* says only that delay is warranted to allow another jurisdiction to finish its prosecution, which in this case occurred on June 24, 2010. If the district court were correct that the government can simply wait until a defendant fully serves their sentence in another jurisdiction before making a "diligent, good faith effort" to obtain custody, *Smith v. Hooey* would have come out the other way and affirmed the Texas Supreme Court's holding to that effect. *See Smith*, 393 U.S. at 383.

While the district court claimed that there is no support "in law" for considering a foreign prosecution's legitimacy as part of the *Barker* calculus, J.A. 276, the illegitimacy of Pakistan's prosecution undermines the claim that Pakistan's prosecution provides a "justifiable excuse" for the U.S. delay in seeking Mr. Chaudhry's extradition. *See Seltzer*, 595 F.3d at 1178. Aside from the fact that the Pakistani trial was completed in June 2010, and thus does not justify the U.S. failure to seek extradition for another decade, the well-publicized charges against the five Americans alleging a conspiracy to attack Pakistani military targets were entirely made up. Accordingly, there was no legitimate reason for allowing the foreign prosecution to proceed "without interference by the federal government." *Thomas*, 55 F.3d at 150. That's why the government had no reluctance in its January 15, 2010, Diplomatic Note in requesting that Pakistan "consider suspending or otherwise deferring its criminal proceedings against the defendants and deporting or expelling them as soon as possible to the United States." J.A. 157-158; J.A. 410.

The government's decision to forego any effort to extradite Mr. Chaudhry while he served ten years in Pakistan on fraudulent charges at best constitutes deliberate indifference to the constitutional obligation to engage in diligent, good faith efforts to bring him to trial in the United States. Such delay is precisely what the speedy trial right protects against. *See Barker*, 407 U.S. at 531 n.32 (deliberate delay "should be weighted heavily against the government"). Between 2010 and

2020, the U.S. government acted neither diligently nor in good faith to seek Mr. Chaudhry's return to this country.

> **2.** **The Government's Two Requests in 2010 for Mr. Chaudhry to Be Deported Were Entirely Futile Because He Is a Dual Citizen of the United States and Pakistan.**

According to the district court, the United States "believed [that an] expedited deportation option was available" because "Chaudhry was a United States citizen." J.A. 277. But it was obvious that filing a formal extradition request was the only effective means of obtaining Mr. Chaudhry's return to the United States given his status as a dual citizen. Consequently, the government's 2010 requests that Pakistan deport Mr. Chaudhry were entirely futile.

States cannot, consistent with basic principles of international law, deport their own citizens. *See, e.g.*, Ian Brownlie, *Principles of Public International Law* 387 (6th ed. 2003). Deportation or removal is universally restricted to non-citizens because it is premised on "[t]he power of the government to exclude foreigners from the country …." *See Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893). In other words, because citizens have a right to remain in their own country, states are prohibited from deporting their own citizens. *See Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) ("Jurisdiction in the executive to order deportation exists only if the person arrested is an alien."); *Trop v. Dulles*, 356 U.S. 86, 101-03 (1958) (describing

banishment or expulsion of citizens as "a fate universally decried by civilized people").

Created in the wake of the massive dislocation of population arising from India's partition in 1947, Pakistan's Constitution incorporates this principle as a basic right of its citizens. Constitution of the Islamic Republic of Pakistan, Art. 15 ("Every citizen shall have the right to remain in, and, subject to any reasonable restriction imposed by law in the public interest, enter and move freely throughout Pakistan and to reside and settle in any part thereof.").

Extradition, on the other hand, is predicated on a treaty between states, and applies to both citizens and non-citizens alike. *See, e.g.*, *Charlton v. Kelly*, 229 U.S. 447, 467 (1913) ("there is no principle of international law by which citizens are excepted out of an [extradition] agreement to surrender 'persons'"); *United States v. Knotek*, 925 F.3d 1118, 1125 (9th Cir. 2019) ("extradition treaties apply equally to U.S. citizens and to noncitizens"). When its conditions are satisfied, an extradition treaty imposes an internationally recognized "duty to extradite" upon its signatories. *See Haxhiaj v. Hackman*, 528 F.3d 282, 290 (4th Cir. 2008).[3]

---

[3] The non-availability of deportation or removal for citizens of a foreign country is well-known and obvious to U.S. officials. *See, e.g.*, *United States v. Rodriguez*, 2023 WL 5740493, at *3 (D.D.C. Sept. 6, 2023) (noting that U.S. officials requested removal of non-citizen suspect from Dominican Republic, while acknowledging that "[t]hat procedure was unavailable for [a co-defendant] because he is a citizen of the Dominican Republic" and therefore required the U.S. "to request [his] extradition.").

Because extradition was the only viable mechanism to obtain Mr. Chaudhry's custody from Pakistan, and Pakistan requested that the U.S. file a formal request for extradition, this case is entirely unlike the cases cited by the district court to support its conclusion that the government acted with reasonable diligence: *United States v. Walton*, 814 F.2d 376 (7th Cir. 1987), *United States v. Diacolios*, 837 F.2d 79 (2d Cir. 1988), and *United States v. Valencia-Quintana*, 136 F. App'x 707 (5th Cir. 2005). In *Walton*, unlike this case, Swedish officials told the United States on several occasions that it was not willing to extradite the defendant while he was serving a sentence in Sweden. 814 F.2d at 379. In *Diacolios*, "no right of extradition exist[ed] under the treaty with [the foreign] country to secure his return," and the defendant instead challenged the U.S. government's failure to exercise "diplomatic efforts outside of the extradition treaty[.]" 837 F.2d at 82.

Finally, in *Valencia-Quintana*, the defendant, a Columbian citizen, did not contest the U.S. government's diligence while the defendant was incarcerated in a third country, the Dominican Republic. 136 F. App'x at 709. Dominican authorities promised to give notice prior to releasing the defendant from Dominican custody, and the U.S. inquired about the defendant's status every six to nine months thereafter. *Id.* at 708. Dominican officials, however, "failed to provide the promised notice," *id.* at 710, and it was another two years before the U.S. was able to obtain

custody of the defendant. The two-year delay after Dominican officials failed to abide by their promise was not, the court held, the government's fault. *Id.*

As the government acknowledged in its January 15, 2010, Diplomatic Note, Mr. Chaudhry is a dual citizen of the United States and Pakistan. He therefore was ineligible for deportation from Pakistan. Indeed, Pakistani authorities explicitly told the U.S. government in December 2009 that "the Government of Pakistan (GoP) will want the USG to follow the formal extradition process." J.A. 114.[4] Moreover, on June 22, 2020, the Pakistani Ministry of Foreign Affairs sent the U.S. Embassy a diplomatic note reiterating its request that the U.S. seek extradition for Mr. Chaudhry and Waqar Khan because both defendants hold dual Pakistani-U.S. citizenship. J.A. 87-88.

Despite these clear instructions, the government only formally requested deportation on two occasions in 2010, knowing that Mr. Chaudhry was being held in Pakistan on fraudulent charges. Thereafter, it simply asked when Mr. Chaudhry was going to be released. Consequently, "[t]here was no testimony or documentation before the district court to show any further steps taken to [obtain custody of Mr. Chaudhry] in this [ten]-year period." *United States v. Velazquez*, 749 F.3d 161, 171 (3d Cir. 2014).

---

[4] The district court opinion reworded this exchange in its opinion to say only that "Pakistan *expected* the United States to follow the formal extradition process." J.A. 268 (emphasis added).

In sum, the government "had a constitutionally imposed duty to take affirmative action to secure [Chaudhry's] return for trial. Mere inquiries about release and availability are not compliance with this duty." *Prince v. State of Ala.*, 507 F.2d 693, 705 (5th Cir. 1975). In this case, the government's modest inquiries fall far short of satisfying its constitutional obligation to diligently pursue custody of Mr. Chaudhry from Pakistan.

### 3. Neither Article 4 of the Extradition Treaty Nor a Domestic Pakistani Court Order Excuse the Government's Failure to Pursue Extradition.

In *United States v. Pomeroy*, 822 F.2d 718, 722 (8th Cir. 1987), the Eighth Circuit affirmed the dismissal of an indictment where the government failed to seek to extradite a defendant imprisoned in Canada. Similarly, in *United States v. Heshelman*, 521 F. App'x 501, 508 (6th Cir. 2013), the Sixth Circuit ordered the dismissal of an indictment because the "government did not pursue extradition for almost three years because of the possibility that Switzerland would place conditions on [the defendant's] extradition."

The district court distinguished *Pomeroy* and *Heshelman* on the ground that "in this case [the government] made repeated efforts to locate and extradite defendant[.]" J.A. 278. Furthermore, it determined that seeking Mr. Chaudhry's extradition would have been futile because of a provision of the extradition treaty

that authorized Pakistan to defer extradition. Neither of these rationales supports finding that this factor weighs in favor of the government.

As an initial matter, the district court was wrong that the United States "made repeated efforts to locate and extradite" Mr. Chaudhry. J.A. 278; J.A. 279 n.9. Mr. Chaudhry's location in Pakistani custody was not in question, and the U.S. made only two futile requests for deportation in 2010. As the government conceded below, in 2010 the U.S. requested deportation, not extradition. J.A. 88. Such efforts were no more diligent than in *Heshelman*, in which the government sought Swiss assistance in locating the defendant, and submitted a legal request to the Swiss government as to whether it would extradite the defendant on specific pending charges. *Heshelman*, 521 F. App'x at 503.

While the government in *Pomeroy* explicitly declined to seek extradition while the defendant faced a trial and then a retrial in Canada, the delay between the defendant's Canadian conviction and deportation to the United States was only five months. *Pomeroy*, 822 F.2d at 719-20 (noting that defendant pleaded guilty in Canada and was sentenced to 12 months and 1 day on June 11, 1985, and was deported to Montana on October 31, 1985). Nonetheless, the government's utter failure to seek extradition over a far shorter period of time than in this case resulted in the dismissal of the indictment.

In this case, the provision of the extradition treaty authorizing signatories to defer extradition applies to the surrender of the person, not extradition proceedings themselves. Specifically, Article 4 of the Extradition Treaty contains a standard provision authorizing a signatory to defer extradition for a person serving a criminal sentence:

> If the person claimed should be under examination or under punishment in the territories of the High Contracting Party applied to for any other crime or offence, his extradition shall be deferred until the conclusion of the trial and the full execution of any punishment awarded to him.

J.A. 174 (Article 4, Extradition Treaty between the United States and the United Kingdom, U.S.-U.K., Dec. 22, 1931, 47 Stat. 2212). This provision authorizes the deferral of the person's extradition, not the extradition proceedings. Nothing prevented the U.S. government from pursuing an extradition that, had Pakistan invoked Article 4, would have been deferred until 2020 when Mr. Chaudhry completed his sentence.

More importantly, a signatory is not required to invoke this provision, so extradition proceedings are not futile simply because a person is serving a foreign sentence. Indeed, the United States has declined to invoke its authority under an identical provision in the treaty between the U.S. and South Africa. *See Beukes v. Pizzi*, 888 F. Supp. 465, 469 (E.D.N.Y. 1995). Although the extradition treaty provided that "extradition shall be deferred until … the full execution of any punishment awarded to him," and the person "had not yet served the entire sentence

imposed for the crimes he committed in the United States," it was solely the prerogative of the United States "to invoke [the extradition treaty] provisions to block an extradition." *Id.* In that case, it did not.

Article 4 thus merely reflects a signatory's discretion to defer extradition once a person has been found to be extraditable. *See Sindona v. Grant*, 619 F.2d 167, 176 (2d Cir. 1980) (noting executive branch's discretion to defer extradition); *Hoxha v. Levi*, 465 F.3d 554, 564-65 (3d Cir. 2006) (observing that Secretary of State enjoys broad discretion "[o]nce an individual is certified by a court as extraditable"). But a treaty signatory is not *required* to invoke this provision. *See* I.M. Bassiouni, II *International Extradition*, ch. IX at 601–602 (2d ed. 1987) (noting discretion of executive branch in determining conditions of surrendering a person found extraditable).

Pakistan, like the United States in *Beukes v. Pizzi*, could have declined to invoke Article 4 had the U.S. sought Mr. Chaudhry's extradition. *See Pomeroy*, 822 F.2d at 721 n.7 (construing similar provision of U.S.-Canadian extradition treaty and concluding that because "it was always within the Canadian officials' discretion to grant a request for Pomeroy's extradition, despite the fact that he was being held on a Canadian charge[,]" an extradition "request would not necessarily have been inefficacious.").

In other words, "[a]lthough under Article [4] of the treaty, [Pakistani] officials admittedly had the discretion to deny [Mr. Chaudhry's] surrender, there is nothing in the record to indicate they would have done so had a proper request been made by the Government." *Pomeroy*, 822 F.2d at 721-22. The mere fact that officials in a foreign country have the discretion to deny the request for extradition does not mean that a request is necessarily futile. *Id.*; *see also Smith v. Hooey*, 393 U.S. 374, 382 (1969). Indeed, in December 2009, Pakistan explicitly asked the U.S. to formally request Mr. Chaudhry's extradition.

The government also claimed below that the successful extradition of defendants from Pakistan are exceedingly rare. But Mr. Chaudhry provides an example of a successful extradition, and the fact that extradition requests often go unanswered has not prevented the government from diligently requesting extradition in other cases. Yet in this case, the government waited more than a decade to formally request extradition following the filing of the complaint that triggered Mr. Chaudhry's Sixth Amendment right to speedy trial. The U.S. government's failure to do so for over ten years reflects, at minimum, an unacceptable lack of diligence in prosecuting the charges.

The district court also pointed to a local Pakistani court order and the absence of a prisoner transfer treaty as reasons that a request for extradition would have been futile. J.A. 277-78. But the government's two 2010 requests for deportation faced

these same obstacles, and yet the government did not seem to think that requesting deportation was futile. Indeed, the local court order barring transfer remained in effect when the government filed its formal request for extradition in 2020, and the order did not prevent Mr. Chaudhry's ultimate extradition from Pakistan. *See* J.A. 156-157. Given that Pakistan has an internationally recognized "duty to extradite" individuals found extraditable pursuant to a valid extradition treaty, *Haxhiaj v. Hackman*, 528 F.3d 282, 290 (4th Cir. 2008), the government's post-hoc explanation for its lack of diligence in seeking extradition should be rejected.

In sum, the government's two futile requests that Mr. Chaudhry be deported do not excuse the government's failure to pursue the proper legal channel that was available from the start. *See Smith*, 393 U.S. at 383 (holding that prosecution has a constitutional duty to make a diligent, good-faith effort to bring defendant to trial despite his imprisonment in another jurisdiction); *United States v. Battis*, 589 F.3d 673, 680 (3d Cir. 2009) ("The Government cannot indict a defendant and then delay a case indefinitely, without any notice to a federal judge, merely because it is aware of a state proceeding involving the same defendant."). As such, this factor unequivocally weighs in favor of finding a violation of the Sixth Amendment right to a speedy trial.

**C. Mr. Chaudhry's Failure to Assert His Speedy Trial Rights While Incarcerated in Pakistan Cannot Be Held Against Him Given His Lack of Knowledge of the U.S. Charges.**

The third *Barker* factor examines whether and when a defendant asserted his speedy trial right. *Barker*, 407 U.S. at 531-32. While failure to assert the right, or "even the explicit waiver of that right, is not dispositive of a Sixth Amendment speedy-trial claim," *United States v. Thomas*, 55 F.3d 144, 150 (4th Cir. 1995), it is one factor to consider in the overall balance. *Barker*, 407 U.S. at 528.

As an initial matter, the critical period of post-accusation delay is the decade before 2020, during which Mr. Chaudhry was imprisoned in Pakistan. During that time, Mr. Chaudhry had no knowledge of the pending U.S. charges. J.A. 197 (2018 consular note reflecting that Mr. Chaudhry asked whether charges were pending in the United States). Mr. Chaudhry cannot be faulted for failing to call for a speedy trial on charges that he did not know existed. *Doggett*, 505 U.S. at 653-54 (noting that defendant's failure to assert speedy trial rights could not be held against him when he was unaware of indictment).

Moreover, once Mr. Chaudhry appeared before the district court, he promptly asserted his Sixth Amendment right to a speedy trial and filed a motion to dismiss on January 11, 2024, within 30 days of his December 12, 2023, arraignment date. J.A. 18-19 (docket entries 163, 165). The prompt filing of the motion to dismiss on speedy trial grounds weighs in a defendant's favor for purposes of the third *Barker*

factor. *See, e.g.*, *United States v. Garcia*, 59 F.4th 1059, 1068 (10th Cir. 2023) (noting that defendant's motion to dismiss filed less than two months after her initial appearance weighed in favor of finding that defendant actively asserted speedy trial right).[5]

Mr. Chaudhry's initial opposition to extradition from Pakistan and his agreement to extend the Speedy Trial Act trial deadline at his arraignment do not alter this calculus. Again, it is "not the defendant's responsibility to assure that cases are brought to trial in a timely manner"; rather, "it is the prosecution's burden (and ultimately the court's)[.]" *United States v. Seltzer*, 595 F.3d 1170, 1175-76 (10th Cir. 2010). And just as it would be "intolerable that one constitutional right should have to be surrendered in order to assert another," *Simmons v. United States*, 390 U.S. 377, 394 (1968), assertion of a defendant's rights under an extradition treaty should not be counted against her rights to assert protections under the Sixth Amendment.

In this case, moreover, Mr. Chaudhry has not challenged the government's diligence after it sought to extradite him from Pakistan, so the period of delay

---

[5] This case is entirely unlike *United States v. Lozano*, 962 F.3d 773, 781 (4th Cir. 2020), cited by the district court, J.A. 281, in which the defendant failed to raise a Sixth Amendment claim *at any time* before the district court. Indeed, *Lozano's* holding, before it addressed the merits of the Sixth Amendment claim in dicta, was that the defendant waived his speedy trial claim by failing to raise it before he pleaded guilty. *Id.* at 778. Nor is this case like *United States v. Thomas*, 55 F.3d 144, 147 (4th Cir. 1995), also cited by the district court, in which the defendant, advised of pending federal charges while in state custody, "stated that he did not wish to have a speedy trial."

subsequent to the filing of the extradition request is irrelevant. In other words, Mr. Chaudhry's speedy trial claim does not turn on any period of delay of which he could be identified as the author.

On the contrary, Mr. Chaudhry's Sixth Amendment claim turns on whether the government acted with requisite diligence during the decade he was in Pakistani custody, when his failure to assert his Sixth Amendment rights cannot be held against him. The government cannot obviate its violation of the Sixth Amendment right to a speedy trial by exercising diligence for three years after ten years of indolence. *United States v. Velazquez*, 749 F.3d 161, 167 (3d Cir. 2014) (holding that even though government "revived their efforts after the five-year lull" to obtain defendant's custody, those efforts were insufficient to overcome Sixth Amendment violation); J.A. 209 (defense pointing out that "it's not as if the government gets to satisfy the speedy trial constitutional requirement by suddenly, ten years later, acting with reasonable diligence").

As for Mr. Chaudhry's consent to a single 11-week extension of the Speedy Trial Act trial deadline, the case had already been certified as complex, so Mr. Chaudhry's agreement was not required to set the trial outside of the Speedy Trial Act's presumptive deadline. J.A. 63. The Speedy Trial Act, moreover, is completely distinct from Mr. Chaudhry's Sixth Amendment right to a speedy trial. Waiver, violation or compliance as to one says little about a waiver, violation, or compliance

as to the other. *See United States v. Gomez*, 67 F.3d 1515, 1523 n.10 (10th Cir. 1995) ("analysis of a Speedy Trial Act claim is separate from analysis of a Sixth Amendment violation"); *United States v. White*, 443 F.3d 582, 588 (7th Cir. 2006) (statutory and constitutional speedy trial rights are "related but distinct, so that a violation of one may be found without a violation of the other").

In sum, Mr. Chaudhry's initial opposition to extradition and agreement to a brief extension of the Speedy Trial Act deadline do not undermine the fundamental violation that had already occurred through the government's decade-long delay in seeking his extradition from Pakistan, during which time Mr. Chaudhry did not know about the pending charges in the United States. Moreover, Mr. Chaudhry promptly asserted his Sixth Amendment rights within one month of his arraignment in federal court. This factor thus weighs in favor of finding a Sixth Amendment speedy trial violation.

### D. The Extraordinary Length of Delay Establishes Presumptive Prejudice, and Mr. Chaudhry Suffered Actual Prejudice.

The final *Barker* factor considers prejudice to the defendant in light of the interests animating the Sixth Amendment right to a speedy trial: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. Importantly, "affirmative proof of particularized prejudice is not essential to every speedy trial claim." *Doggett*, 505 U.S. at 655. As the Supreme

Court has recognized, "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." *Id.* at 655-56.

In particular, "[w]hen the Government's negligence [] causes delay [ten] times as long as that generally sufficient to trigger judicial review, the "presumption of prejudice" shifts the burden to the government to "persuasively rebut[]" the presumption by "affirmatively prov[ing] that the delay left [the defendant's] ability to defend himself unimpaired." *Doggett*, 505 U.S. at 658 & n.4; *accord Prince v. State of Ala.*, 507 F.2d 693, 707 (5th Cir. 1975) ("[W]here the defendant has established a prima facie case of denial of the speedy trial right, the burden is upon the State to show that the defendant has not been prejudiced by the delay."). The government cannot overcome the strong presumption of prejudice arising from its decade-long delay in seeking Mr. Chaudhry's extradition from Pakistan.

Specifically, the passage of more than a decade presumptively compromised Mr. Chaudhry's ability to defend against charges involving events from 2009. The delay here was ten times longer than the threshold needed to trigger judicial review, and the government has offered no persuasive justification for its failure to employ the only mechanism by which it could obtain his custody from Pakistan.

While Mr. Chaudhry eventually pleaded guilty to violating U.S. law, his admissions of criminal liability cannot be considered in the context of the Court's

consideration of prejudice arising from post-accusation delay. *See Doggett*, 505 U.S. at 658 n.3. Mr. Chaudhry "did not sign a guilty plea simpliciter, but a conditional guilty plea under Federal Rule of Evidence 11(a)(2) …. One cannot reasonably construe this agreement to bar [Mr. Chaudhry] from pursuing as effective an appeal as he could have raised had he not pleaded guilty." *Id.*

Beyond presumptive prejudice, Mr. Chaudhry also suffered actual prejudice. First, the government's refusal to seek Mr. Chaudhry's extradition eliminated the possibility that he could have potentially served concurrent sentences. *See Smith v. Hooey*, 393 U.S. 374, 378 (1969) (recognizing possible concurrent sentences as legitimate concern protected by speedy trial right); *United States v. Grimmond*, 137 F.3d 823, 830 n.10 (4th Cir. 1998) (noting that post-accusation delay may prejudice defendant by making him "ineligible for a concurrent or partially concurrent sentence"); *Prince*, 507 F.2d at 707 (same).

Second, and relatedly, the U.S. government's failure to seek extradition ensured that "the conditions under which [Mr. Chaudhry] [] serve[d] his sentence [were] greatly worsened," *Smith*, 393 U.S. at 378, such that he endured conditions of confinement in Pakistan that effectively amounted to torture for a crime— conspiring to conduct terrorist attacks on Pakistani targets—that he did not commit. Accordingly, because the United States never sought Mr. Chaudhry's extradition while he was incarcerated under inhumane conditions in Pakistan, the possibility of

serving at least a portion of that sentence under less draconian conditions "was forever foreclosed." *Prince*, 507 F.2d at 707.

Finally, the delay between charge and trial necessarily undermined the possibility of mounting a defense to the U.S. charges. Indeed, the ten-year delay resulted in the severe mental breakdown of one of Mr. Chaudhry's co-defendants, Mr. Yemer, who was unable to serve as a potential witness upon his return to the United States.

Under these circumstances, the government cannot satisfy its burden to "affirmatively prove that the delay left [Mr. Chaudhry's] ability to defend himself unimpaired." *Doggett*, 505 U.S. at 658 n.4. Dismissal is therefore the only available sanction, and it is required to vindicate Mr. Chaudhry's constitutional right to a speedy trial.

## <u>CONCLUSION</u>

For these reasons, this Court should reverse the district court's denial of Mr. Chaudhry's motion to dismiss and vacate his conviction.

Respectfully submitted,

s/   Geremy C. Kamens
_____
Geremy C. Kamens
Federal Public Defender for the
  Eastern District of Virginia
Counsel for Appellant
1650 King Street, Suite 500
Alexandria, VA 22314
(703) 600-0800
Geremy_Kamens@fd.org

Dated December 4, 2024

## REQUEST FOR ORAL ARGUMENT

Counsel for appellant asserts that the issues raised in this brief may be more fully developed through oral argument.

## **CERTIFICATE OF COMPLIANCE**

1.      This brief has been prepared using Microsoft Word for Office 365 software, Times New Roman font, 14-point proportional type size.

2.      Excluding the table of contents, table of authorities, signature block, statement with respect to oral argument, and this certificate of compliance, this brief contains no more than 13,000 words, specifically 9,201 words.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions. If the Court so requests, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

<table>
<tr><td>     December 4, 2024     </td><td>    s/   Geremy C. Kamens    </td></tr>
<tr><td align="center">Date</td><td>Geremy C. Kamens<br>Federal Public Defender</td></tr>
</table>