## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH COURT

————————————

## UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,

v.

## UMAR FAROOQ CHAUDHRY,
*Defendant/Appellant.*

————————————

**On Appeal From the United States District Court
for the Eastern District of Virginia
Alexandria Division (The Hon. Leonie M. Brinkema)**

————————————

## JOINT APPENDIX

## VOLUME II of III (pages 179–322)

————————————

**JESSICA D. ABER**
**United States Attorney**

**Joseph Attias**
**Assistant United States Attorney**
**Counsel for Appellee**
**2100 Jamieson Avenue**
**Alexandria, VA 22314**
**(703) 299-3700**

**GEREMY C. KAMENS**
**Federal Public Defender**

**Geremy C. Kamens**
**Federal Public Defender**
**Counsel for Appellant**
**1650 King Street, Suite 500**
**Alexandria, VA 22314**
**(703) 600-0800**



This page intentionally left blank for double-sided pagination and printing

# TABLE OF CONTENTS

VOLUME I (pages 1–178)

District Court Docket Sheet (as of Dec. 2, 2024) ........................................................ 1

Criminal Complaint (Dec. 23, 2009, Doc. 1) .............................................................. 23

Government's Motion for Limited Unsealing Order (Dec. 24, 2009, Doc. 6) ........ 24

Government's Motion for Limited Unsealing Order (Dec. 31, 2009, Doc. 8) ........ 26

Indictment (Nov. 16, 2017, Doc. 10) .......................................................................... 28

Government's Motion to Certify Case as Complex Under the Speedy Trial
   Act (Sept. 12, 2022, Doc. 69) ............................................................................... 34

Order (certifying case as complex) (Sept. 13, 2022, Doc. 73) ................................ 38

Government's Second Motion to Certify Case as Complex Under the Speedy
   Trial Act (Jan. 25, 2023, Doc. 100) ..................................................................... 40

Order (certifying case as complex) (Jan. 26, 2023, Doc. 101) ................................ 44

Government's Memorandum Memorializing Sentencing Recommendation
   [as to co-defendants Minni and Zamzam] (Apr. 21, 2023, Doc. 114) .............. 46

Transcript, Arraignment (Dec. 12, 2023, Doc. 205) ................................................ 61

Defendant's Motion to Dismiss Indictment for Violating the Right to a Speedy
   Trial and Rule 48 (Jan. 11, 2024, Doc. 165) ....................................................... 68

Government's Opposition to Defendant's Motion to Dismiss Indictment on
   Speedy Trial Grounds (Feb. 12, 2024, Doc. 168) ............................................... 80

   Attachment 1 (summary of Dec. 15, 2009, meeting between Assistant
   Legal Attaché and Pakistani Director General of National Crisis
   Management Center, Ministry of Interior) ...................................................... 112

   Attachment 2 (correspondence from Legal Attaché to Pakistani Secretary
   of Ministry of Interior re. transfer of custody of five Americans in
   Sargodha, dated Dec. 24, 2009) ...................................................................... 118

i

Attachment 3 (five Interpol Red Notice applications)......................................122

Attachment 4 (declaration of Jeffrey M. Olsen)..............................................150

Attachment 5 (letter from Legal Attaché to Pakistani Secretary of Ministry of Interior re. coordination of disposition of five Americans in Sargodha, dated June 23, 2010) ........................................................................................164

Attachment 6 (memorandum from Legal Attaché to Pakistani Director General of Federal Investigation Agency re. request for meeting to discuss development of a mutual legal assistance treaty, dated Mar. 4, 2013)............168

Attachment 7 (extradition treaty between United Kingdom and United States, signed Dec. 22, 1931, and entered into force June 24, 1935)...............171

Attachment 8 (duplicate of attachment 5) ................................................. omitted

## VOLUME II (pages 179–322)

Defendant's Reply in Support of Motion to Dismiss Indictment for Violating the Sixth Amendment Right to a Speedy Trial and Rule 48(b) (Feb. 22, 2024, Doc. 172).................................................................................................179

Defendant's Supplement to Motion to Dismiss Indictment (Mar. 27, 2024, Doc. 174)................................................................................................190

Exhibit 1 (*United States v. Palos*)..................................................................192

Exhibit 2 (consular visit notes) ......................................................................197

Transcript, Hearing on Motion to Dismiss Indictment (Apr. 4, 2024, Doc. 178) ........................................................................................................................198

Argument by defense ......................................................................................199

Argument by government ...............................................................................201

Rebuttal by defense........................................................................................207

Court's ruling.................................................................................................211

Defense Hearing Exhibit 1 (Apr. 4, 2024, Doc. 176-1) (excerpt from summary of Dec. 15, 2009, meeting between Assistant Legal Attaché and Pakistani Director General of National Crisis Management Center, Ministry of Interior) ...................................................................................................217

Order (denying motion to dismiss indictment) (Apr. 9, 2024, Doc. 177) ............218

Transcript, Plea Hearing (May 2, 2024, Doc. 201) ...............................................219

Plea Agreement (May 2, 2024, Doc. 180) .............................................................246

Statement of Facts (May 2, 2024, Doc. 181).........................................................254

Opinion (denying motion to dismiss indictment) (June 5, 2024, Doc. 182) .........266

Defendant's Position on Sentencing (Aug. 7, 2024, Doc. 188)............................283

Exhibit 1 (declaration of Khalid Farooq Chaudhry).........................................293

Transcript, Sentencing Hearing (Aug. 14, 2024, Doc. 202)................................296

Judgment in a Criminal Case (Aug. 14, 2024, Doc. 193)....................................315

Notice of Appeal (Aug. 28, 2024, Doc. 195).........................................................321

VOLUME III (pages 323–end) – SEALED

Exhibit 1 to Co-Defendant Aman Yemer's Motion for Emergency Relief and for a Hearing (Aug. 4, 2020, Doc. 29-1) (judgment, District and Sessions Judge of the Anti-Terrorism Court, Sargodha, Pakistan, dated June 24, 2010) ....................................................................................................................323

Government's Supplemental Response to Defendant Yemer's Motion for Emergency Relief (Aug. 26, 2020, Doc. 38) ....................................................391

Diplomatic Note from U.S. Embassy to Pakistani Ministry of Foreign Affairs, dated Jan. 8, 2010 .............................................................................................405

Diplomatic Note from U.S. Embassy to Pakistani Ministry of Foreign Affairs, dated Jan. 15, 2010 ...........................................................................................408

This page intentionally left blank for double-sided pagination and printing

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:17cr270(LMB) |
| | ) | |
| UMAR FAROOQ CHAUDHRY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS INDICTMENT FOR VIOLATING THE SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL AND RULE 48(b)

The government argues that its failure to seek Mr. Chaudhry's extradition for over a decade after filing formal charges did not violate his Sixth Amendment right to a speedy trial because: (1) waiting until after Mr. Chaudhry completed his sentence constitutes a valid reason for delay; (2) seeking extradition would have been futile, and the government exercised reasonable diligence through less formal requests for Mr. Chaudhry's return; (3) Mr. Chaudhry failed to assert his Sixth Amendment speedy trial right in a timely manner; and (4) no prejudice exists from the government's delay in seeking extradition. The government is wrong, and the Court should dismiss the indictment.

## I.    The Sixth Amendment Right to Speedy Trial Was Triggered by the Filing of Federal Charges in December 2009

Mr. Chaudhry's Sixth Amendment right to a speedy trial was triggered by the filing of federal charges against him in December 2009. *See United States v. Woolfolk*, 399 F.3d 590, 597-98 (4th Cir. 2005); *United States v. Thomas*, 55 F.3d 144, 149 (4th Cir. 1995); *accord United States v. Burgess*, 684 F.3d 445, 452 (4th Cir. 2012) (citing

*Woolfolk* and noting that federal detainer, arrest warrant, complaint, or indictment triggers Sixth Amendment speedy trial right); *United States v. Sherman*, 2022 WL 2124496, at *4 (E.D. Va. June 13, 2022) (Young, J.) (filing of federal detainer triggered Sixth Amendment speedy trial right). In other words, the federal complaint and red notice constituted an "official accusation" for purposes of Sixth Amendment protections. *United States v. MacDonald*, 456 U.S. 1, 6 (1982). The government disagrees that *Woolfolk* and *Thomas* were correctly decided, Gov't Resp. at 12 n.7, but both decisions reflect settled law in this Circuit. As such, the Court must measure Mr. Chaudhry's Sixth Amendment claim beginning in December 2009.

The government also wrongly claims that Rule 48(b) does not apply prior to formal arrest. Gov't Resp. at 30 n.9 (citing *United States v. Ball*, 18 F.4th 445, 453 (4th Cir. 2021)). Earlier Fourth Circuit precedent makes clear that Rule 48(b) "provides for enforcement of the Sixth Amendment," and is "broader in compass" than the Sixth Amendment, not narrower. *United States v. Goodson*, 204 F.3d 508, 513 (4th Cir. 2000); *accord Pollard v. United States*, 352 U.S. 354, 361 n.7 (1957) (Rule 48(b) is designed to enforce the Sixth Amendment right to a speedy trial); *United States v. Ward*, 211 F.3d 356, 361–62 (7th Cir. 2000) ("Although Rule 48(b) is not limited by the Sixth Amendment right to a speedy trial, it is driven by the same general considerations."); *Mathies v. United States*, 374 F.2d 312, 314-15 (D.C. Cir. 1967) ("Rule 48(b) obviously does not grant the Appellant less rights than the Sixth Amendment."). The rule itself does not contain language that limits its scope to delays following arrest, so no textual limitation prevents the Court's inherent authority from

**J.A. 180**

extending to official federal accusations other than an arrest, just as the Sixth Amendment speedy trial right extends to other types of official accusations.

To be sure, quoting dicta from *United States v. Marion*, 404 U.S. 307, 319 (1971), the Fourth Circuit stated in *Ball* that Rule 48(a) applies to "post-arrest situations." 18 F. 4th 445, 450 (4th Cir. 2021). But like *Marion*, *Ball* involved a claim of pre-accusation delay, in which the defendant claimed that the government should not have waited to file formal criminal charges until several years after the defendant engaged in the charged conduct. Claims of pre-accusation delay are not encompassed by either the Sixth Amendment speedy trial right or Rule 48. Unlike *Ball* and *Marion*, this case involves a *post-accusation delay* of over a decade, a circumstance that implicates both the Sixth Amendment and Rule 48(a).

## II. The Government's Delay in Seeking Extradition Was Not Actually Motivated by the Government's Desire to Wait Until Pakistan Completed its Prosecution.

Citing *United States v. Grimmond*, 137 F.3d 823 (4th Cir. 1998), the government claims that waiting for Pakistan to complete its prosecution of Mr. Chaudhry constitutes a valid justification for the lengthy decade-long delay in seeking extradition. In this case, however, the Pakistani charges were fraudulent, and the U.S. government expressed its lack of concern for whether Pakistan completed its criminal prosecution. Accordingly, the delay in this case is not due to the U.S. government's considered judgment to await the conclusion of the Pakistani criminal proceedings.

In appropriate cases, "waiting for another sovereign to finish prosecuting a codefendant is a valid reason for delay." *Grimmond*, 137 F.3d at 829. But this rationale presumes that charges brought by the foreign sovereign are legitimate, and that delaying federal efforts to obtain custody of the defendant are designed to promote the interest in allowing the foreign prosecution to proceed "without interference by the federal government." *United States v. Thomas*, 55 F.3d 144, 150 (4th Cir. 1995).

In this case, however, the U.S. government's informal communications with Pakistan expressed no considered judgment to allow the Pakistani proceedings to run their course. In fact, its January 15, 2010, Diplomatic Note requested that Pakistan "consider suspending or otherwise deferring its criminal proceedings against the defendants and deporting or expelling them as soon as possible to the United States." Gov't Resp. Ex. 4 ¶ 25. In other words, the government did not make a considered judgment to avoid interfering in Pakistan's criminal legal process before seeking Mr. Chaudhry's return.

Mr. Chaudhry's criminal charges in Pakistan, in fact, rest on the entirely false claim that he and his co-defendants conspired to engage in terrorist attacks at a Pakistani nuclear power plant and Pakistani air force bases. Def. Yemer's Mot. Emergency Relief (ECF 29) Attachment 1 (Pakistani judgment of conviction from court in Sargodha, Pakistan) at 45, 57; *see also* Gov't Resp. at 6. Knowing that these baseless charges and convictions were based on false evidence, the U.S. government cannot claim that its delay in seeking extradition was due to a reasoned decision to

4

**J.A. 182**

allow Pakistan to prosecute Mr. Chaudhry without interference from the United States.

### III. Seeking Mr. Chaudhry's Extradition From Pakistan Was Not Futile.

Having successfully extradited Mr. Chaudhry from Pakistan, the government is in the awkward position of arguing that seeking Mr. Chaudhry's extradition sooner would have been futile. It claims futility based upon a local court order barring transfer to a foreign country, Article 4 of the extradition treaty, and that obtaining extradition from Pakistan has typically been difficult. None of these rationales support the government's arguments.

The government is obligated "to seek extradition of an accused incarcerated in a foreign state when a treaty exists under which the accused could be extradited." *United States v. Pomeroy*, 822 F.2d 718, 720 (8th Cir. 1987); *see also United States v. Heshelman*, 521 F. App'x 501, 507 (6th Cir. 2013) ("The government is obligated to act diligently even when the defendant is located in a foreign country."). Moreover, the mere fact that officials in a foreign country have the discretion to deny the request for extradition does not mean that a request is necessarily futile. *Pomeroy*, 822 F.2d at 7121-22; *accord Smith v. Hooey*, 393 U.S. 374, 382 (1969) ("The possibility of a refusal is not the equivalent of asking and receiving a rebuff.").

In this case, the fact that a local court issued a ruling barring transfer was not an insurmountable barrier to extradition. As a U.S. government official recognized, "if the [Government of Pakistan] wanted to deport the five, a provincial High Court ruling would not stand in the way." Bates No. FBI – 53173.

5

**J.A. 183**

The government also wrongly claims that because of Article 4 of the Extradition Treaty, "the United States was obliged to wait until the defendants had completed the Pakistani prison sentences they were given." Gov't Resp. Ex 4 Olson Decl. ¶ 30. Article 4 of the Treaty provides:

> If the person claimed should be under examination or under punishment in the territories of the High Contracting Party applied to for any other crime or offence, his extradition shall be deferred until the conclusion of the trial and the full execution of any punishment awarded to him.

Gov't Ex. 7, Article 4, Extradition Treaty between the United States and the United Kingdom, U.S.-U.K., Dec. 22, 1931, 47 Stat. 2212. Pursuant to this standard provision, a signatory has the authority to defer extradition "until the conclusion of the trial and the full execution of any punishment."

But a treaty signatory is not obligated to invoke this provision. *See Beukes v. Pizzi*, 888 F. Supp. 465, 469 (E.D.N.Y. 1995) (noting that United States declined to invoke identical provision in extradition treaty). Pakistan could have declined to invoke it. Moreover, such discretion could only be exercised "after a person has been certified as extraditable under the governing treaty." *Hoxha v. Levi*, 465 F.3d 554, 564–65 (3d Cir. 2006). In other words, this provision was not operative until after the government had completed the extradition process. And finally, the provision authorizes the deferral of the person's extradition itself, not the extradition proceedings. Nothing prevented the U.S. government from pursuing an extradition that, had Pakistan invoked Article 4, would have been deferred until 2020 when Mr. Chaudhry completed his sentence.

6

**J.A. 184**

"Although under Article [4] of the treaty, [Pakistani] officials admittedly had the discretion to deny [Mr. Chaudhry's] surrender, there is nothing in the record to indicate they would have done so had a proper request been made by the Government." *Pomeroy*, 822 F.2d at 721–22. Indeed, the government concedes that Pakistani government officials in 2009 requested that the U.S. follow the "formal extradition process." Gov't Resp. at 3. Similarly, the government notes that Pakistan refused to simply deport Mr. Chaudhry because he "held dual Pakistani-U.S. citizenship," and Pakistan therefore demanded extradition documents. *Id.* at 9.

Although the government claims that the successful extradition of defendants from Pakistan are exceedingly rare, Mr. Chaudhry provides an example of a successful extradition. Indeed, seeking extradition was the *only* effective means of obtaining his return to the United States given his status as a dual national, and it was the government's informal requests for deportation that were entirely futile. *See United States v. McConahy*, 505 F.2d 770, 773-74 (7th Cir. 1974) (ordering dismissal of indictment because government failed to seek extradition while defendant served sentence in England); *United States v. Fernandes*, 618 F. Supp. 2d 62, 69 (D.D.C. 2009) ("In cases such as this one—where a defendant is located abroad for much of the delay—the hallmark of government diligence is extradition."). Yet the government waited more than a decade to formally request extradition following the filing of the complaint triggering the Sixth Amendment right to speedy trial.

7

**J.A. 185**

### IV.   Mr. Chaudhry Made a Timely Invocation of His Sixth Amendment Right to a Speedy Trial.

The government claims that because Mr. Chaudhry "never demanded a speedy trial while incarcerated in Pakistan," or thereafter until filing a motion to dismiss in this Court, his prior failure to assert his constitutional right to a speedy trial weighs against his constitutional claim. Specifically, the government states that Mr. Chaudhry's "years-long failure" to request a speedy trial "calls into question the defendant's theory that the government was obligated to diligently pursue him in a foreign jurisdiction while he was incarcerated." This argument is meritless.

The government presents no evidence that Mr. Chaudhry even knew about the pending charges in the United States until he was released from Pakistani custody in 2020. *See* Gov't Resp. at 24. In fact, the case was sealed for over a decade after filing the complaint. *See* August 4, 2020 Order to Unseal Case, ECF 30. Under such circumstances, Mr. Chaudhry was under no position during his decade of incarceration in Pakistan to demand a speedy trial on U.S. charges he knew nothing about. *Doggett v. United States*, 505 U.S. 647, 654 (1992) (because defendant did not know of charges, he cannot "be taxed for invoking his speedy trial right only after his arrest").

The government also wrongly claims that by waiving a claim under the Speedy Trial Act and agreeing to a trial date outside of the Speedy Trial Act's 70 day period at the arraignment, Mr. Chaudhry also somehow forfeited his constitutional right to challenge the government's failure to seek his custody with reasonable diligence over the prior decade. Gov't Resp. at 25. That argument is specious. "A criminal

8

**J.A. 186**

defendant's right under the Act is separate and distinct from his Sixth Amendment right to a speedy trial." *United States v. Thomas*, 305 F. App'x 960, 963 (4th Cir. 2009). Indeed, the Speedy Trial Act is designed to establish "an orderly and expeditious procedure for federal criminal prosecutions" by establishing "mechanical time limits" for procedural steps in the case, while the Sixth Amendment provides an independent constitutional protection against prejudicial delays between an official accusation and trial. *Woolfolk*, 399 F.3d at 594, 597. In short, a single relatively brief waiver of one "mechanical time limit," continuing the trial date for a few weeks, has no bearing on ability to assert a violation of the constitutional right to a speedy trial based upon the government's failure for over a decade to request Mr. Chaudhry's extradition from Pakistan.

## V.   Mr. Chaudhry Has Established Prejudice from the Government's Violation of His Sixth Amendment Right to a Speedy Trial.

The government argues that Mr. Chaudhry's claims of prejudice are too speculative. Gov't Rep. at 31. But it is well established that "consideration of prejudice is not limited to the specifically demonstrable." *Doggett*, 505 U.S. at 655. As the Supreme Court explained, "affirmative proof of particularized prejudice is not essential to every speedy trial claim," particularly given that "time's erosion of exculpatory testimony and testimony 'can rarely be shown.'" *Id.*

In *Doggett*, the defendant was charged with drug trafficking shortly before he went to Colombia. Subsequently, he was arrested in Panama, and "thinking that a formal extradition request would be futile," an assigned DEA officer asked Panama to deport the defendant to the United States. 505 U.S. at 649. Instead, the defendant

was released, went back to Columbia, and then returned to the U.S. a little over two years after the charges were brought. *Id.* DEA officials lost track of the defendant's whereabouts until six years later, when a credit check revealed the defendant's location in the United States, and he was promptly arrested. *Id.* at 650.

The government's "principal contention" in the case was that the defendant failed to show "precisely how he was prejudiced by the delay between his indictment and trial." *Id.* at 654. But the Court held that because "[t]he lag between [the defendant's] indictment and arrest was 8½ years, and he would have faced trial 6 years earlier than he did but for the Government's inexcusable oversights," the defendant was entitled to dismissal of the indictment due to "delay six times as long as that generally sufficient to trigger judicial review" attributable to the government. *Id.* at 657-58.

The delay in this case is longer than the delay in *Doggett*. Moreover, Mr. Chaudhry explicitly pointed to the loss of the potential ability to run any federal sentence concurrently, and the likely inability to obtain testimony from a co-defendant who suffers from a mental illness, as two specific examples of prejudice arising from the delay in this case exceeding a decade between accusation and trial.

The government cannot justify the delay because it made a reasoned decision to await the conclusion of fraudulent Pakistani criminal proceedings, particularly given its diplomatic request that Pakistan forego its criminal prosecution. Furthermore, the government's periodic diplomatic requests for Mr. Chaudhry's deportation had no chance of success given Mr. Chaudhry's status as a dual U.S.-

Pakistani citizen. In this context, the government's intransigence in seeking extradition --- the only means by which Pakistan indicated that it would ever transfer Mr. Chaudhry's custody to the United States – for over a decade cannot support a finding that the government acted with reasonable diligence in this case. Under these circumstances, as in *Doggett*, "the defendant is entitled to relief." 505 U.S. at 658.

Respectfully submitted,

UMAR FAROOQ CHAUDHRY

By: _____/s/_____

Geremy C. Kamens
Federal Public Defender
Virginia Bar No. 41596
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: 703-600-0800
Facsimile: 703-600-0880
Geremy_Kamens@fd.org

11

**J.A. 189**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:17cr270-4(LMB) |
| | ) | |
| UMAR FAROOQ CHAUDHRY, | ) | |
| | ) | |
| Defendant. | ) | |

## SUPPLEMENT TO MOTION TO DISMISS INDICTMENT

Umar Farooq Chauhdry, by counsel, submits this supplementary memorandum to advise the Court of *United States v. Palos*, 2024 WL 1192315 (S.D. Iowa Mar. 20, 2024), in which the court granted the defendant's motion to dismiss on constitutional speedy trial grounds. Exhibit 1 (attached).

The defendant in *Palos* was charged with a federal drug offense in July 2016. Although an arrest warrant was issued in 2016, the defendant was not arrested until a deputy U.S. Marshal searched residential databases in December 2022. As a result, the defendant was arrested on February 13, 2023.

The court found that the six year and six month time period between the federal charge and arrest were presumptively prejudicial, and that the government's failure to seek the defendant's arrest was negligent. Although the court found that the defendant knew he had been charged with a federal offense and that he could not show actual prejudice, *id.* at *4-5, the government failed to rebut the presumption of prejudice arising from its failure to diligently seek the defendant's arrest. *Id.* at *6.

In this case, unlike in *Palos*, Mr. Chaudhry was not aware of the pending charges while he was incarcerated in Pakistan. Indeed, notes from a consular visit dated February 1, 2018, reflect that Mr. Chaudhry asked the consular officer "for any updates on whether there is a pending case in the United States." Exhibit 2 (attached).

Respectfully submitted,

_____/s/_____
Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia
Counsel for Mr. Chaudhry
VA Bar No. 41596
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
Geremy_Kamens@fd.org

Case 1:17-cr-00270-LMB   Document 174-1   Filed 03/27/24   Page 1 of 5 PageID# 1060
United States v. Palos, --- F.Supp.3d ---- (2024)

2024 WL 1192315

2024 WL 1192315
Only the Westlaw citation is currently available.
United States District Court, S.D. Iowa, Central Division.

UNITED STATES of America, Plaintiff,

v.

David Anthony PALOS, Defendant.

No. 4:16-cr-00118-SMR-HCA
|
Signed March 20, 2024

**Attorneys and Law Firms**

Jonathan Louis Holscher, United States Attorney's Office, Des Moines, IA, for Plaintiff.

### ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

STEPHANIE M. ROSE, Chief Judge

**\*1** Before the Court is David Palos's motion to dismiss on constitutional speedy trial grounds. ECF No. 103. After careful consideration, that motion is **GRANTED**.

## I. BACKGROUND

### A. Procedural history

Palos was charged by indictment with conspiracy to distribute and possess with intent to distribute methamphetamine (Count 1) and possession with intent to distribute methamphetamine (Count 3). ECF No. 17 1-2. Palos filed a motion to suppress, ECF No. 87, which was denied after an evidentiary hearing. ECF Nos. 99-100. Palos then filed a motion to dismiss on constitutional speedy trial grounds. ECF No. 103 at 1. The Court held an evidentiary hearing on Palos's motion on March 15, 2024. ECF No. 124.

### B. Relevant facts

A Des Moines police officer stopped a vehicle driven by Palos on July 6, 2016. ECF No. 100 at 1. Palos explained to the officer during the traffic stop that he had flown in from California to post bail for his friend, Vincente Perez. *Id.* at 1-2. Palos was arrested for Failure to Obey a Traffic Control Device and released on bond. *Id.* at 2. Officers responded to a Motel 6 in Des Moines on July 14, 2016, after learning a

guest had left behind a duffel bag of marijuana after checking out. *Id.* The duffel bag also contained methamphetamine and a large amount of cash. *Id.* at 2-3. The hotel manager identified Palos as the guest. ECF No. 100 at 3. The manager called Palos to tell him he left his duffel bag behind. *Id.* Police arrested Palos when he returned to the hotel to retrieve the duffel bag. *Id.*

The parties stipulated at the evidentiary hearing on Palos's motion to dismiss that Palos was charged with possessing the drugs in Polk County state court on July 15, 2016. Palos remained in jail until he posted bond on August 5, 2016. The State filed a motion to dismiss the state charges on August 15, 2016, indicating in its motion that Palos "will be prosecuted by the United States of America." ECF No. 123-1. A Polk County judge granted the State's motion to dismiss the same day. ECF No. 123-2 at 1-2. The Government indicated at the March 15 evidentiary hearing that no detainer was placed on Palos at the Polk County Jail. Why no detainer was placed is unknown.[1]

[1] The Court notes that the Assistant United States Attorney assigned to the Palos case in 2016 is no longer with the office, nor is the DEA agent who spearheaded the investigation.

The Government indicted Palos on July 27, 2016. ECF No. 16. The federal indictment was filed under seal. The parties stipulated that a warrant was issued for Palos's arrest on the federal indictment at the time of indictment.

Luke Peters, a retired Deputy United States Marshal, testified at the evidentiary hearing that he reviewed Palos's file when he was still a Deputy Marshal. According to Peters, in December 2016, the DEA asked the Marshals to locate Palos. One of the Marshals' first steps was to enter the Palos warrant into NCIC—a searchable national database of arrest warrants. For reasons unknown, Palos's warrant was never added to NCIC by DEA. The Government presented no evidence at the March 15 hearing about the delayed entry of the warrant into NCIC nor any evidence about DEA's efforts, if any, to locate Palos before requesting assistance from the Marshals.

**\*2** Peters testified that now-retired Homeland Security Investigations Agent Aaron Simon was assigned to locate Palos in 2016. The Government presented no evidence at the March 15 hearing regarding Simon's efforts to locate Palos and Peters did not know what Simons may have done.

2024 WL 1192315

Peters did not get involved in locating Palos until December of 2022, when he became bored before going on leave for a knee replacement. Peters started going through the "cold case drawer" and pulled a couple files that piqued his interest. One of them was Palos's. Peters ran Palos's name through the LexisNexis database, which contained information from driver's license and vehicle registration, utility information, and telephone information. The LexisNexis database provided Peters with multiple addresses for Palos. Peters sent out a lead to United States Marshals in central California on January 25, 2023. The California Marshals started surveilling several addresses Peters had given them, eventually locating Palos at 442 East Bonnie View Drive in Rialto, California. Records showed Palos had been using that address from November of 2020 to November of 2022. Palos was living there in a trailer. Officers observed Palos and arrested him at the trailer on February 13, 2023.

Palos testified he was living in Downey, California before he was arrested in July of 2016. Palos returned to Downey after posting bond. Palos then moved to 12051 Paramount Boulevard in Downey, where he lived for four years. He moved to the Rialto trailer in late 2020 and has lived there ever since. Between his arrest in July of 2016 and his arrest in February of 2023, he used these addresses on tax forms and at pawn shops. He obtained a ServSafe certification, received unemployment after being laid off during the pandemic, and received food stamps a few years later at these addresses. Palos also maintained a driver's license and vehicle registration using these addresses.

Palos's state attorney did not provide him with a copy of the order dismissing his state case, though Palos vaguely recalled his attorney mentioning the case had been dismissed because Palos was going to be federally prosecuted. Palos was aware there was a federal prosecution. He had at least some contact with Perez, his co-defendant, after his indictment. Palos knew that Perez had gone to prison on the same case in which he had been charged, but Palos had never seen the indictment until it was provided to him upon his arrest in 2023.

## II. DISCUSSION

Palos argues "[t]he seven-year delay between the charges and arrest and trial is constitutionally excessive." ECF No. 103 at 1 (citing U.S. Const. amend. VI). The Sixth Amendment right to a speedy trial "attaches at the time of arrest or indictment, whichever comes first, and continues until the trial commences." *United States v. Williams*, 557

F.3d 943, 948 (8th Cir. 2009) (citation and quotation omitted). To determine whether a constitutional speedy trial violation occurred, the Court starts with whether "the delay between indictment and [defendant's] motion to dismiss was presumptively prejudicial." *United States v. Cooley*, 63 F.4th 1173, 1177 (8th Cir. 2023) (citation and quotation omitted). If it is, the Court must "analyze the four factors governing the Sixth Amendment's speedy trial protections under *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)." *Id.* (citation omitted).

**\*3**  Palos was indicted July 27, 2016. ECF No. 16. He moved to dismiss on November 8, 2023. ECF No. 103. The approximately seven-year delay between Palos's indictment and his motion to dismiss was presumptively prejudicial. *See, e.g.,* *United States v. Rodriguez-Valencia*, 753 F.3d 801, 805 (8th Cir. 2014) (finding that 6.5-year delay between indictment and arrest was presumptively prejudicial). The Government concedes as much. *See* ECF No. 109 at 3. The Court must now analyze the four factors under *Barker. See Cooley*, 63 F.4th at 1177. Those are: "Length of delay, the reason for the delay, the defendant's assertion of his [speedy trial] right, and prejudice to the defendant." *Barker*, 407 U.S. at 530, 92 S.Ct. 2182.

### A. Length of delay
Consideration of the first factor—the length of the delay—" 'requires a double inquiry: (1) whether the length of delay was presumptively prejudicial such that it triggers the *Barker* analysis, and, if triggered, (2) the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.' " *United States v. Johnson*, 990 F.3d 661, 670 (8th Cir. 2021) (quotation omitted). "This latter enquiry is significant to the speedy trial analysis because ... the presumption that pretrial delay has prejudiced the accused intensifies over time." *Doggett v. United States*, 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992).

The Court has already determined that the delay was presumptively prejudicial. Over six years and six months lapsed between Palos's indictment and his arrest. *Compare* ECF No. 16, *with* ECF No. 67. This is well beyond "the bare minimum needed to trigger judicial examination of the claim." *See* *Doggett*, 505 U.S. at 652, 112 S.Ct. 2686 (finding that "the extraordinary 8½ year lag between

Doggett's indictment and arrest clearly suffices to trigger the speedy trial enquiry ..."). This factor weighs in Palos's favor.

*See, e.g.,* ⚑ *United States v. Erenas-Luna*, 560 F.3d 772, 776 (8th Cir. 2009) (three-year time period between indictment and arrest weighed in favor of defendant).

### B. Reason for delay

"The second Barker factor—reason for the delay—requires determining 'whether the government or the criminal defendant is more to blame.' " ⚑ *Id.* (citing ⚑ *Doggett*, 505 U.S. at 651, 112 S.Ct. 2686). "Courts accord 'different weights ... to different reasons.' " ⚑ *Id.* (quotation omitted). The Court weighs "intentional delay by the government 'heavily against it.' " ⚑ *Erenas-Luna*, 560 F.3d at 777 (quotation omitted). The Court weighs "negligence by the government 'less heavily' but still regard[s] such negligence as 'a considerable factor in the weighing process.' " ⚑ *Id.* (quotation omitted). Delay caused by the defendant is weighed against the defendant. ⚑ *Id.* (citation committed).

The Government correctly argues that it "made no deliberate attempts to delay the proceedings in order to hamper the Defense," ECF No. 109 at 4, but the Government did not explain why it took so long to arrest Palos after it indicted him. The Government gave no explanation in its brief, *see* ECF No. 109 at 3-4, only offering that it "anticipates the evidence at the hearing will establish the Government was not negligent in apprehending the Defendant." *Id.* 109. That evidence never came.

The Government indicted Palos on July 27, 2016, ECF No. 16—six weeks after Palos's state charges were dismissed. *See* ECF No. 123-2 at 1-2. Palos's federal arrest warrant was not entered into NCIC until December of 2016, when the DEA asked the Marshals to locate Palos. There is no evidence the Marshals made any effort to locate Palos until Peters became bored in December of 2022 and decided to open the cold case drawer. After a brief LexisNexis search and a couple emails, California Marshals looked for, located, and apprehended Palos at the home he had been living at since late 2020. It took approximately two months from pulling Palos's file out of the cold case drawer to arrest him. The information the Marshals used to locate Palos had been available to them through the LexisNexis database well before they began searching for Palos. They just failed to look.

**\*4** The Government presented no evidence that it pursued Palos before December of 2022. Its failure to pursue Palos in the intervening six years since his indictment was negligent.

*See, e.g.,* ⚑ *Doggett*, 505 U.S. at 652–53, 112 S.Ct. 2686 (upholding a district court's finding of negligence when "[f]or six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that Doggett was living abroad, and, had they done so, they could have found him within minutes. While the Government's lethargy may have reflected no more than Doggett's relative unimportance in the world of drug trafficking, it was still findable negligence, and the finding stands."); ⚑ *Erenas-Luna*, 560 F.3d at 777 (upholding finding of negligence "where the government readily admits that it 'dropped the ball,' let Ontiveros's case 'slip through the cracks,' made no efforts to locate and arrest Ontiveros over a three-year period, and missed multiple opportunities to apprehend Ontiveros in a timely manner.").

This case is distinguishable from ⚑ *United States v. Walker*, 92 F.3d 714, 718 (8th Cir. 1996), where the defendant fled the state after posting bond, disguised his identity, used a false name and identification, and where the FBI searched NCIC every six months to see if defendant had been apprehended, provided defendant's fingerprints to FBI headquarters, and did not know where defendant might be. Unlike here, there was no evidence in ⚑ *Walker* that defendant "lived openly under his own name or by running his name through a credit bureau the government would have discovered his whereabouts." ⚑ *Id.* Palos was living openly under his own name, interacting regularly with different state and local governments. Palos paid taxes, obtained a state food license, unemployment benefits, and food stamps, and maintained a driver's license and vehicle registration—information that Peters testified would be accessible from the LexisNexis database he searched.

In cases where the Court upheld a lower court's finding that the Government was not negligent in pursuing a defendant, the Government continuously sought the defendant. *See, e.g.,* ⚑ *Rodriguez-Valencia*, 753 F.3d at 807 (where "For six years, the government searched computer databases, public utilities, welfare benefits, insurance records, identification-cards, and driver's licenses; interviewed family, friends, and neighbors in Missouri and California; monitored phone records; requested fingerprints; prepared extradition paperwork; and coordinated with law enforcement in the

**J.A. 194**

United States and Mexico."). The Government did not do that here. The Court finds the Government was negligent in its pursuit of Palos and that this factor weighs in Palos's favor.

### C. Defendant's assertion of his speedy trial right

The third 🔖 *Barker* factor considers "whether in due course the defendant asserted his right to a speedy trial." 🔖 *Erenas-Luna*, 560 F.3d at 778 (citing 🔖 *Walker*, 92 F.3d at 718; 🔖 *Barker*, 407 U.S. at 531-32, 92 S.Ct. 2182 (explaining that the defendant's assertion of his constitutional speedy-trial right "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of [the right]"). The Court disagrees with Palos that this factor "has little bearing on this inquiry." ECF No. 103-1. It is true that this factor should not be given any weight when a defendant was unaware of his indictment, *see* 🔖 *Erenas-Luna*, 560 F.3d at 778 (citing 🔖 *United States v. Richards*, 707 F.2d 995, 997 (8th Cir. 1983)), but Palos testified that he was aware of his indictment, so this factor is not, as it was in 🔖 *Richards*, inapplicable. The Court also disagrees with the Government that this factor "should be neutral, and not favor either Defendant or the Government." ECF No. 109 at 4. This factor is not neutral. If Palos knew he had been indicted and wanted to demand his right to a speedy trial, he could have made that demand but chose not to. This factor weighs against Palos.

### D. Prejudice to the defendant

**\*5** "The final Barker factor—prejudice—considers 'whether the defendant suffered prejudice as a result of the delay.' " 🔖 *Rodriguez-Valencia*, 753 F.3d at 807 (quotation omitted). "Prejudice ... should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect .... (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *United States v. Aldaco*, 477 F.3d 1008, 1019 (8th Cir. 2007) (quotation omitted). "The extent to which a defendant must demonstrate prejudice under this factor depends on the particular circumstances." 🔖 *Erenas-Luna*, 560 F.3d at 778. "A showing of actual prejudice is required if the government exercised reasonable diligence in pursuing the defendant." 🔖 *Id.* at 778-79 (citation omitted). But "[w]here the government has been negligent ... prejudice

can be presumed if there has been an excessive delay." 🔖 *Id.* at 779 (quotation omitted).

Palos cannot show actual prejudice here. Palos was not incarcerated in the six-plus years between his indictment and arrest. Palos did not testify he was living with anxiety or concern about the case before he was arrested. And there is little to no possibility that his defense will be impaired now. The drugs Palos is accused of possessing were located by two housekeepers in his hotel room. True, one of the housekeepers has since died and is unavailable for cross-examination, but the Government can make its case without her. Palos cannot point to any serious impediment to his defense other than the housekeeper's death and witnesses' fading memory. *See* ECF No. 103-1 at 12. These are insufficient to establish prejudice in a straightforward case where drugs were found in Palos's hotel room and he returned to the hotel room to retrieve them when contacted by hotel staff. *See, e.g., United States v. Dowl*, 394 F. Supp. 1250, 1256 (D. Minn. 1975) ("Although prejudice may sometimes be presumed to exist by mere passage of time because memories fade ... that factor does not bear heavily in this instance as the defendant is charged with a rather uncomplicated crime and the witnesses are still available.") (internal and external citations omitted). If Palos had to show actual prejudice, this factor would weigh in favor of the Government.

But a defendant must show actual prejudice only "if the government exercised reasonable diligence in pursuing the defendant." 🔖 *Erenas-Luna*, 560 F.3d at 778-79. The Court has already determined that the Government was negligent in pursuing Palos. Thus, "prejudice can be presumed if there has been an excessive delay." 🔖 *Id.* at 779. Because the Court has also already determined that there has been an excessive delay, prejudice is presumed. But just because prejudice is presumed does not necessarily mean this factor weighs in Palos's favor. "The government can ... rebut the presumption by proving that the prejudice is 'extenuated by the defendant's acquiescence.' " *United States v. Duran-Gomez*, 984 F.3d 366, 379 (5th Cir. 2020) (citing 🔖 *United States v. Cardona*, 302 F.3d 494, 499 (5th Cir. 1994); 🔖 *Doggett*, 505 U.S. at 658, 112 S.Ct. 2686).

Palos arguably acquiesced in the delay of his trial by failing to invoke his right to a speedy trial after knowing he had been indicted. But "presuming waiver of a fundamental right from inaction ... is inconsistent with [the Supreme]

2024 WL 1192315

Court's pronouncements on waiver of constitutional rights."

*Barker*, 407 U.S. at 525, 92 S.Ct. 2182. Waiving a constitutional right involves " 'an intentional relinquishment or abandonment of a known right or privilege.' " *Id.* (quotation omitted). Palos's inaction in California is not such an affirmative act (like agreeing to a continuance of trial would be once a defendant appeared in court). Courts should " 'indulge every reasonable presumption against waiver,' " and should " 'not presume acquiescence in the loss of fundamental rights ...' " *Id.* (quotation omitted). The Court will not presume that Palos acquiesced in the delay of his trial. The Government has not presented any evidence that he did. The Court therefore cannot find that the Government has rebutted the presumption of prejudice. This factor weighs in Palos's favor.

**\*6** Under *Doggett*, "when the Government's negligence ... causes delay six times as long as that generally sufficient to trigger judicial review ... and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence ... nor persuasively rebutted, the defendant is entitled to relief." *Doggett*, 505 U.S. at 657, 112 S.Ct. 2686 (footnotes omitted). The Government's negligence in apprehending Palos caused a delay that far exceeded what was necessary to trigger judicial review. The presumption of prejudice was neither extenuated nor persuasively rebutted. Palos, like the defendant in *Doggett*, is therefore entitled to relief.

## III. CONCLUSION

The Court has "engage[d] in a difficult and sensitive balancing process." *Barker*, 407 U.S. at 533, 92 S.Ct. 2182. Three of the four *Barker* factors weigh in Palos's favor, suggesting a speedy trial violation. Palos has been accused of serious crimes, but the right to a speedy trial is "a fundamental right" that "is specifically affirmed in the Constitution." *Id.* *Barker* acknowledges that the remedy for a speedy trial violation—dismissal of the indictment—is "unsatisfactorily severe ... but it is the only possible remedy." *Id.* at 522, 92 S.Ct. 2182. That is the only possible remedy here, as well. Defendant's Sixth Amendment right to a speedy trial was violated, and the Court is obligated to dismiss the indictment.

**IT IS SO ORDERED** that Palos's motion to dismiss, ECF No. 103, is **GRANTED**. The indictment, ECF No. 16, is **DISMISSED**.

### All Citations

--- F.Supp.3d ----, 2024 WL 1192315

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**March 27, 2019**: Umar reported that the ringing in his ears continues and he would like to see an ENT. He is having problems with molar pain and bleeding/swollen gums and has requested to see a dentist. He stated that he was aware that there had been 2 days of court hearings regarding the case and that the judge denied the petition for bail.  He has no message for his family today because of regular visits.

**Feb 1, 2018:** Umar seemed in good health and spirits, although he complained about a recent bout with tinnitus (ringing of ears) and ongoing dental problems (cavities).  He said the healthcare was generally ok, but sometimes slow to arrive.  He met the day before the visit with his parents.  He asked for any updates on whether there is a pending case in the United States.  He asked about specific book titles and authors he requested during the March 15, 2017 visit, and asked for more reading material covering science, technology, tennis and other sports, astronomy, and educational topics.  He also requested that the prison start allowing him to have access to local news.

**March 15, 2017:**  Says he is in good health with no complaints.  He eats the normal menu, and says the bread has improved.  He wants books or magazines on science, technology, sports, or astronomy.  He is sending and receiving mail with no issues.  He asks that we research the Pakistani Penal Code to determine if the prison authorities are able to restrict the prisoners from getting current events books and magazines.

**July 11, 2018:** Umar seemed in good health and spirits, although he asked us to remind the Superintendent that he would like a dental and ENT checkup, the latter to deal with ringing in his ears, a complaint he also mentioned on the previous visit.  He told Conoff that his parents returned to the United States on April 15, so he hasn¿t seen or heard from them since that time.  He asked for an update on his case, and we provided the same update the lawyer gave us as noted above.  Umar¿s canteen balance is 8,067 Pakistani rupees (about $67).

Message to relay: Hello, I am doing okay.  Please send a money order for 5,000 Pakistani rupees per month.  Say hi to my brothers.  Please write letters to me.  I have sent three letters since April, did you receive them?  If yes, why haven¿t you responded?  Send money through the consulate.

**Oct 11, 2018:** Umar reported that the ringing in his ears continues and he has seen the doctor and is on medication for this issue.  He has pain in his teeth and would like to see a dentist.  He asked the Lahore team to please bring magazines at each visit and that if there is an English dictionary, to please bring that as well.  CONOFF explained that we rely on donations for reading material and would see if that is possible.  His family last visited in April and is planning to visit again in January.  CONOFF delivered the message from his family and deposited the OCS Trust received from his family into his canteen account.  Amount deposited in local currency:  PK rupees 24,476.00 ($200).

Message to relay: I will soon write to you. My ear problem is bearable, not too much of a problem.  I received the 2,000 PK rupees that you sent last time.  I only get 1 hour walking time, not 2 hours, with handcuffs in a very small space.

**July 17, 2019:** Umar reported that the ringing in his ears continues and he has seen the doctor.  He received a filling for his tooth and he¿s applied to see a dentist again.   CONOFF delivered the message

FBI-00052687

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                   ALEXANDRIA DIVISION

 3      --------------------------x
       UNITED STATES OF AMERICA  :     Criminal Action No.:
 4                               :     1:17-cr-270-4
            versus               :
 5                               :     Thursday, April 4, 2024
       UMAR FAROOQ CHAUDHRY,     :     Alexandria, Virginia
 6                               :
                  Defendant.     :     Pages 1-19
 7      --------------------------x

 8           The above-entitled motions hearing was heard before
       the Honorable Leonie M. Brinkema, United States District
 9     Judge.  This proceeding commenced at 10:00 a.m.

10                  A P P E A R A N C E S:

11     FOR THE GOVERNMENT:    JOHN GIBBS, ESQUIRE
                              OFFICE OF THE UNITED STATES ATTORNEY
12                            2100 Jamieson Avenue
                              Alexandria, Virginia  22314
13                            (703) 299-3700

14                            JOHN CELLA, ESQUIRE
                              UNITED STATES DEPARTMENT OF JUSTICE
15                            950 Pennsylvania Avenue, NW
                              Washington, D.C.  20530
16                            (202) 514-2000

17     FOR THE DEFENDANT:     GEREMY KAMENS, ESQUIRE
                              OFFICE OF THE FEDERAL PUBLIC DEFENDER
18                            1650 King Street
                              Suite 500
19                            Alexandria, Virginia  22314
                              (703) 600-0800

20
       COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
21                            Official Court Reporter
                              United States District Court
22                            401 Courthouse Square
                              Alexandria, Virginia  22314
23                            (571) 298-1649
                              S.AustinReporting@gmail.com

24

25          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
                                                              1
```

```
1                    P R O C E E D I N G S

2          THE DEPUTY CLERK:  Criminal Case

3   Number 1:17-cr-270-4, United States versus Umar Farooq

4   Chaudhry.

5          Counsel, will you please note your appearances for

6   the record.

7          MR. GIBBS:  Good morning, Your Honor.  John Gibbs

8   on behalf of the United States.  I also have John Cella,

9   who's from the National Security Division, and Dan Abrams,

10   who's from the FBI.

11          THE COURT:  Good morning.

12          MR. GIBBS:  Good morning.

13          MR. KAMENS:  Good morning, Your Honor.  Geremy

14   Kamens on behalf of Mr. Chaudhry, who is present.

15          THE COURT:  All right.  And this is your motion to

16   dismiss for a speedy trial violation.

17          The case has been fully briefed.  Is there

18   anything you want to add to your papers?

19          MR. KAMENS:  Just briefly, Your Honor, and that is

20   a short timeline, and I'll submit one exhibit.

21          Mr. Chaudhry was arrested in Pakistan on

22   December 6th of 2009.  On December 15th of 2009, a Pakistani

23   official, the director general within the Ministry of the

24   Interior, advised that the government of Pakistan will want

25   the U.S. government to follow the formal extradition process
```

2

1   and further advised that it may take a bit of time to

2   arrange for their extradition, deportation, repatriation,

3   and, as such, the U.S. government should initiate a formal

4   request soon.

5           The U.S. government did not submit an extradition

6   request to Pakistan until over a decade later in November of

7   2020.  In the interim, the U.S. government, on January 15th

8   of 2010, sent a diplomatic note requesting transfer by

9   deportation, expulsion or other lawful means.  On June 5th

10  or 6th of 2010, the U.S. ambassador met with -- to Pakistan,

11  met with the Pakistani interior minister and asked for a

12  return.  And then on June 23rd, the legal attaché sent a

13  letter to the Pakistani minister of interior reiterating

14  U.S. interest in custody at the earliest opportunity.  And

15  that's it.

16          The requests by the government in this case for

17  Pakistan to deport a dual national, someone who was a

18  Pakistani citizen, was entirely futile, and it was not a

19  serious effort to obtain Mr. Chaudhry's return.  It is as if

20  a foreign government would ask the United States to deport a

21  U.S. citizen.  That is not a serious request.  The only

22  effective means here was asking for extradition, which the

23  government did not do for a decade.  And I'll submit as an

24  exhibit Defendant's Exhibit 1, which is the Bates Number FBI

25  530080, which has the information from the Pakistani

3

1    government.

2          Under the circumstances, Your Honor, given that

3    the government did not act with reasonable diligence,

4    prejudice is presumed.  We're not required to provide a

5    demonstration of actual prejudice.  The time period far

6    exceeds the time period that results in presumptive

7    prejudice, so we're talking about over a decade.  And given

8    the government's lack of a serious effort to obtain

9    Mr. Chaudhry's return, the Court has no other relief option

10   but to grant the motion.  Thank you.

11          THE COURT:  All right.  Mr. Gibbs.

12          MR. GIBBS:  Thank you, Judge.

13          Your Honor, I'd like to go back through a brief

14   timeline as well because I think it's important.  And as I

15   go through it, I think the key point here is the U.S.

16   government and Pakistan are allies, they have treaties

17   between one another including a specific extradition treaty.

18   And the Untied States --

19          THE COURT:  I'm sorry.  That treaty, as I

20   understand it, does have a provision that if there are

21   criminal charges in the receiving country, extradition is

22   delayed until the country has resolved those charges.

23          MR. GIBBS:  That's absolutely correct, Judge.

24   And, in fact, the treaty language is very forceful.  It says

25   under those circumstances where somebody's been charged and

                                                          4

```
1   is subject to prosecution, his extradition shall be deferred
2   until a conclusion of the trial and the full execution of
3   any punishment awarded to him, which is what happened in
4   this case.
5           So -- and, in fact, as Jeffrey Olson stated in his
6   affidavit -- and I'm quoting here from paragraph 30 -- he
7   said, as the treaty -- the extradition treaty required that
8   the full execution of any punishment be completed in
9   Pakistan, and there being no prison transfer treaty in place
10  between the United States and Pakistan, the United States
11  was obliged to wait until the defendants had completed the
12  Pakistani prison sentence they were given.  So I think Your
13  Honor has it exactly right.
14          The only way that the U.S. government could
15  surmount that obstacle was to convince the Pakistani
16  government not to prosecute these defendants, but instead to
17  hand them over.  And as we pointed out in our pleading, the
18  U.S. government, at the very highest level, all the way up
19  to the ambassador, tried to convince Pakistan not to
20  prosecute these defendants, but once Pakistan chose to do
21  that, the U.S. government had no further recourse, and it
22  would have been futile to seek to extradite any of these
23  defendants given the treaty and the fact that Pakistan had
24  decided to proceed as they did.
25          THE COURT:  And is there any evidence in the
```

1    record that Pakistan has, in the past, agreed to extradite

2    to the United States an individual who was under Pakistani

3    criminal proceedings?

4              MR. GIBBS:  Not that I'm aware of, Judge.  And I

5    think the -- you know, the most knowledge I have on that is

6    from the Olson affidavit, and I think he pointed out

7    there --

8              THE COURT:  There was one instance in which that

9    might have happened.

10             MR. GIBBS:  I don't know that it was somebody who

11   was -- I'm not aware of anyone who was currently under

12   prosecution in Pakistan being extradited.  I think the way

13   it proceeded in this case is the way Pakistan handles it.

14   If they choose to prosecute someone in their country under

15   their laws, you know, as a sovereign nation, they can do

16   that, and the United States or some other nation simply has

17   to wait.  I think what the Olson affidavit pointed out is

18   just how difficult and how rare extraditions from Pakistan

19   are.

20             I think, according to the affidavit, from 2010 to

21   2021, there had been two successful extraditions, and

22   Mr. Chaudhry made the third.  But, again, we only got

23   Mr. Chaudhry after he had completed his sentence, after he

24   had -- you know, we had submitted a formal extradition

25   package.  But even then -- and I think this is the important

                                                              6

```
1   point, and this is what the defense has glossed over here --
2   we didn't get him until he finally consented to be
3   extradited back to the United States.  He was fighting
4   extradition for about a year in Pakistan, and we had not
5   been successful in getting him back.  And it was only after
6   two of his co-defendants had pled guilty to no jail
7   sentences that he finally agreed to return.  And I've got
8   the chronology because I think it's important.
9          You know, the U.S. government was making all
10  reasonable steps to get Mr. Chaudhry, and we had actually
11  moved the Court to appoint counsel for him in 2019 after he
12  was indicted.  And that was -- the indictment was filed on
13  November 16th of 2017.  We made a motion on November 22nd,
14  2019 to appoint counsel, the PDs were appointed to represent
15  him.  The FBI informed the families of all five defendants
16  of the charges in September of 2019.  And then it was on
17  June 22nd, 2020 that Pakistan formally requested extradition
18  documents for just Chaudhry and Khan.  The other defendants
19  were already here or on their way back.  On October 22nd --
20  27th, 2020, the legate advised that it was working with the
21  Ministry of the Interior of Pakistan to petition the local
22  court to lift the order prohibiting the transfer of any of
23  the five defendants.  And then legate advised that Chaudhry
24  was arrested on August 17th, 2022.  But Chaudhry fought his
25  extradition from then on.
```

7

1          And, again, the motion that the defense makes

2     would seem to argue that all he wanted in this case was to

3     return to the United States quickly and promptly to face

4     these charges.  But if we had gotten him in 2009 or 2010, he

5     would have been facing significant jail time here in the

6     United States, but it was only after he realized that he was

7     facing no jail time that he consented to return.  And, in

8     fact, as early as June of 2020, Chaudhry's attorney told the

9     U.S. government he would likely contest his extradition for

10    Pakistan.  On August 17th, 2020, he confirmed that.  And

11    there were approximately seven hearings in Pakistan where

12    Mr. Chaudhry contested his extradition.  And while that was

13    going on, on April 21st, 2023, the U.S. government filed a

14    motion agreeing to no jail time for Minni and Zamzam here in

15    the U.S.

16         Zamzam pled guilty on April 26th, 2023, and then a

17    couple months later, on July 5th of 2023, now knowing that

18    he wasn't going to be facing any jail time, Chaudhry finally

19    agreed to waive extradition and return to the United States,

20    and it still took a number of months to get him.

21         So, Judge, this notion that the defendant, all he

22    wanted in this case was to return here to face the charges

23    in the U.S., I think is belied by all the evidence in the

24    case.

25         THE COURT:  Well, you also point out that even in

8

1    this case after the arraignment in December, the Speedy

2    Trial Act was then again waived, right, because --

3            MR. GIBBS:  Correct.

4            THE COURT:  -- there was a finding that this was a

5    complex case.  So that's one more instance of somebody

6    indicating that a speedy resolution was not something that

7    he necessarily wanted.

8            MR. GIBBS:  Exactly, Judge.

9            And I think it's very obvious that the Court is

10   very familiar with the pleadings in this case and the

11   attachments, so unless there's any other specific questions

12   or any other specific issues that the Court wants me to

13   address, it's pretty clear that you've got a very strong

14   grasp of the record here.

15           THE COURT:  Okay.

16           MR. GIBBS:  And we would just urge the Court to

17   deny the speedy trial motion -- you know, the motion that

18   speedy trial has been violated in this case.  We would argue

19   forcefully it has not been violated.  The government went to

20   great lengths to attempt to get this and the other

21   defendants.  Extradition from Pakistan is difficult.  We

22   still don't have Mr. Khan and it's been a number of years

23   and I'm not sure that we will ever get him.  So --

24           THE COURT:  And is there a -- you do have a formal

25   extradition request filed for Khan?

                                                            9

```
 1            MR. GIBBS:  We do.  And my understanding is he is
 2   not in custody in Pakistan, which I think is part of the
 3   difficulty.  I don't know that he's been located or how --
 4   how much effort the Pakistani government has made to locate
 5   him.
 6            But, yes, the -- we have filed -- you know, at the
 7   request of the Pakistani government, as soon as they asked
 8   for an extradition request, we filed it.  My
 9   understanding -- and I've been in touch with OI -- they're
10   still active.  Obviously the one for Mr. Chaudhry has been
11   satisfied, and we're still awaiting the one for Mr. Khan.
12            THE COURT:  All right.
13            MR. GIBBS:  Thank you, Judge.
14            MR. KAMENS:  Just three points, Your Honor.
15            First, the government says that Mr. Chaudhry did
16   not make any effort to try to come back to the United States
17   or negotiate waiving a challenge to the extradition before
18   Mr. Zamzam was sentenced to no time, and that's not
19   accurate.
20            The Court actually asked at Mr. Zamzam's plea
21   hearing whether Mr. Chaudhry had made any effort to waive
22   extradition, and so after that, I wrote to Mr. Gibbs, my
23   friend, and said, in light of Judge Brinkema's question in
24   court this morning at Mr. Zamzam's plea hearing about
25   whether Mr. Chaudhry could waive extradition, I'm writing to
```

10

 1  document that we have discussed the possibility of

 2  Mr. Chaudhry waiving extradition in return for his ability

 3  to return to the United States without being in handcuffs or

 4  detained while he is in transit.

 5          We had been involved in those discussions.  The

 6  government said that was not a possibility.  And so it is

 7  not as if this is -- Mr. Chaudhry was not interested in

 8  coming back to the United States before he learned of the

 9  results of Mr. Zamzam and Mr. Minni's cases.  We had been

10  discussing that.

11          The second point that the Court read --

12          THE COURT:  But let me stop for a second, though.

13          But the government has cited to the fact that

14  certainly early on in your representation of the defendant,

15  he communicated with you that he did not want to be

16  extradited; is that not correct?

17          MR. KAMENS:  Well, I did not have communication

18  directly with Mr. Chaudhry when he was imprisoned, so I was

19  communicating with other members of the family, and so I was

20  expressing what I anticipated would be the position in

21  Pakistan; however, I did ask the government if there was a

22  way for him to return to the United States outside of

23  handcuffs or being detained.  So that is also something that

24  I had discussed with the family but not directly with

25  Mr. Chaudhry.  So --

                                                              11

```
 1            THE COURT:  But there were seven -- there were
 2   multiple hearings in Pakistan concerning the extradition;
 3   right?
 4            MR. KAMENS:  Absolutely.
 5            And just to back up.  We're not challenging the
 6   government's diligence once they finally filed the
 7   extradition request.  The Court can eliminate all of the
 8   time after November of 2020 when the government finally
 9   submitted their extradition request to Pakistan.  But it's
10   not as if the government gets to satisfy the speedy trial
11   constitutional requirement by suddenly, ten years later,
12   acting with reasonable diligence.
13            The inquiry is, is there a lag, or is there a time
14   period between accusation and trial that is attributable to
15   the government based upon its lack of reasonable diligence.
16   And under the circumstances here, we take no issue once the
17   government submitted a formal request in November of 2020.
18   All of that time is irrelevant to the inquiry.  The question
19   for the Court is, is there initially a threshold period of
20   time that triggers the Barker v. Wingo inquiry.  And
21   everybody agrees that there is.
22            THE COURT:  All right.
23            MR. KAMENS:  The second is, did the government act
24   with reasonable diligence.  And the government is pointing
25   to all of the efforts that it made after it filed the
```

12

1    extradition request in November of 2020, as well as a few

2    letters from basically 2010.  But that is not sufficient.

3            The Court pointed -- I want to get to this point.

4    The Court pointed to the treaty, Article IV of the

5    extradition treaty, which is standard language in many, many

6    extradition treaties.  And the Court needs to understand

7    that that provision does not become in effect until the

8    extradition proceedings are concluded and an individual is

9    determined to be subject to the extradition request.  It

10   doesn't, in any way, delay the government's ability to file

11   and seek extradition, nor is Pakistan required to invoke

12   that provision.  And we submitted to the Court a case in

13   which the United States in an identical circumstance

14   declined to invoke that provision and allowed a U.S. citizen

15   to be extradited to face charges in another country

16   notwithstanding the existence of that provision.

17           The point is that the fact that another country

18   may rebuff the United States' request for extradition does

19   not obviate the responsibility of the government to make the

20   request.  It goes back to *Smith v. Hooey,* the Supreme Court

21   case in which the Court made that specific observation.  The

22   government has to act with reasonable diligence, and part of

23   that is making a serious effort to obtain the defendant and

24   not to assume that that serious effort is going to be

25   declined by the other country.

                                                            13

1              The last point I'd make, Your Honor, is with

2     respect to the Speedy Trial Act.  The Court had already

3     certified this case as complex.  We agreed to extend the

4     trial deadline for a few weeks.  That, in no way, obviates

5     the violation of the speedy trial Constitutional right from

6     the previous decade.  And so it's certainly something that

7     the Court could take into account in a case where the

8     defendant is saying, look at all of this time between the

9     formal accusation and trial.  And part of the time that the

10    defendant is challenging are times where the defendant

11    agreed to extend the trial date.  But we're not asking the

12    Court to look at any date past November of 2020; we're

13    looking at the formal accusation from December of 2009 until

14    that period, and the government didn't act with reasonable

15    diligence.

16             THE COURT:  Well, it's an unfortunate case for

17    many reasons, but there's no question in my mind that the

18    defendant is not able to meet the *Barker v. Wingo* factors.

19    And I do find on this record that the government did act in

20    a diligent and appropriate fashion in trying to get all five

21    of the defendants back to the United States.

22             Certainly one cannot say in my view that a

23    government is not diligent when it -- the highest

24    representative of the government in the foreign country,

25    that is the ambassador, is, himself, meeting with a

                                                              14

1  similarly highly-placed person in the foreign country to try

2  to get the American citizens returned.

3          There's plenty of communication between the people

4  in the embassy, and as I said, going all the way up to the

5  ambassador to try to get these men returned to the United

6  States.  And Pakistani justice is much faster than the EDVA.

7  I mean, these men were charged within only a few months of

8  these requests being made.  And so --

9          MR. KAMENS:  If I could interject.

10          THE COURT:  Yeah.

11          MR. KAMENS:  To be fair, the evidence was

12  fraudulent and false, but I understand the Court's point.

13          THE COURT:  Well, regardless of that, you can't --

14  this is not a habeas case, you know.  The Pakistani

15  authorities did what they did, and we can't control that.

16          There's no evidence in this record from what I've

17  seen that there was some sort of collusion between the

18  Pakistani authorities and American authorities.

19          MR. KAMENS:  And we don't allege that.

20          THE COURT:  All right.  So you've got a foreign

21  country that -- and also, in your client's case, he's a dual

22  citizen.  So he actually is a Pakistani citizen, which

23  means, you know, they were looking at one of their own

24  citizens, and they charged him very quickly with criminal

25  offenses, and they adjudicated them very quickly, and they

15

1    sentenced him.  I mean, you talk about a speedy trial

2    violation.  That was almost too fast, you know, but that was

3    what happened.

4          And given the fact that there is not a significant

5    record of successful extraditions from Pakistan, and given

6    the unique facts of this case, I think the government did

7    make reasonable and diligent efforts to get these men

8    returned quickly.  But once the Pakistani -- and I've also

9    looked at a matter under seal, and I will tell you, I mean,

10    once they dug their heels in, they weren't budging.  And so

11    although the length of delay is certainly problematic, I

12    don't think it's at the U.S. government's fault.  This is as

13    a result of decisions made by the Pakistani government, and

14    so the government was not remiss in its diligent efforts to

15    get the men back.

16          And in terms of the other three *Barker v. Wingo*

17    factors, again, I think there is justification for the

18    delay.  I think that the defendant's assertion of rights is

19    problematic because, you know, as soon as he was released

20    from Pakistani custody, you know, there's this one-year gap.

21    I don't know whether he was in hiding or what, but, I mean,

22    he -- and he must have known at that point because there

23    were communications going back and forth with at least

24    family members.

25          MR. KAMENS:  And just to be clear and for the

```
 1    record --

 2              THE COURT:  Yeah.

 3              MR. KAMENS:  -- he was not in custody at that

 4    point; he was released from prison living with family

 5    members in Pakistan.  The government subsequently submitted

 6    the extradition request, and Pakistan said in order to

 7    initiate the extradition, the defendant needs to be

 8    rearrested.

 9              THE COURT:  Right.

10              MR. KAMENS:  So approximately a year later,

11    August, I think, of '22, he was arrested and then released

12    subsequently on bond again.

13              THE COURT:  But there is that delay.  And I don't

14    know -- and this is not in the record -- whether in Pakistan

15    one can self-surrender the way you can in the United States.

16    I mean, you know yourself, if you have a client and you hear

17    there's an arrest warrant our for the client, you can walk

18    the client into the courthouse and turn yourself in.

19              But, I mean, there was that delay.  Again, that's

20    not the time period you're focusing on, but I'm just saying

21    that that's -- you know, it's problematic whether the

22    defendant really was interested in coming back here.

23              But lastly, I don't see the argument on prejudice

24    in this case.  The defendant -- I'm assuming the government

25    is not penalizing your client for having, you know, invoked
```

17

```
 1   his right to file this motion.  The offer that they've made
 2   to all the other defendants was, you know, no sentence of
 3   any time.  And whether the case is going to go to trial or
 4   whether that plea is going to be offered, that's another
 5   issue.
 6            But I don't find in this case the type of
 7   prejudice that normally is associated with a violation of
 8   the Speedy Trial Act, that is that evidence is lost, that
 9   memories are somehow weakened, that sort of thing.  We don't
10   have that here because, at least the government's position
11   in the past has been there will be no trial, they'll agree
12   to a very, very, you know, generous disposition.
13            So, for all those reasons, I'm going to deny the
14   motion, and this case is set for trial.  If it's going to be
15   resolved, I need to let you know that there are times when
16   I'm not going to be available.  So if you're going to try to
17   resolve this, you need to get with my chambers and get a
18   date on the calendar.  All right.  I didn't bring my
19   calendar with me today.  All right.
20            MR. KAMENS:  Understood, Your Honor.
21            MR. GIBBS:  Understood, Judge.
22            THE COURT:  All right.  Is there anything further
23   on this case?
24            MR. GIBBS:  Not from the government, Your Honor.
25   Thank you.
```

18

```
1              MR. KAMENS:  Nothing further, Your Honor.

2              THE COURT:  All right.  Very good.  We'll recess

3    court for the day.

4                   (Proceedings adjourned at 10:23 a.m.)

5              ----------------------------------

6    I certify that the foregoing is a true and accurate

7    transcription of my stenographic notes.

8

9                               Stephanie Austin
                               _____
10                              Stephanie M. Austin, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                              19
```

**J.A. 216**



**Details:** ▓▓ On 12/15/2009, ALAT Aaron Steps met with ▓▓▓▓
▓▓▓▓▓▓ Director General (DG), National Crisis Management
Center, Ministry of Interior, Government of Pakistan
pertaining to United States citizens Ramy Zamzam, Aman Yemer,
Umar Chaudhry, Ahmed Minni, and Waquar Khan, and the FBI's
desire to return them to the United States.

▓▓ ALAT Steps advised DG ▓▓▓ that the FBI and
the United States Department of Justice (DoJ) were preparing
charges against Zamzam, Yemer, Chaudhry, Minni, and Khan and
that the FBI would be seeking their return to the United
States to face these charges. ALAT Steps requested DG ▓▓▓▓
advice on how the USG could proceed in this matter to ensure a
smooth and quick transfer of the five into United States
custody.

▓▓ DG ▓▓▓ advised that because the five had
received a consular visit, their detention was now "formal"
and "on the books", which meant that the Government of
Pakistan (GoP) will want the USG to follow the formal
extradition process. DG ▓▓▓ also advised that a joint
investigation involving multiple intelligence and law
enforcement agencies had been ordered into the five and their
activities, and specifically in an effort to identify any
larger network to which they may have been a part.

▓▓ When asked whether, because the five were United
States citizens, the GoP would be willing to deport the five
directly to a USG operated plane in Pakistan for immediate
repatriation to the United States, DG ▓▓▓ advised that this
was possible but harder now that the intelligence agencies
were involved. DG ▓▓▓ further advised that it may take a
bit of time to arrange for their extradition/deportation/
repatriation, and as such the USG should initiate a formal
request soon. DG ▓▓▓ also advised that while the decision
to deport/repatriate the five currently resides with the
district police, it has become a political decision.

▓▓ DG ▓▓▓ advised that if the USG wished to
smooth the process of transferring the five into US custody,
Ambassador ▓▓▓▓▓ should discuss this matter directly with
Minister of the Interior ▓▓▓▓▓ and immediately

2



DEFENDANT'S
EXHIBIT

FBI-00053080

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA          )
                                  )
              v.                  )
                                  )        1:17-cr-270-4 (LMB)
UMAR FAROOQ CHAUDHRY,             )
                                  )
              Defendant.          )

## ORDER

For the reasons stated in open court, it is hereby

ORDERED that defendant's Motion to Dismiss Indictment for Violating the Right to a

Speedy Trial and Rule 48 [Dkt. No. 165] be and is DENIED.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this 9ᵗʰ day of April, 2024.

Alexandria, Virginia

/s/
**Leonie M. Brinkema**
United States District Judge

**J.A. 218**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

--------------------------x
UNITED STATES OF AMERICA   :    Criminal Action No.:
                           :    1:17-cr-270
     versus                :
                           :    Thursday, May 2, 2024
UMAR FAROOQ CHAUDHRY,      :    Alexandria, Virginia
                           :
          Defendant.       :    Pages 1-27
--------------------------x

        The above-entitled plea hearing was heard before the
Honorable Leonie M. Brinkema, United States District Judge.
This proceeding commenced at 11:02 a.m.

              A P P E A R A N C E S:

FOR THE GOVERNMENT:    JOHN GIBBS, ESQUIRE
                       OFFICE OF THE UNITED STATES ATTORNEY
                       2100 Jamieson Avenue
                       Alexandria, Virginia  22314
                       (703) 299-3700

FOR THE DEFENDANT:     GEREMY KAMENS, ESQUIRE
                       OFFICE OF THE FEDERAL PUBLIC DEFENDER
                       1650 King Street
                       Suite 500
                       Alexandria, Virginia  22314
                       (703) 600-0800

COURT REPORTER:        STEPHANIE M. AUSTIN, RPR, CRR
                       Official Court Reporter
                       United States District Court
                       401 Courthouse Square
                       Alexandria, Virginia  22314
                       (607) 743-1894
                       S.AustinReporting@gmail.com

        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1

2        THE DEPUTY CLERK:  Criminal Number 1:17-cr-270-4,

3   United States of America versus Umar Farooq Chaudhry.

4        Will counsel please note their appearance for the

5   record beginning with the government.

6        MR. GIBBS:  Good morning, Your Honor.  John Gibbs

7   on behalf of the United States.

8        THE COURT:  Good morning.

9        MR. KAMENS:  Good morning, Your Honor.  Geremy

10  Kamens on behalf of Mr. Chaudhry, who's present.

11        THE COURT:  All right.

12        MR. KAMENS:  Can I ask the Court's indulgence just

13  for one moment?

14        THE COURT:  Yes.

15                    (Pause.)

16        THE COURT:  Now are there any -- were any changes

17  made either to the plea agreement or the statement of facts

18  since the papers were filed with chambers?

19        MR. GIBBS:  No, Your Honor.

20        THE COURT:  All right.

21        MR. KAMENS:  I'm just finding the signatured

22  copies, Your Honor.

23        THE COURT:  All right.

24        MR. KAMENS:  Okay.  Thank you, Your Honor.

25        THE COURT:  All right.  So that's the plea

2

1    agreement and the statement of facts?

2              MR. KAMENS:  It is, Your Honor.

3              THE COURT:  All right.  All right.  Mr. Chaudhry,

4    you're going to be affirmed by the clerk.

5              THE DEPUTY CLERK:  Can you raise your right hand,

6    please.

7                   (Defendant sworn in open court.)

8              THE DEPUTY CLERK:  Thank you.

9              THE COURT:  All right.  Mr. Chaudhry, you have

10   just taken a promise to tell the truth in answering all of

11   the Court's questions.  That means if you should lie in

12   answering any question, the government could prosecute you

13   for a new and separate crime called perjury; do you

14   understand that?

15             THE DEFENDANT:  Yes.

16             THE COURT:  For the record, what is your full

17   name?

18             THE DEFENDANT:  Umar Farooq Chaudhry.

19             THE COURT:  Mr. Chaudhry, how old are you?

20             THE DEFENDANT:  I'm 39.

21             THE COURT:  39.

22             How many years of schooling have you completed?

23             THE DEFENDANT:  I've competed high school and

24   about six years extra in college.

25             THE COURT:  Do you have any problem reading,

                                                             3

```
1   writing, understanding or speaking English?

2           THE DEFENDANT:  No.

3           THE COURT:  Are you a United States citizen?

4           THE DEFENDANT:  Yes.

5           THE COURT:  Are you currently on probation, parole

6   or supervised release from any other criminal matter?

7           THE DEFENDANT:  No.

8           THE COURT:  Are you at this time under the care of

9   a doctor for any physical or mental condition?

10          THE DEFENDANT:  No.

11          THE COURT:  Within the last 24 hours, have you

12  taken any kind of medication, whether by a prescription or

13  over the counter like an aspirin or an Advil?

14          THE DEFENDANT:  No.

15          THE COURT:  Are you at this time under the

16  influence of any alcohol or illegal drugs?

17          THE DEFENDANT:  No.

18          THE COURT:  All right.  Mr. Chaudhry, we have in

19  court this morning a written plea agreement, which I think

20  you just actually signed in court.  The document is eight

21  pages long, and I do see what appears to be your signature

22  on the bottom of page 7.

23          Did you, in fact, sign the written plea agreement?

24          THE DEFENDANT:  Yes.

25          THE COURT:  And you signed it today; right?
```

                                                           4

```
 1                    THE DEFENDANT:  Yes.

 2                    THE COURT:  Now, before you signed the plea

 3       agreement, did you have a chance to read it over for

 4       yourself word-for-word?

 5                    THE DEFENDANT:  Yes, I did.

 6                    THE COURT:  And have you had enough time to

 7       thoroughly discuss it with Mr. Kamens, your attorney?

 8                    THE DEFENDANT:  Yes, I did.

 9                    THE COURT:  Have you asked Mr. Kamens all the

10       questions that you have about the plea agreement?

11                    THE DEFENDANT:  Yes, I did.

12                    THE COURT:  Has he answered all of your questions

13       to your satisfaction?

14                    THE DEFENDANT:  Yes, he has.

15                    THE COURT:  Do you have any questions you want to

16       ask me about the plea agreement?

17                    THE DEFENDANT:  No.

18                    THE COURT:  And do you understand while we're

19       having this dialogue today, if you should have a question,

20       you can stop and either ask Mr. Kamens or ask me; do you

21       understand that?

22                    THE DEFENDANT:  I understand.

23                    THE COURT:  Now, I do want you to look at page 7.

24       I assume you have a copy in front of you.

25                    MR. KAMENS:  We do, Your Honor.
```

1          THE COURT:  If you look at the two sentences that

2    are right above your signature at the bottom of page 7, and

3    they go as follows:  I have read this plea agreement and

4    carefully reviewed every part of it with my attorney.  I

5    understand this agreement and voluntarily agree to it; do

6    you see those two sentences?

7          THE DEFENDANT:  Yes, I see it.

8          THE COURT:  Are they completely true?

9          THE DEFENDANT:  True.  Yes.

10          THE COURT:  Now, by telling the Court that you've

11    read the entire plea agreement and discussed it thoroughly

12    with counsel and you understand it and you're voluntarily

13    agreeing to it, that means you will be bound by everything

14    in this 7-page document, even if I don't go over every --

15    it's 8 pages, actually -- even if I don't go over every

16    paragraph or page with you today in court; do you understand

17    that?

18          THE DEFENDANT:  I understand.

19          THE COURT:  And the reason why that occurs is this

20    plea agreement is really a written contract that you're

21    entering with the U.S. attorney for this district, and when

22    a person signs a written contract after he's carefully

23    reviewed it himself and with a lawyer and he understands it

24    when he signs it and he signs it voluntarily, then that's a

25    binding legal instrument, and you can't just come back to

6

1 court in a couple of weeks and say I don't like what's on

2 page 3 I want to change something, it's too late; do you

3 understand that?

4        THE DEFENDANT: I understand.

5        THE COURT: Now, other than this plea agreement,

6 do you believe you have any side deals or side

7 understandings with any prosecutor, investigator or anybody

8 else concerning this case? I do know that you are going to

9 maintain your right to appeal the Court's denial of your

10 motion to dismiss, but other than that, is there anything

11 that you feel is not fully reflected in the plea agreement?

12        THE DEFENDANT: No.

13        THE COURT: Is that correct, Mr. Kamens?

14        MR. KAMENS: It is correct. And that right to

15 appeal is in the plea agreement.

16        THE COURT: I know it is, but it was sort of -- it

17 was an email warning the Court to make sure we knew about

18 that.

19        MR. KAMENS: Understood.

20        THE COURT: All right. Then I want you to turn to

21 page 1, paragraph 1. And there it says: You've agreed to

22 plead guilty to Count 3 of the pending indictment. That

23 count charges you with being a member of a conspiracy to

24 provide material support and resources to a designated

25 foreign terrorist organization, namely Jaish-e-Mohammed, in

7

1   violation of Title 18 of the United States Code

2   Section 2339B.

3          Do you understand that's the charge to which

4   you're going to plead guilty?

5          THE DEFENDANT:  Yes, I understand.

6          THE COURT:  Now, that is a felony offense exposing

7   you to a maximum term of 15 years of imprisonment followed

8   by a period of supervised release, which could go as far as

9   life; do you understand that?

10         THE DEFENDANT:  I understand.

11         THE COURT:  In addition, you could be required to

12  pay a fine of up to $250,000, and there will be an automatic

13  special assessment of $100 that must be paid; do you

14  understand that?

15         THE DEFENDANT:  I understand.

16         THE COURT:  Now, in the federal system, parole is

17  not any longer available, which means any term of

18  imprisonment must be served entirely; do you understand

19  that?

20         THE DEFENDANT:  Yes.

21         THE COURT:  And when the prison portion of a

22  sentence has been satisfied, then the supervised release

23  portion goes into effect.  When a person is on supervised

24  release, it's very much like the bond that you're on right

25  now.  You'd be under the control of a federal probation

8

1  officer, and there may be restrictions on things that you

2  can do or requirements, frankly, that you have to do certain

3  things.

4          I can't give you all those conditions yet because

5  I haven't seen the presentence report, but the key fact you

6  need to understand at this point is that if you were to

7  violate any condition of supervised release, you could be

8  brought back to court, and if the Court determines that

9  there has been a violation, you could be sent back to

10 prison, and that could be for as long as the period of

11 supervision; do you understand that?

12         THE DEFENDANT:  I understand.

13         THE COURT:  Now, when it comes time for

14 sentencing, the Court will be looking at two sources of law,

15 The Federal Sentencing Guidelines, and Section 3553(a) of

16 Title 18 of the United States Code.

17         Under the guidelines, before we can even establish

18 the guidelines, the Court has to make two factual decisions.

19 First, we have to determine your criminal history.  Criminal

20 histories are divided into six categories with each category

21 getting a number.  So a Number I criminal history goes to

22 someone who's never been in trouble with the law or has a

23 very minor record, and then as convictions and other

24 problems occur, the score goes up with a Level VI going to

25 the most serious offenders; do you understand that?

                                                      9

```
 1              THE DEFENDANT:  Yes.

 2              THE COURT:  And then the Court must look at the

 3   offense conduct.  Now, every federal crime has a basic

 4   number given to it by the Sentencing Commission, and then

 5   depending upon the facts of the case, that number can go up

 6   or down; do you understand that?

 7              THE DEFENDANT:  Yes.

 8              THE COURT:  All right.  Now, starting on page 2 in

 9   paragraph 4, but primarily on page 3, there are some

10   guideline factors that you and the government have agreed

11   to.

12              You've agreed, first of all, that the conspiracy

13   to provide material support or resources to a designated

14   foreign terrorist organization has a base offense level of

15   26, and that there is a 12-level increase for the terrorism

16   aspect of the case, bringing the total offense level up to

17   38.  And then it says further on that page that the United

18   States has agreed that by pleading guilty and accepting

19   responsibility, you're going to be eligible for a two-point

20   reduction.  And if that occurs, then the government would

21   not oppose filing -- would, in fact, agree to file the

22   motion giving you a third-level reduction, which would then

23   bring the offense level down to a 35.

24              Is that part of your understanding?

25              THE DEFENDANT:  Yes.
```

THE COURT:  All right.  And then most importantly,

I think in your case on the bottom paragraph, the United

States and you have agreed to jointly recommend to the Court

that a sentence of not more than time served followed by a

20-year term of supervision is the appropriate sentence for

this case.  And obviously you know that I have given similar

sentences to several of the co-defendants in this case.

          I just want to make sure you understand, though,

that that is not binding on the Court.  This agreement is

only binding on you all and the prosecution.  So if for some

reason I were to decide to impose a different sentence, that

would not be a violation of your plea agreement, and it

would not give you a basis to withdraw your guilty plea

because this is not a binding Rule 11 plea; do you

understand all that?

          THE DEFENDANT:  Yeah, I understand that.

          THE COURT:  All right.  In addition to the

guidelines -- again, because the Court must determine the

guidelines -- so, again, I determine the criminal history, I

determine the offense level, I put the two numbers on a

chart.  That's going to establish the advisory guideline

range.  The Court is required to consider the range but is

not required to sentence within it, and if the Court has

good reasons, I can sentence above the range or below the

range.  The only actual limit on the Court's sentencing

1    power is the statute of conviction.  So we cannot sentence

2    you to more than the statutory maximum, which in this case

3    would be 15 years of imprisonment; do you understand that?

4              THE DEFENDANT:  I understand.

5              THE COURT:  All right.  In addition to the

6    guidelines, the Court also takes into consideration the

7    3553(a) factors.  And of course in your case, as it was with

8    the other defendants, the extensive amount of time that you

9    had to spend in a Pakistani prison, the conditions under

10   which you served that very long sentence, your family

11   background, your work history, et cetera will all be taken

12   into consideration.  As well, of course, the sentences that

13   the co-defendants received, because an issue the Court must

14   always look at is whether a sentence is disparate with those

15   of other similarly situated defendants.  All of that will go

16   into the sentencing decision.

17             Now, obviously you and Mr. Kamens have talked a

18   great deal about the possible sentence, and you've discussed

19   that with the government as well, but I just want to make

20   sure you understand that no matter what is written in the

21   plea agreement or what counsel may have said to you, if the

22   sentence of the Court is different from what you're

23   expecting, that does not give you a basis to withdraw your

24   guilty plea; do you understand that?

25             THE DEFENDANT:  I understand.

1      THE COURT:  Now, paragraph 5 talks about the

2  waiver of appeal rights.  And, again, the way the law is

3  structured and the way this plea agreement reads, you

4  understand, first of all, that normally a defendant can

5  appeal both his conviction and his sentence, but under this

6  plea agreement and the way the law is structured, by

7  being -- by pleading guilty, you're giving up your right to

8  actually appeal the substantive issue about your conviction

9  or any sentence within the statutory limits, but you have

10  reserved for yourself actually the right to appeal the

11  Court's denial of your motion to dismiss on speedy trial

12  grounds; correct?

13      THE DEFENDANT:  Correct.  Yes.

14      THE COURT:  And also you still have a residual

15  right to appeal any ineffective assistance of counsel that

16  might be cognizable on a direct appeal; do you understand

17  that?

18      THE DEFENDANT:  I understand.

19      THE COURT:  But other than that, it's my

20  understanding that all the standard language is in this plea

21  agreement and other -- all other aspects of the case cannot

22  be appealed.  If you do, the Court of Appeals is going to

23  find that they were waived.  The only remaining issue is

24  jurisdiction.  You can always also attack the jurisdiction

25  of the Court; do you understand that?

1          THE DEFENDANT:  Yes, I understand.

2          THE COURT:  All right.  In exchange for your

3    guilty plea today, the government in paragraph 6 has agreed

4    that at the time of sentencing, the government will move to

5    dismiss the remaining counts in the indictment, and that

6    will therefore end the litigation; do you understand that?

7          THE DEFENDANT:  I understand.

8          THE COURT:  All right.  In terms of monetary

9    payments, my understanding is there is no forfeiture in this

10   case; correct?

11         MR. GIBBS:  Correct, Judge.

12         THE COURT:  All right.  Have you had enough time

13   to discuss everything you know about this case with

14   Mr. Kamens?

15         THE DEFENDANT:  Yes, I have.

16         THE COURT:  Has he discussed with you the nature

17   of this conspiracy charge and any ways in which you could

18   possibly defend yourself against the charge if you chose to

19   plead not guilty and go to trial?

20         THE DEFENDANT:  Yes, we discussed everything.

21         THE COURT:  And has he kept you fully advised

22   about his plea bargaining efforts on your behalf?

23         THE DEFENDANT:  Yes, he has.

24         THE COURT:  Are you fully satisfied with how he

25   has negotiated this plea?

                                                          14

```
1              THE DEFENDANT:  Yes, I am.

2              THE COURT:  And are you fully satisfied with the

3    way in which he has represented you throughout this case?

4              THE DEFENDANT:  Yes, I am.

5              THE COURT:  And do you understand you still at

6    this time have a right to change your mind and plead not

7    guilty to this charge, and therefore this case will go to

8    trial, I think next week, because it's scheduled to go to

9    trial next week.

10             Now, if you did go to trial, at a criminal trial,

11   the burden is on the prosecution to prove your guilt.  There

12   is absolutely no burden on you to prove your innocence; do

13   you understand that?

14             THE DEFENDANT:  I understand.

15             THE COURT:  And in order for the government to

16   prove you're guilty of the conspiracy charge, they basically

17   have to prove the following facts.  They have to prove,

18   first of all, that there was, in fact, a conspiracy as

19   described in that count.  And a conspiracy is essentially an

20   agreement between two or more people to do something the law

21   forbids.  So in this case, they have to prove that there was

22   an agreement between at least two people to provide material

23   support to an organization that had already at that point

24   been designated as a terrorist organization.

25             Then they have to prove that at some point during
```
15

1  the life of that agreement, not necessarily from the
2  beginning, and not necessarily lasting until the end of the
3  agreement, you knowingly and intentionally, and that means
4  not by an accident or mistake or some other innocent reason,
5  joined into the activities of the agreement or conspiracy;
6  do you understand that?
7          THE DEFENDANT:  I understand.
8          THE COURT:  They also must show that at least one
9  act in furtherance of the agreement occurred in the Eastern
10  District of Virginia; do you understand that?
11         THE DEFENDANT:  I understand.
12         THE COURT:  And that's basically what they have to
13  prove.
14         THE DEFENDANT:  Okay.
15         THE COURT:  Now, if you went to trial, there's
16  certain rights and protections that you would have at a
17  trial that you essentially give up by pleading guilty.
18  First, at trial, you could see all the government's
19  witnesses and evidence and have it tested through the
20  questions of your lawyer; do you understand that?
21         THE DEFENDANT:  Yes.
22         THE COURT:  You could also ask the Court for help
23  in getting witnesses and/or physical evidence brought to the
24  courthouse.  That would be done by having the Court issue
25  subpoenas; do you understand that?

16

```
 1              THE DEFENDANT:  I understand.

 2              THE COURT:  Of course you would have the right to

 3    be represented by an attorney at all aspects of the trial.

 4    If you could not afford to pay for a lawyer, we would

 5    appoint one for you at taxpayers' expense; do you understand

 6    that?

 7              THE DEFENDANT:  Yes.

 8              THE COURT:  Now, you could testify at the trial if

 9    you wanted to, and then you would be treated like any other

10    witness; do you understand that?

11              THE DEFENDANT:  Yes.

12              THE COURT:  You could also invoke your Fifth

13    Amendment right to remain silent, and if you chose not to

14    testify, no inference of guilt could be drawn from your

15    silence; do you understand that?

16              THE DEFENDANT:  Yes.

17              THE COURT:  When you were arraigned, you chose to

18    have a trial by jury, which means we would have brought

19    12 -- basically developed a jury of 12 ordinary citizens to

20    hear the case.

21              Your other option would have been a trial just to

22    a judge alone, which we call a bench trial.  But in either

23    type of trial, whether to a jury or to a judge, the same

24    burden is on the prosecution, and that is you cannot be

25    found guilty unless the government proves guilt beyond a
```

1    reasonable doubt.

2           And in the case of a jury, for a jury to convict,

3    all 12 jurors must agree with the decision.  So if just one

4    juror had a reasonable doubt about your guilt, that jury

5    could not convict you, it would be a hung jury, you would

6    have a right to a new trial with a new jury; do you

7    understand that?

8           THE DEFENDANT:  Yes, I do.

9           THE COURT:  If you continued with a not guilty

10   plea, Mr. Kamens could try to attack the prosecution's case.

11   For example, there might or might not be an issue about

12   whether the organization described in the indictment was

13   actually properly designated as a terrorist organization.

14          I don't know what, if any, defenses you might

15   have, but what you need to understand is with the exception

16   of the speedy trial issue, you've given up your right to

17   appeal any other defects in the case other than the

18   possibility of a lack of the Court's subject matter

19   jurisdiction; do you understand that?

20          THE DEFENDANT:  Yes.

21          THE COURT:  So lastly, if you plead not guilty and

22   you went to trial and you were found guilty at trial, then

23   you would have a right to appeal both the conviction and the

24   sentence; do you understand that?

25          THE DEFENDANT:  Yes, I do.

                                                              18

```
 1              THE COURT:  All right.

 2              MR. KAMENS:  Your Honor, can I just mention for

 3    the record --

 4              THE COURT:  Yes.

 5              MR. KAMENS:  -- that the principal reason for the

 6    delay for this proceeding until the week before trial was

 7    not because of any lack of agreement between the parties

 8    before the Court; it was simply getting approval from higher

 9    levels at Main Justice.  So that's why it took so long to

10    get back before you.

11              THE COURT:  That's fine.  I mean, we were

12    concerned about the trial date, but other than that, I don't

13    have any problem with how this developed.

14              MR. KAMENS:  I understand.

15              THE COURT:  All right.  Do you understand that if

16    the Court accepts your guilty plea today, there will be no

17    further trial of the issue?

18              THE DEFENDANT:  Yes, I understand.

19              THE COURT:  All right.  In any respect, do you

20    feel that anybody has put any force or pressure on you to

21    plead guilty today?

22              THE DEFENDANT:  No.

23              THE COURT:  And you're pleading guilty of your own

24    freewill?

25              THE DEFENDANT:  Yes.
```

1          THE COURT:  All right.  Now, the last thing we

2    have to address is the statement of facts.  And the

3    statement of facts is 12 pages long.  I see what appears to

4    be your signature on page 12.

5          Did you, in fact, sign the statement of facts?

6          THE DEFENDANT:  Yes, I did.

7          THE COURT:  And I guess you signed it again today

8    in court; is that right?

9          THE DEFENDANT:  Yes, that's correct.

10          THE COURT:  Now, before you signed the statement

11    of facts, did you carefully read over the 33 numbered

12    paragraphs that precede your signature?

13          THE DEFENDANT:  Yes, I did.

14          THE COURT:  Do you understand that by signing the

15    statement of facts, you've done two things.  You are

16    admitting the truth of everything in those 33 paragraphs,

17    and you are admitting that if the case went to trial, the

18    government could prove all those facts beyond a reasonable

19    doubt; do you understand that?

20          THE DEFENDANT:  Yes, I understand.

21          THE COURT:  So I've read all of this as well in

22    chambers.  I'm not going to go over it with you

23    word-for-word, but I just want to make sure.

24          Do you agree that you were a member of an

25    agreement or conspiracy along with Ahmed Ameer Minni, Ramy

1 Said Zamzam, Aman Hassan Yemer, and Waqar Hussain Khan to

2 engage in the conspiracy that's been alleged?

3 THE DEFENDANT: Yes.

4 THE COURT: All right. And do you agree that on

5 or about May 28 of 2009, Yemer posted a comment on his

6 YouTube account and replied to someone about Islam is the

7 enemy of civilization, and in that he replied about he was

8 going to go to Afghanistan to fight the Taliban?

9 THE DEFENDANT: Yes.

10 THE COURT: All right. And then Yemer responded

11 about that. Do you agree with that quote?

12 THE DEFENDANT: Yes.

13 THE COURT: Okay. And then do you agree with the

14 description about how you all -- or some of your friends

15 were contacted about joining into various activities

16 overseas?

17 THE DEFENDANT: Yes.

18 THE COURT: All right. And various YouTube

19 conversations that are then discussed in the statement of

20 facts, are you agreeing that all those occurred?

21 THE DEFENDANT: Yes, I'm agreeing.

22 THE COURT: All right. And you understand that

23 those conversations include such things as, you know,

24 suggesting are you ready to fight, are you ready to get

25 prepared for these activities; do you agree with that

21

```
 1    happening?

 2              THE DEFENDANT:  Yes.  Yes.

 3              THE COURT:  All right.  Do you agree that -- this

 4    is in paragraph 18, sort of this final message video, that

 5    in or about late November of 2009, you created, caused to be

 6    created, or adopted the statements contained in the video

 7    that's been discussed as a final message?

 8              THE DEFENDANT:  Yes.

 9              THE COURT:  All right.  And the video was

10    approximately 11 minutes long and included both English and

11    Arabic, and it included background music, graphics, text and

12    film clips of you as soldiers in Iraq and photographs of

13    civilian casualties; do you agree that that happened?

14              THE DEFENDANT:  Yes.  Yes.

15              THE COURT:  And Co-Defendant Zamzam was the sole

16    speaker; is that correct?

17              THE DEFENDANT:  Yeah, that's correct.

18              THE COURT:  And the video discussed a Muslim's

19    obligation to engage in Jihad to defend Muslims and Muslim

20    lands; isn't that correct?

21              THE DEFENDANT:  Yes, that's correct.

22              THE COURT:  And at one point, the video showed

23    video of U.S. forces and Zamzam saying on the video, when

24    Muslim lands are invaded, when Muslim children are

25    terrorized, when Muslim women are raped, when our brothers
```

1   and sisters are attacked and killed, Jihad becomes, by the

2   consensus of the scholars, an individual obligation.

3            Do you agree with that, that that language

4   appeared?

5            THE DEFENDANT:  Yes.  Yes.

6            THE COURT:  And you were aware of that at the

7   time?

8            THE DEFENDANT:  Yes, I was aware of that.

9            THE COURT:  Okay.  And then do you agree that you

10  and the co-defendants decided to travel to Pakistan in order

11  to get the appropriate training and to assist in fighting?

12           THE DEFENDANT:  Yes.  Yes.

13           THE COURT:  All right.  I'm not going to go

14  through the rest of this with you because I think, again,

15  the statement of facts that I've looked at is very clear.

16  Just the last paragraph or paragraph 30 indicates that on

17  December 9 of 2009, you and the other defendants were taken

18  into custody by Pakistani law enforcement authorities; do

19  you agree with that?

20           THE DEFENDANT:  Yes, that's correct.

21           THE COURT:  All right.  And among your belongings

22  were handwritten notes and lists; is that correct?

23           THE DEFENDANT:  Yes.

24           THE COURT:  And one was a list of cities in

25  Pakistan that Co-Defendant Minni prepared while searching

                                                              23

```
1    the Internet; is that correct?

2           THE DEFENDANT:  Yes, that's correct.

3           THE COURT:  And next to four city names on the

4    list were initials J.E.M., which are described as

5    Jaish-e-Mohammed, and that's the name of the organization

6    that you were trying to connect with?

7           THE DEFENDANT:  Yes.

8           THE COURT:  All right.  Do you understand if the

9    Court accepts your guilty plea today, there will be no

10   further trial of the issue and you will be found guilty of

11   this count?

12          THE DEFENDANT:  I understand.

13          THE COURT:  Do you claim in any respect that

14   you're innocent of this conspiracy charge?

15          THE DEFENDANT:  No.

16          THE COURT:  Then how are you pleading to the

17   charge, guilty or not guilty?

18          THE DEFENDANT:  I plead guilty.

19          THE COURT:  All right.  And, Mr. Kamens, are you

20   satisfied that Mr. Chaudhry has entered this plea in a fully

21   knowing and voluntary fashion?

22          MR. KAMENS:  I am.

23          THE COURT:  And are you satisfied that the written

24   statement of facts, as well as what you know about the case

25   and your client's oral admissions today, are sufficient to
```
                                                           24

```
 1   establish his guilt beyond a reasonable doubt?

 2            MR. KAMENS:  I am.

 3            THE COURT:  Then based on these questions,

 4   Mr. Chaudhry, the Court is finding that you've entered your

 5   guilty plea in a knowing and voluntary fashion with the full

 6   advice of competent counsel, and the written statement of

 7   facts, as well as your oral admissions, are more than enough

 8   evidence upon which to find you guilty beyond a reasonable

 9   doubt.  So the plea is accepted.

10            We do need to set this case for a sentencing

11   hearing, and we're looking now into July and August.  Let's

12   see.

13            MR. GIBBS:  Judge, would any day the week of

14   July 22nd through the 26th work for the Court?

15            THE COURT:  I'm actually going to be out of town.

16   Can we do it on Friday the 19th?

17            MR. GIBBS:  I should be able to, yes, Judge.

18            THE COURT:  Mr. Kamens, is that a problem for you?

19            MR. KAMENS:  I understand the Court expects a

20   pleading the Friday before.

21            THE COURT:  Well, I mean, we could push it to --

22   is July 31st available, Mr. Gibbs, for you?

23            MR. KAMENS:  That's fine for us, Your Honor.

24            THE COURT:  That's a Wednesday.

25            MR. GIBBS:  I believe.  When I get back to my
```

```
1   office, if I find out there's a problem, I can call
2   chambers.  I'm pretty sure the 31st of July should work.
3   And that's a Wednesday I believe.
4           THE COURT:  That's a Wednesday.  All right.  We'll
5   do this -- we can set it at 10:00 that day if that works for
6   everybody.
7           MR. GIBBS:  It does.  Thank you, Judge.
8           MR. KAMENS:  Thank you, Your Honor.
9           THE COURT:  All right.  Mr. Chaudhry, you've done
10  well on bond, and so I'm going to continue you on your
11  current bond.  The only additional conditions are, Number 1,
12  that you cooperate with the probation office with the
13  preparation of the presentence report; and 2, that you
14  reappear in this court on Wednesday, July 31st at 10:00 for
15  sentencing.
16          THE DEFENDANT:  Okay.  I understand.
17          THE COURT:  All right.
18          THE DEFENDANT:  Thank you.
19          THE COURT:  Anything further for this case?
20          MR. GIBBS:  Not from the government, Judge.  Thank
21  you.
22          THE COURT:  Mr. Kamens, you should take your
23  client to the probation office.
24          MR. KAMENS:  I will do that.
25          THE COURT:  All right.  Very good.
```

```
 1              We'll recess court to await the decision of the

 2    jury.

 3              (Proceedings adjourned at 11:28 a.m.)

 4              -----------------------------------

 5    I certify that the foregoing is a true and accurate

 6    transcription of my stenographic notes.


 8                        _Stephanie Austin_

 9                     Stephanie M. Austin, RPR, CRR
```

27

**J.A. 245**

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

MAY - 2 2024

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.

UMAR FAROOQ CHAUDHRY,

Defendant.

No. 1:17-cr-270 (LMB)

## PLEA AGREEMENT

The United States Attorney for the Eastern District of Virginia; the defendant, Umar

Farooq Chaudhry; and the defendant's counsel have entered into an agreement pursuant to Rule

11 of the Federal Rules of Criminal Procedure. The terms of this Plea Agreement are as follows:

### 1. Offense and Maximum Penalties

The defendant agrees to plead guilty to Count Three of the Indictment, charging the

defendant with conspiring to provide material support and resources to a designated foreign

terrorist organization, namely *Jaish-e-Mohammed*, in violation of 18 U.S.C. § 2339B. The

maximum penalties for this offense are: a maximum term of 15 years of imprisonment, a fine of

$250,000, a special assessment pursuant to 18 U.S.C. § 3013, and a maximum supervised release

term of up to life. The defendant understands that any supervised release term is in addition to

any prison term the defendant may receive, and that a violation of a term of supervised release

could result in the defendant being returned to prison for the full term of supervised release.

### 2. Factual Basis for the Plea

The defendant will plead guilty because the defendant is in fact guilty of the charged

offense. The defendant admits the facts set forth in the Statement of Facts filed with this Plea

Agreement and agrees that those facts establish guilt of the offense charged beyond a reasonable

**J.A. 246**

doubt.  The Statement of Facts, which is hereby incorporated into this Plea Agreement,

constitutes a stipulation of facts for purposes of Section 1B1.2(c) of the Sentencing Guidelines.

### 3.      Assistance and Advice of Counsel

The defendant is satisfied that the defendant's attorney has rendered effective assistance.

The defendant understands that by entering into this Plea Agreement, defendant surrenders

certain rights as provided in this agreement.  The defendant understands that the rights of

criminal defendants include the following:

      a.    the right to plead not guilty and to persist in that plea;

      b.    the right to a jury trial;

      c.    the right to be represented by counsel—and, if necessary, have the court appoint counsel—at trial and at every other stage of the proceedings; and

      d.    the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses.

### 4.      Sentencing Guidelines, Recommendations, and Roles

The defendant understands that the Court has jurisdiction and authority to impose any

sentence within the statutory maximum described above, but that the Court will determine the

defendant's actual sentence in accordance with 18 U.S.C. § 3553(a).  The defendant understands

that the Court has not yet determined a sentence and that any estimate of the advisory sentencing

range under the U.S. Sentencing Commission's Sentencing Guidelines Manual the defendant

may have received from the defendant's counsel, the United States, or the Probation Office, is a

prediction, not a promise, and is not binding on the United States, the Probation Office, or the

Court.  Additionally, pursuant to the Supreme Court's decision in *United States v. Booker*, 543

U.S. 220 (2005), the Court, after considering the factors set forth in 18 U.S.C. § 3553(a), may

impose a sentence above or below the advisory sentencing range, subject only to review by

higher courts for reasonableness. The United States makes no promise or representation concerning what sentence the defendant will receive, and the defendant cannot withdraw a guilty plea based upon the actual sentence.

Further, in accordance with Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United States and the defendant will recommend to the Court that the following provisions of the Sentencing Guidelines apply:

| Guideline(s) | Description | Offense Level |
|---|---|---|
| U.S.S.G. §2M5.3(a) | Conspiracy to Provide Material Support or Resources to Designated Foreign Terrorist Organizations | +26 |
| U.S.S.G. §3A1.4 | Terrorism | +12 |
| | Total Offense Level | 38 |

The United States and the defendant agree that the defendant has assisted the government in the investigation and prosecution of the defendant's own misconduct by timely notifying authorities of the defendant's intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently. If the defendant qualifies for a two-level decrease in offense level pursuant to U.S.S.G. § 3E1.1(a) and the offense level prior to the operation of that section is a level 16 or greater, the government agrees to file, pursuant to U.S.S.G. § 3E1.1(b), a motion prior to, or at the time of, sentencing for an additional one-level decrease in the defendant's offense level.

The United States and the defendant further agree to jointly recommend to the Court that a sentence of not more than time-served followed by a 20-year term of supervised release be imposed on the defendant. The United States and the defendant have not agreed on any further sentencing issues, whether related to the Sentencing Guidelines or the factors listed in 18 U.S.C.

J.A. 248

§ 3553(a), other than those set forth in this Plea Agreement and in the government's Memorandum of the United States Memorializing Sentencing Recommendation filed at Docket Number 114, which includes the parties' joint recommendation for a 20 year term of supervised release and the government's recommended sentence. Accordingly, any such determinations will be made by the Court at sentencing.

### 5.     Waiver of Appeal, FOIA, and Privacy Act Rights

The defendant understands that 18 U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. Nonetheless, the defendant knowingly waives his right to appeal the conviction and any sentence within the statutory maximum described above (or the manner in which that sentence was determined) on the grounds set forth in 18 U.S.C. § 3742, or on any ground, other than an ineffective assistance of counsel claim that is cognizable on direct appeal and the sole preserved issue noted below, in exchange for the concessions made by the United States in this Plea Agreement.

The defendant agrees that he is pleading guilty conditionally to the indictment pursuant to Fed. R. Crim. P. 11(a)(2). The defendant knowingly waives the right to appeal his conviction on any ground, except that the parties agree that he preserves the right to appeal the denial (Dkt. 177) of his motion to dismiss the indictment on Sixth Amendment speedy-trial grounds (Dkt. 165), in exchange for the concessions made by the United States in this Plea Agreement. The defendant agrees that the United States has the right to seek affirmance of the denial of the defendant's motion to dismiss the indictment on any grounds supported by the record. The defendant also agrees that the United States has the right on appeal to argue in favor of the sentence imposed. This agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b).

4

**J.A. 249**

The defendant also hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

### 6. Dismissal of Other Counts

As a condition of the execution of this agreement and the Court's acceptance of the defendant's plea of guilty, the United States will move to dismiss the remaining counts pending against this defendant at the conclusion of this defendant's sentencing hearing.

### 7. Payment of Monetary Penalties

The defendant understands and agrees that, pursuant to 18 U.S.C. § 3613 and 18 U.S.C. § 3572, all monetary penalties imposed by the Court, including restitution, will be due immediately and subject to immediate enforcement by the United States as provided for in Section 3613. Within 14 days of a request, the defendant agrees to provide all of the defendant's financial information to the United States and the Probation Office and, if requested, to participate in a pre-sentencing debtor's examination and/or complete a financial statement under penalty of perjury. If the Court imposes a schedule of payments, the defendant understands that the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment. Until all monetary penalties are paid in full, the defendant will be referred to the Treasury Offset Program so that any federal payment or transfer of returned property to the defendant will be offset and applied to pay the defendant's unpaid monetary penalties. If the defendant is incarcerated, the defendant agrees to participate voluntarily in the Bureau of Prisons' Inmate Financial

Responsibility Program, regardless of whether the Court specifically directs participation or imposes a schedule of payments. Defendant agrees to make good-faith efforts toward payment of all monetary penalties imposed by the Court.

### 8. Special Assessment

Before sentencing in this case, the defendant agrees to pay a mandatory special assessment of $100 per felony count of conviction, pursuant to 18 U.S.C. § 3013(a)(2)(A).

### 9. Breach of the Plea Agreement and Remedies

This Plea Agreement is effective when signed by the defendant, the defendant's attorney, and an attorney for the United States. The defendant agrees to entry of this Plea Agreement at the date and time scheduled with the Court by the United States (in consultation with the defendant's attorney). If the defendant withdraws from this agreement, or commits or attempts to commit any additional federal, state, or local crimes, or intentionally gives materially false, incomplete, or misleading testimony or information, or otherwise violates any provision of this agreement, then:

a. The United States will be released from its obligations under this agreement. The defendant, however, may not withdraw the guilty plea entered pursuant to this agreement.

b. The defendant will be subject to prosecution for any federal criminal violation, including, but not limited to, perjury and obstruction of justice, that is not time-barred by the applicable statute of limitations on the date this agreement is signed. Notwithstanding the subsequent expiration of the statute of limitations, in any such prosecution, the defendant agrees to waive any statute-of-limitations defense.

c. Any prosecution, including the prosecution that is the subject of this agreement, may be premised upon any information provided, or statements made, by the defendant, and all such information, statements, and leads derived therefrom may be used against the defendant. The defendant waives any right to claim that statements made before or after the date of this agreement, including the Statement of Facts accompanying this agreement or adopted by the defendant and any other statements made pursuant to this or any other agreement with the United States, should be

6

J.A. 251

excluded or suppressed under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f), the Sentencing Guidelines, or any other provision of the Constitution or federal law.

Any alleged breach of this agreement by either party shall be determined by the Court in an appropriate proceeding at which the defendant's disclosures and documentary evidence shall be admissible and at which the moving party shall be required to establish a breach of this Plea Agreement by a preponderance of the evidence.

### 10.    Nature of the Agreement and Modifications

This written agreement constitutes the complete plea agreement between the United States, the defendant, and the defendant's counsel. The defendant and the defendant's attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in writing in this Plea Agreement or any associated documents filed with the Court, to cause the defendant to plead guilty. Any modification of this Plea Agreement shall be valid only as set forth in writing in a supplemental or revised plea agreement signed by all parties.

Jessica D. Aber
United States Attorney

By: _____

John T. Gibbs
Assitant United States Attorney


Defendant's Signature: I hereby agree that I have consulted with my attorney and fully understand all rights with respect to the pending criminal Indictment. Further, I fully understand all rights with respect to 18 U.S.C. § 3553 and the provisions of the Sentencing Guidelines Manual that may apply in my case. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement and voluntarily agree to it.

Date: 5/2/2024          _____

Umar Farooq Chaudhry

7

**J.A. 252**

Defense Counsel's Signature: I am counsel for the defendant in this case. I have fully explained to the defendant the defendant's rights with respect to the pending Indictment. Further, I have reviewed 18 U.S.C. § 3553 and the Sentencing Guidelines Manual, and I have fully explained to the defendant the provisions that may apply in this case. I have carefully reviewed every part of this Plea Agreement with the defendant. To my knowledge, the defendant's decision to enter into this agreement is an informed and voluntary one.

Date: 5/2/24

Geremy C. Kamens
Counsel for the Defendant

J.A. 253

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

MAY - 2 2024

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:17-CR-270 (LMB) |
| UMAR FAROOQ CHAUDHRY | |
| Defendant. | |

STATEMENT OF FACTS

The United States and the defendant, Umar Farooq Chaudhry, agree that at trial the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

On or about the following dates, Ahmed Ameer Minni, Ramy Said Zamzam, Aman Hassan Yemer, Umar Farooq Chaudhry, and Waqar Hussain Khan (collectively "the defendants") committed, or knew of and ratified, the following overt acts in furtherance of the conspiracy charged in Count Three of the Indictment:

YOUTUBE POSTINGS

1.     On or about May 28, 2009, Yemer posted a comment on his YouTube account in reply to someone who said "Islam is the enemy of civilization" and who implied that he was going to Afghanistan to fight the Taliban.   Yemer responded:

> The only rapists are the stupid U.S. soldiers who go to Iraq and Afghanistan then rape and murder innocent people. Approximately [655,000] from March 2003 to July 2006 have died from the illegal Iraqi occupation and only a 4-5 thousand from the U.S.... Those who have been expelled from their homes unjustly only because they said:"Our Lord is Allah." ... "O you who believe fight those of the unbelievers near you and let them see how harsh you can be. Know that Allah is with the righteous."

**J.A. 254**

## COMMUNICATIONS WITH THE RECRUITER

2.      In or about May through August 2009, Minni was contacted by a recruiter by the name of "Saifullah" (which translates to "Sword of Allah") as a result of Minni's postings about *jihadist* videos on YouTube.   "Saifullah" encouraged Minni to travel to Pakistan to engage in violent *jihad*.   In or about the same time, Yemer was also in contact with "Saifullah."   "Saifullah" provided guidance on how to travel in Pakistan in a manner that would not arouse suspicion, including that the defendants should be clean shaven.

3.      "Saifullah" used the YouTube user name "SwordofAllah74."   Minni's "nawminni" YouTube channel listed "SwordofAllah74" among his subscribers, subscriptions, and "friends."   The "SwordofAllah74" account was registered from an IP address in Pakistan in or about August 2009.   The "SwordofAllah74" account contains a photograph of a male subject in camouflage clothing, with his face covered, holding a gun and a sign reading, in English, "In the Name of Allah, SwordofAllah74, Taliban, 12-2-09."

4.      On or about August 25, 2009, Minni wrote to another YouTube user, "I see that you're friends with SwordofAllah74. I was wondering if he sent an invitation to you to go out [to join in *jihad*]? If so, have you replied back yet?"

5.      On September 10, 2009, Minni sent a message to "Saifullah" at another YouTube account, "AKM68r," saying:

> I'm going to have to kindly decline your invitation. I still have my study's to take care of. I do know, however, of a brother that is really interested in [*jihad*]. He recently got a very nice a haircut and is ready to travel and spread islam IA [i.e., "Insha'Allah," meaning "Allah willing."]

6.      Less than half an hour later, Yemer wrote to AKM68r:

I hope nawminni told you about me. I would like to travel and [engage in *jihad*] insh'Allah. I will try to bring along some more brothers too if that's ok insh'Allah. Please tell me everything I should know brother. I have already started making preparations for this wonderful opportunity. Insh'Allah we will meet soon!!

7.     The next day, "Saifullah" wrote to Yemer including some information on travel to Pakistan:

Cant wait to meet with you, you will iA be pleased with my Jammat Dawah Very sweet brothers who are hungry to show the world Islam and convert it-lol see you iA. We will also tour the famous Islamic sites/mosques in Pakistan iA. look into what you would like to check out here. your stay will be limited (visa) for 3 months i beleive. And the North (nwfp) areas are sensitive now so we cannot go there..for our safety. But besides that everything is beautiful iA

8.     In or about September 2009, Minni and Yemer told Khan of their communications with "Saifullah" and recruited Khan to join them in traveling to Afghanistan to engage in violent *jihad*.   Khan agreed.   Thereafter Minni, Yemer, and Khan recruited Chaudhry to join them, and Chaudhry agreed to do so.   Finally, Minni, Yemer, Khan, and Chaudhry approached Zamzam to recruit him.   Zamzam agreed to travel with them to Afghanistan to wage *jihad*.

9.     On or about October 18, 2009, "Saifullah" wrote to Minni telling him that they should communicate, but to "[u]se code words, but not to an extreme so I wont be able to understand iA."   "Saifullah" also wrote, "to be safe lets not talk like believers or greet each other properly or even say His name."   He ended the message asking for a status on "our project" and "May we be united soon."

10.    On or about October 19, 2009, Minni responded:

- Money situation is good
- Passes have arrived for some and still coming for others
- Still need few weeks, so it seems

-3-

11.     On or about October 22, 2009, Minni wrote, "Are you safe? Are u in uz af
pk or waz? Does anyone else know about this in case anything happens to you?"   On or
about October 26, 2009, "Saifullah" responded,

> yes, thank you. i am good for now. but i must go today and cut up the
> smelly pigs(i will be gone for 40 days give or take). im in waz in the middle
> of af and pk..i have handed info over to a close brother of mine. if i fly in
> the sky he will be with you. i have done some thinking with the brothers,
> and we thought of only you or the smartest one of you visit me for a lil
> schooling then you go back and do homework and teach your brothers and
> work where u at...arrive @ karachi,pk. i will have a plan made (let me
> know 2-3 weeks prior when your about to peace out).

12.     On or about October 24, 2009, Zamzam and Chaudhry had an online chat
during which Chaudhry told Zamzam that Zamzam was "about to get 72 [wives] buddy"
and that it was "a great trade right?"   Chaudhry then asked Zamzam:

| Chaudhry: | you ready to give dawa? |
|---|---|
| Zamzam: | yea bro just busy with midterms |
| Chaudhry: | yeah must be hard to think of being at 2 places at once |
| Zamzam: | yea |

13.     On October 28, 2009, Minni wrote to "Saifullah," "Once any of us leaves, it
will cause an alarm in our community, jus like the minesota boys who left. It will b
impossible for any of us to return here bro."   On or about October 30, 2009, Minni
wrote, "we have done much on our side as far as shots/preparation but were wondering
how do many of the bros fair there as far as health goes."   Over the next several days,
Minni and "Saifullah" discussed cover stories that Minni and the others might use to
travel to Pakistan to meet with "Saifullah" and his "brothers."

14.     On or about November 6, 2009, Chaudhry received an email from the U.S.
Department of State informing him that it had finished processing his passport and that

-4-

J.A. 257

the passport had been mailed to him and that it would arrive on Monday, November 8, 2009.   A few hours later, Chaudhry had this online chat with Zamzam about this "great news":

| | |
|---|---|
| Chaudhry: | my six flags ticket has been mailed and will arrive on monday |
| Zamzam: | ur pass? |
| Chaudhry: | yea |
| Zamzam: | season pass awesome! . . . did u tell Ahmed? |
| Chaudhry: | yes so we can meet on sunday and finish our six flags trip planning |
| Zamzam: | yea def we need to asappp : ) |

15.     On or about November 10, 2009, Minni wrote to Saifullah,

i talked with the bros and we cant do [a suggested] plan because it will take too long and its not possible for various reasons. we understand being patient is important but for our reasons we cant delay. among us are pakistani. We will ia arrive in late Nov with a good cover story. how should we proceed

16.     On or about November 13, 2009, "Saifullah" wrote to Minni,

dont buy anything yet... our brothers and i have been doing some thinking... you and your brothers are very crucial for other work. i will discuss with you later .... this path isnt always how you see it in the vids..it takes much patience, really. i am on this side and cant go back and if i could than i would but being behind you know what is stopping me. i have spent much time here 13 mnths and working abroad is more affective if you know what i mean. you don't have to come here than go back. you can take a vacation in turkey- learn a few tricks and start on homework slowly and at a pace you feel you can handle- and meet with my brothers. i know your eagerness to get away but work like this helps our community so much more.

17.     On November 18, 2009, Chaudhry and Zamzam had the following online chat:

-5-

| Chaudhry: | did you get your season pass tix? |
| Zamzam: | idk if ahmed n waqar got em or not |
| Chaudhry: | i think they are supposed to get it today |
| Zamzam: | k sounds good u find a wife yet? |
| Chaudhry: | is it necessary anymore? |
| Zamzam: | i think u guys r getting ur six flags tickets today also |
| Chaudhry: | i gave my info to a muslim burial business but no call back :( |
| Zamzam: | just stay low key anything local bro |

### THE FINAL MESSAGE VIDEO

18.    In or about late-November  2009, the defendants created, caused to be created, or adopted the statements contained in a video on a USB drive in a file named, Aafinalmessage.@   The video was approximately eleven minutes long, and included both English and Arabic.   The video included background music, graphics, text, and film clips of U.S. soldiers in Iraq and photographs of civilian casualties.   During the video, Zamzam was the sole speaker.   He discussed a Muslim's obligation to engage in *jihad* to defend Muslims and Muslim lands.   At one point, while the video showed footage of U.S. forces, Zamzam said on the video, "when Muslim lands are invaded, when Muslim children are terrorized, when Muslim women are raped, when our brothers and sisters are attacked and killed, . . . *jihad* becomes, by the consensus of the scholars . . . , an individual obligation . . . to defend his brothers and sisters and give them victory."   The video then bore a message saying, "physical jihad against the disbelievers becomes obligatory . . . [w]hen the Muslim is present in a jihad situation . . . [or] when the enemy has come and attacked a Muslim land."   Minni recorded and edited the "final message" video.

-6-

J.A. 259

19.     On or about the evening of November 26-27, 2009, the defendants went to a computer repair shop in Lorton, Virginia, belonging to Chaudhry's family within the Eastern District of Virginia.   There, Zamzam used a desktop computer inside the shop to play for the other defendants the video described above.   After playing the video, Zamzam told an individual who was present to upload the video from a USB drive to a website.   Zamzam told the individual to create a hyperlink to the video and to email the link to a list contained on a second USB drive.   Zamzam gave the individual a user name and password for an account to use in uploading the video.

20.     On or about November 28, 2009, Khan gave an individual two USB drives and told the individual, "this is from Ramy.   You'll know when to open it."   One of the USB drives contained the video of Zamzam described above.   It was the defendants' intention that the "Final Message" video ultimately would be made publicly available through YouTube.

### THE DEFENDANTS' PASSAGE TO PAKISTAN

21.     The plan to travel to Pakistan originated with Minni, based upon his contact with "Saifullah."   Minni was responsible for communicating messages from "Saifullah" to the rest of the defendants.

22.     The defendants prepared for the trip to Pakistan for four months, including obtaining money and passports.   In or about November 2009, the defendants withdrew thousands of dollars from various accounts in anticipation of traveling to Pakistan to engage in *jihad*.   Zamzam obtained some of the money from his educational aid, and Khan provided approximately $20,000 that he withdrew from relatives' accounts.

-7-

J.A. 260

23.     Minni continued to post messages for "Saifullah" until the defendants left for Pakistan.   Once in Pakistan Minni attempted to contact "Saifullah" in an effort to make arrangements to meet with "Saifullah" and his "brothers."

24.     On or about November 30, 2009, an individual had a telephone conversation with Zamzam, during which Zamzam said that he and the other defendants were overseas.   The individual asked Zamzam if he would ever see Zamzam again, to which Zamzam replied, "no."

25.     Once in Pakistan, Minni and Chaudhry created an email account, the purpose of which was to allow the defendants to communicate in the event that they became separated or lost communication with each other.

26.     On or about December 3, 2009, Minni, who was in Pakistan at the time, corresponded with a number of persons via YouTube asking whether they were at the "frontlines" and reporting that he and his friends were in Pakistan seeking assistance. One of the YouTube users who responded was "Freedomisour."   Minni sent a message to "Freedomisour" with the subject "caravan" in which he stated, "salam akhi, are you in the front lines? if so I need some help, im in pk."   "Freedomisour" responded in a message that translated as "My dear brother, write in Urdu because there is a lot of spying going on here What if I tell you I am in that place you asked about, then my brother? You can ask me what you want to ask. Peace." Minni replied, "saifullah (SoA74) invited us but he hasn't been on for a while and we are trying to find a door to the frontlines. Jzk."   In a later message, Minni said, "I am from the US. I am in Sindh right now. You tell me, should I go to work?"   "Freedomisour" responded, "brother go to the channel of my brother . . . ask him further he is also in pakistan."

-8-

J.A. 261

27.     Because the defendants had difficulty contacting "Saifullah" once in Pakistan, the defendants initiated their own efforts to get into Afghanistan.   Waqar Khan and Chaudhry went into the town of Hyderabad to research local mosques that could help the defendants join in *jihad*.   Khan and Chaudhry found one that they understood to be associated with *Jaish-e-Mohammed*, a designated foreign terrorist organization.   When Waqar and Chaudhry went there, they spoke with a man about joining in *jihad*.   The man gave them a piece of paper with the name of a mosque, "Babal Islam," written on it.   The defendants went to that mosque and encountered another man, with whom they discussed becoming *mujahideen* and joining in *jihad*. The next day, this man introduced Zamzam and Chaudhry to the emir of the mosque. The emir told Zamzam and Chaudhry to go to Lahore where there was a headquarters for a camp of *mujahideen*.

28.     The day after they met the emir, the defendants left Hyderabad for Lahore and went to the location described by the emir, which was a mosque.   The defendants understood the location to be associated with *Jamaat-ud-Dawa*.   At the location, the defendants encountered people of whom asked the defendants why they were there. The *Jamaat-ud-Dawa* representative told the defendants that the defendants would need a reference before they would be accepted.   The *Jamaat-ud-Dawa* representative told the defendants that because Chaudhry was a dual citizen and had family living in Pakistan, they should get a reference from one of Chaudhry's family members in Sargodha.   The representative told them that they should go to the *Jamaat-ud-Dawa* office in Sargodha after they obtained the reference and then the organization could take

-9-

J.A. 262

all of the defendants in.   The defendants then traveled to Sargodha and contacted one of Chaudhry's relatives.

29.     At all times, the defendants understood that while engaged in *jihad* in Afghanistan, they would likely encounter U.S. military forces.   The defendants intended to fight and, if necessary, to kill any U.S. military forces that opposed the defendants or their fellow *jihadists*.

### THE DEFENDANTS' ARRESTS IN PAKISTAN

30.     On or about December 9, 2009, the defendants were taken into custody by Pakistani law enforcement authorities in Sargodha, Pakistan.   Among the defendants' belongings were handwritten notes and lists.   One was a list of cities in Pakistan that Minni prepared in Pakistan while searching the Internet.   Next to four city names on the list are the initials "JeM," *i.e., Jaish-e-Mohammed*.   Under the initials "JeM" is "Markaz Babal Islam," the name of the mosque given to the defendants by the man at the Hyderabad mosque associated with *Jaish-e-Mohammed*.   The list also referred to the Hyderabad mosque itself.   There was also a reference to *Jamaat-ud-Dawa* under "Lahore."

### CONCLUSION

31.     Defendant Umar Farooq Chaudhry agrees that the foregoing facts establish that at least from in or about November 2009 through on or about December 9, 2009, within the Eastern District of Virginia and elsewhere, the defendants knowingly conspired and agreed among themselves and with others to provide material support and resources to *Jaish-e-Mohammed*, a designated foreign terrorist organization.   The material support and resources that the defendants conspired to provide included, but

-10-

J.A. 263

was not necessarily limited to, the defendants' services and the defendants themselves as personnel in engaging in armed fighting and other acts of violence in Afghanistan against U.S. forces and U.S.-allied forces operating there.

32.   This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States.   It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

33.   The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date:  Click to enter a date.        By: _____

John T. Gibbs
Assistant United States Attorney

-11-

J.A. 264

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, Umar Farooq Chaudhry, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proven the same beyond a reasonable doubt.

_____
Umar Farooq Chaudhry

I am the defendant's attorney.   I have carefully reviewed the above Statement of Facts with him.   To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Geremy C. Kamens
Attorney for the Defendant

-12-

**J.A. 265**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA )
                                               )
v.                                             )
                                               )   1:17-cr-270 (LMB)
UMAR FAROOQ CHAUDHRY,          )
                                               )
            Defendant.                  )

## MEMORANDUM OPINION

Before the Court is defendant Umar Farooq Chaudhry's ("defendant" or "Chaudhry")

"Motion to Dismiss Indictment for Violating the Sixth Amendment Right to a Speedy Trial and

Rule 48" ("Motion to Dismiss the Indictment") [Dkt. No. 165]. More specifically, defendant

argues that he is entitled to relief because the government filed a criminal complaint and

obtained an arrest warrant for him on December 23, 2009; however, it waited almost eight years

to seek an indictment, which was filed on November 16, 2017, and did not formally request his

extradition from Pakistan until August 26, 2020. Id. at 3. In opposition, the government argues

that defendant cannot satisfy the test set forth in Barker v. Wingo, 407 U.S. 504 (1972), to

warrant dismissal of his Indictment. For the reasons stated during oral argument and more fully

explained within this Memorandum Opinion, defendant's Motion to Dismiss the Indictment has

been denied.

## I. BACKGROUND

On November 16, 2017, Chaudhry along with Ahmed Ameer Minni, Ramy Said

Zamzam, Aman Hassan Yemer, and Waqar Hussain Khan were indicted for conspiring to

provide material support to terrorists in violation of 18 U.S.C. § 2339A (Count One), attempting

to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339A

(Count Two), conspiring to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B (Count Three), and attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B (Count Four).  [Dkt. No. 10].  These charges arose out of defendants flying to Pakistan for the purpose of going onward to Afghanistan to defend Muslims against American and other foreign troops.  [Dkt. No. 2] at 4.  Before their departures from Northern Virginia, Zamzam, assisted by Minni, recorded a "Final Message" video explaining the reasons for the defendants' trip.  Among the reasons cited was the need for Muslims to go overseas and assist their fellow Muslims physically, by fighting, which was described as a religious obligation.  Id. at 2-3.  When the defendants left the United States, almost no one knew of their plans.[1]

On December 9, 2009, shortly after the defendants arrived in Pakistan, Pakistani authorities arrested all five defendants in a house belonging to Chaudhry's cousin.  Id. at 5.  On December 10, 2009, the United States' Assistant Legal Attaché in Pakistan ("ALAT") interviewed the defendants for the first time.  The FBI also immediately sent a team of agents to attempt to interview defendants.  From December 10, 2009 through December 19, 2009, the FBI conducted nine interviews of the defendants.  During those interviews, defendants Minni and Khan made numerous admissions, including that a recruiter had contacted Minni to arrange for the group to travel to Pakistan and instructed him on how to travel in Pakistan in a manner that would not arouse suspicion.  Id. at 5-6.  Minni also admitted that everyone in the group supported the goal of fighting American troops in Afghanistan.  Id. at 6.  During Chaudhry's interview, he stated that "we came for the sake of Islam to work with the Muslims" and added, "I

---

[1] The FBI first became aware of these defendants on December 1, 2009 after their families came forward to report that their sons were missing.  The family members provided the FBI with a USB that contained the video file named "afinalmessage."  [Dkt. No. 2] at 2.

am letting you know that I know about the video. We came here together and the video speaks for us. Whatever the video says, I am for that." Id. at 8.

Around December 15, 2009, the ALAT met with his counterpart in the Pakistani Ministry of the Interior concerning the defendants and asked if the Pakistani government would be "willing to deport the five directly to a USG operated plane in Pakistan for immediate repatriation to the United States," [Dkt. No. 168-1] at 3; however, the ALAT was told that because the defendants had received a consular visit, their detention was now "formal" and "on the books," meaning that Pakistan expected the United States to follow the formal extradition process. Id.

On December 23, 2009, the United States Attorney's Office for the Eastern District of Virginia ("EDVA") filed a criminal complaint against the defendants and obtained arrest warrants for them. [Dkt. No. 1]. The following day, the government filed a motion seeking a limited unsealing order so that "summary information as to the defendants' offense conduct could be taken from the complaint and supporting affidavit and provided to INTERPOL, as required for issuance of a Red Notice/Wanted Person Diffusion Alerts with respect to the warrants issued by the Court for the defendants' arrest."[2] [Dkt. Nos. 6, 7]. On December 30, 2009, the Department of Justice approved the Red Notice applications for all five defendants, which reinforced that "the Red Notice is a firm commitment by your office, and by the United States to request this fugitive's extradition in all but the most exceptional circumstances." [Dkt. No. 168-3] at 3. Under "Action to be taken if traced," the Red Notice for each defendant sought

---

[2] An INTERPOL Red Notice is an international notification to all country members of INTERPOL (of which Pakistan is a member) that a defendant is wanted in the United States on an arrest warrant or court order. See INTERPOL, Red Notices, https://www.interpol.int/How-we-work/Notices/Red-Notices (last visited Apr. 8, 2024).

3

to "locate and arrest [that defendant] with a view to extradition" in "conformity with national laws and/or the applicable bilateral and multilateral treaties." Id. at 7.

On December 24, 2009, the United States Legal Attaché provided copies of the arrest warrants to the Pakistani Ministry of the Interior. [Dkt. No. 168-2]. The Legal Attaché also advised that "[t]he US Government seeks custody of these individuals so that they may stand trial in the US for the charge above and any additional charges that may be added to the complaint. The Legat office is prepared to facilitate the transfer of the five via air transport from Pakistan to the US within a timeframe of 72 hours of notification." Id. at 3. That same day, Pakistan informed the Legal Attaché that "there was a court order from the local court which ordered the Sargodha Fives'[3] detention, prohibiting their transfer to any foreign government." [Dkt. No. 168-4] at 7-8.

On December 28, 2009, the Legal Attaché advised the United States government that an official request from the United States for the transfer of custody of the defendants might carry more weight than simply providing the arrest warrants and advised that the defendants would likely be formally charged in Pakistan on January 4, 2010, for directing terrorist activities. Id. at 8. In response, the Office of International Affairs of the United States Department of Justice ("OIA") and EDVA worked together to provide an official request to Pakistan to turn over the five defendants.[4] Id. This request was issued in the form of a diplomatic note presented to the Pakistani Ministry of Foreign Affairs in Islamabad on January 8, 2010, but due to a

---

[3] Because the defendants were arrested in Sargodha, Pakistan, the Declaration of the Assistant Director at the Office of International Affairs attached to the government's Opposition and other documents refer to the defendants as "the Sargodha Five." [Dkt. No. 168-4] at 7.

[4] According to the Associate Director of the OIA, because the five defendants were United States citizens, the government sought Pakistan's consent to return them home to the United States without requiring a full extradition request. Id. at 8.

4

typographical error in the note, an amended note was presented on January 15, 2010. Id. The diplomatic note requested the transfer by "deportation, expulsion, or other lawful means" of the five defendants. Id. It specifically requested "that the Government of Pakistan consider suspending or otherwise deferring its criminal proceedings against the defendants and deporting or expelling them as soon as possible to the United States." Id. at 8-9. There is no evidence in the record of a response from Pakistan to this request; however, on June 5 or 6, 2010, the United States Ambassador to Pakistan met with the Pakistani Minister of Interior to reiterate the United States' position that the defendants should be returned to the United States. Id. at 9.

On June 23, 2010, the Legal Attaché sent a letter to the Pakistani Ministry of Interior about these defendants, repeating that "the US Government has a strong interest in seeing their custody transferred to the United States at the earliest opportunity." [Dkt. No. 168-8] at 2. The letter also reiterated that the defendants could be held in custody "until a US Government aircraft could arrive to transport those who are deported out of Pakistan." Id. Instead of transferring the defendants to the United States, Pakistan quickly prosecuted the defendants all of whom were found guilty on June 24, 2010 of various charges and were sentenced to ten years' imprisonment. [Dkt. No. 29-1]; [Dkt. No. 168-4] at 9.

According to the declaration of Jeffrey Olson, the OIA Associate Director, over the next ten years, the Legal Attaché "routinely inquired with the Pakistan government as to the completion of" the defendants' sentences. [Dkt. No. 168-4] at 10. For example, on March 4, 2013, while the defendants were serving their sentences, the Legal Attaché sent a letter to the Director General of the Federal Investigative Agency in Pakistan regarding the defendants. The letter stressed that the United States government was "interested in discussing a number of

5

pending requests for extradition in Pakistan to the United States, such as" the five named defendants in this case. [Dkt. No. 168-6] at 2.

On November 16, 2017, while the defendants were still serving their sentences in Pakistan, a grand jury in this district charged the defendants in a four-count Indictment with material support offenses. [Dkt. No. 10]. On the same day, new criminal arrest warrants were issued. [Dkt. No. 16].

In November 2019, the Department of Justice learned that the defendants would be released soon. [Dkt. No. 168-4] at 10. On November 22, 2019, in anticipation of the defendants' release from prison in Pakistan, the government filed a motion to appoint counsel for them. [Dkt. No. 17]. In that motion, the government explained that it expected the defendants' sentences in Pakistan to conclude in early January 2020; however, "[i]t [wa]s unclear what the Pakistan government will do upon the defendants' release, including whether the Pakistanis will release the defendants directly to the U.S. State Department." Id. As a result, Judge O'Grady appointed counsel for each defendant. Chaudhry's counsel came from the Federal Public Defendant's Office.[5]

In early December 2019, the OIA Associate Director requested that the Department of State and U.S. Embassy in Islamabad "send a cable to the Pakistan Ministry of Foreign Affairs, noting that it was our understanding that the sentences of the [defendants] were due to expire imminently, and asking for confirmation of that fact so that the U.S. could proceed with extradition or deportation." [Dkt. No. 168-4] at 10.

---

[5] This case was initially assigned to Judge Liam O'Grady and, on September 7, 2022, was randomly reassigned to the undersigned judge following Judge O'Grady's retirement.

6

Chaudhry was released on June 9, 2020. On June 22, 2020, the Pakistani Ministry of Foreign Affairs sent the U.S. Embassy a diplomatic note requesting extradition documents for Chaudhry and Khan because both defendants held dual Pakistani-U.S. citizenship. Id. at 11. As for the other three defendants, Minni, Zamzam, and Yemer, because they did not have Pakistani citizenship, Pakistan simply required travel documents and airline tickets to facilitate their deportation. Id. On August 17, 2020, Chaudhry's defense counsel confirmed that Chaudhry would contest extradition from Pakistan.

On August 24, 2020, OIA received two sworn copies of the approved extradition requests for Chaudhry and Khan from the United States Attorney's Office. Id. at 11-12. On October 22, 2020, the government filed a motion for certified copies of the defendants' arrest warrants "to effect the foreign transfer of custody of the defendants to the United States Government and to secure their appearance in this District." [Dkt. No. 47]. Judge O'Grady granted the motion the next day. Because of COVID-19 related delays, OIA sent the certified extradition package to the Department of State on October 27, 2020. [Dkt. No. 168-4] at 12.

On the day OIA sent the certified extradition package to the Department of State, the Legal Attaché advised that the December 2009 order prohibiting the defendants' transfer to any foreign government was still in effect and advised that his staff was working with the Pakistani Ministry of Interior to petition the local court to lift the order to facilitate Chaudhry's extradition. Id. On November 9, 2020, the extradition requests were sent to the United States Embassy in Pakistan and were presented to the Pakistani Minister of Foreign Affairs on November 12, 2020. Id.

On May 16, 2021, the Pakistani Federal Secretary of the Ministry of the Interior informed United States authorities that an arrest warrant had been issued for Chaudhry, who had been

7

J.A. 272

released from custody, and that his extradition proceedings would begin once he was arrested. Id. at 12-13. Chaudhry was arrested around August 17, 2022. Because he contested extradition, court proceedings commenced in Pakistan. Id. at 13. The Legal Attaché regularly updated OIA on the defendant's extradition proceedings, including court sittings held on November 29, 2022; December 13, 2022; January 12, 2023; March 16, 2023; April 18, 2023; May 24, 2023; and June 13, 2023. Id. Around July 5, 2023, Chaudhry finally consented to extradition, and on September 11, 2023, the Cabinet of Pakistan approved Chaudhry's extradition. Id. Due to "great challenges" in securing transportation for Chaudhry's return, Chaudhry was not extradited from Pakistan to the United States until December 6, 2023. Id. at 13-14. He landed at Dulles International Airport in Virginia that same day and was arraigned in this Court on December 12, 2023. Id. at 14; [Dkt. No. 163].

## II. DISCUSSION

### A. <u>Standard of Review</u>

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy public trial." U.S. Const. amend. VI. The remedy for a violation of the constitutional right to a speedy trial is to dismiss an indictment and to vacate any sentence that has been imposed. Strunk v. United States, 412 U.S. 434, 440 (1973).

In determining whether the right to a speedy trial has been violated, courts must balance four factors: (1) the length of the delay; (2) the government's justification for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530 (1972). No factor standing alone is "either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial." Id. at 533.

8

J.A. 273

## B. Analysis

In his Motion to Dismiss the Indictment, Chaudhry argues that the more than ten-year delay in the government formally requesting his extradition after having filed a complaint against him warrants dismissal of the Indictment for violating his Sixth Amendment right to a speedy trial. [Dkt. No. 165] at 5. More specifically, Chaudhry argues that all four Barker factors weigh in his favor because, despite having been in the custody of a foreign government from 2009 to 2020, the United States did not act with reasonable diligence in seeking his extradition, which has prejudiced his case.[6] Id. at 8-10. In opposition, the government argues that because the second, third, and fourth Barker factors weigh against the defendant, he cannot satisfy his burden of showing a Sixth Amendment violation. [Dkt. No. 168] at 30.

### 1. Length of Delay

Under the first Barker factor courts must assess whether the length of the government's delay in seeking extradition was uncommonly long. Barker, 407 U.S. at 530. The length of delay is both a factor and "a threshold requirement because the defendant must establish that the length of the delay is at least presumptively prejudicial to trigger the balancing inquiry." United States v. Villa, 70 F.4th 704, 713 (4th Cir. 2023) (citation omitted). Although the Supreme Court of the United States has expressly stated that the right to a speedy trial does not attach until arrest or indictment, United States v. MacDonald, 456 U.S. 1, 6 (1982), the United States Court of Appeals for the Fourth Circuit has interpreted the Sixth Amendment more broadly, holding that the issuance of a criminal complaint, arrest warrant, and detainer triggers a defendant's Sixth

---

[6] Defendant does not challenge any period of delay postdating the submission of the United States government's extradition request.

Amendment speedy trial right. See United States v. Thomas, 55 F.3d 144, 149 (4th Cir. 1995); United States v. Woolfolk, 399 F.3d 590, 597 (4th Cir. 2005).

Here, the parties do not contest that the length of the government's delay weighs in defendant's favor, [Dkt. No. 168] at 13; however, they disagree about the precise length of the delay. Defendant argues that, under Fourth Circuit precedent, his Sixth Amendment right attached when the government charged him by complaint in 2009, and as such, there was an 11-year delay in seeking his formal extradition. [Dkt. No. 165] at 7. On the other hand, the government argues that, under Supreme Court precedent, defendant's Sixth Amendment right did not attach until 2017 when he was indicted. [Dkt. No. 168] at 12. Although, as the Fourth Circuit acknowledged in Thomas, this circuit's broad interpretation of Sixth Amendment attachment is in tension with Supreme Court precedent, 55 F.3d at 149 n.4, the Court need not decide whether subsequent decisions have narrowed this circuit's broad interpretation of the Sixth Amendment because, under either party's interpretation of when defendant's Sixth Amendment right attached,—three years or eleven years before seeking extradition— the government's delay was uncommonly long. Doggett v. United States, 505 U.S. 647, 652 n.1 (1992) ("[P]ostaccusation delay [is] 'presumptively prejudicial' at least as it approaches one year."). Accordingly, defendant has satisfied the threshold requirement, and the first Barker factor weighs in his favor.

### 2. Reason for Delay

Under the second Barker factor courts consider the government's justifications for the delay. Barker, 407 U.S. at 531. The reasons for delay "should be characterized as either valid, improper, or neutral." United States v. Hall, 551 F.3d 257, 272 (4th Cir. 2009). Courts must focus on the intent of the prosecution when examining the reasons for delay. Id. An improper

10

reason for delay, such as government negligence, is "weighted heavily against the government," whereas "[v]alid reasons for delaying a trial are weighted in favor of the [g]overnment." United States v. Grimmond, 137 F.3d 823, 828 (4th Cir. 1998); Barker, 407 U.S. at 531. The government has explained that the delay in extradition resulted from the defendant's arrest, conviction, and sentence in Pakistan, which began in December 2009 and ended in June 2020. [Dkt. No. 168] at 15. Defendant, on the other hand, asserts that because the government did not file a formal extradition request while defendant was incarcerated in Pakistan, the government failed to act with reasonable diligence. [Dkt. No. 165] at 8-9; [Dkt. No. 172] at 3-7.

As an initial matter, that the government did not file a formal extradition request until defendant completed his sentence in Pakistan "is without question a valid reason for delay." Grimmond, 137 F.3d at 828 (citing Thomas, 55 F.3d at 150 ("The need to allow [the defendant] to be prosecuted by the State without interference by the federal government ... [is] an obvious reason for delaying [the defendant's] federal prosecution.")). Chaudhry's claim that the Fourth Circuit's language in Grimmond does not apply because "the Pakistani charges were fraudulent," [Dkt. No. 172] at 3, is of no moment where he provides no support in the record or the law for this assertion.

Although other circuits have held that the government must make a diligent, good faith effort to obtain custody of a defendant when he is being held in a foreign country, "there is no case law to support [defendant's] argument . . . that absent a formal request for extradition from one government to another, there has been no diligent good faith effort." United State v. Walton, 814 F.2d 376, 379 (7th Cir. 1987); see United States v. Diacolios, 837 F.2d 79, 83 (2d. Cir. 1988) ("[W]e are aware of no case that holds that a formal request for extradition must be made before due diligence can be found to have existed"). Moreover, "the government usually

11

satisfies its diligence obligation if it shows that it attempted extradition informally." United States v. Fernandes, 618 F. Supp. 2d 62, 69 (D.D.C. 2009); see United States v. Valencia-Quintana, 136 F. App'x 707, 709 (5th Cir. 2005) (holding that "[a]lthough the government did not formally request extradition," the government satisfied its diligence obligation by "procur[ing] an agreement from Dominican officials to notify the [government] prior to [the defendant's] release" from a Dominican jail).

The uncontested record shows that the government made extensive reasonable efforts to obtain custody of Chaudhry upon his arrest in Pakistan and continued to make numerous requests to the Pakistani authorities for the speedy extradition or deportation of Chaudhry and his co-defendants. As the declaration of the OIA Associate Director established, when Chaudhry was arrested in Pakistan, there was a pattern of United States' extradition requests not being "addressed in a timely manner by the Government of Pakistan, or simply were not addressed at all,"[7] [Dkt. No. 168-4] at 5-6. Moreover, the OIA knew that "in certain cases" Pakistan had agreed "to deport another country's nationals in lieu of extradition," and this method "is typically faster than extradition proceedings." Id. at 5. Because Chaudhry was a United States citizen, the OIA believed this expedited deportation option was available. As a result, the government proceeded with what it understood to be an "expedited option" to obtain custody of Chaudhry and his co-defendants through informal extradition and deportation requests. Id. at 5-6.

Notably, proceeding informally was reasonable given that Article 4 of the United States-Pakistan Extradition Treaty stated that "extradition shall be deferred until the conclusion of the [defendant's] trial and the full execution of any punishment awarded to him," id. at 9, and that

_____

[7] Despite making "many other extradition requests to Pakistan" between January 2010 and June 2021, the United States had only one successful extradition from Pakistan, in 2015. Id. at 6.

12

there was no prisoner transfer treaty in place between the United States and Pakistan," id. at 10.

Despite these legal hurdles, the United States government nevertheless provided an official

request to Pakistan to turn over the five defendants, requesting "that the Government of Pakistan

consider suspending or otherwise deferring its criminal proceedings against the defendants and

deporting or expelling them as soon as possible to the United States." Id. at 8-9.  In sum, the

government's repeated requests to Pakistan to turn over Chaudhry and his co-defendants clearly

demonstrate reasonable diligence, even in the absence of a formal extradition request before

2020.[8]

     Defendant's reliance on United States v. Pomeroy, 822 F.2d 718, 722 (8th Cir. 1987), and

United States v. Heshelman, 521 F. App'x 501, 508 (6th Cir. 2013), to argue that the government

did not act with reasonable diligence is unpersuasive.  In Pomeroy, the Eighth Circuit affirmed

the dismissal of an indictment where the government knew the defendant's whereabouts for two

years but did nothing in the period to extradite him, 822 F.2d at 720 n.4, and in Heshelman, the

Sixth Circuit ordered the dismissal of an indictment because it found that actively seeking the

defendant's extradition would not have been futile given that the United States had an extradition

treaty with Switzerland that covered all the charges at issue and "made only one attempt to"

inquire into conditions of extradition.  521 F. App'x at 508.  In contrast to the government's

conduct in those cases, in this case it made repeated efforts to locate and extradite defendant

despite the provision in Article 4 of the United States extradition treaty with Pakistan, deferring

extradition until "the full execution of [defendant's] punishment," and despite the local court in

Pakistan having barred defendant's transfer to any foreign state's custody.  [Dkt. No. 168-4] at 9.

---

[8] The facts in the public record are more than sufficient to establish the government's diligence
in seeking the speedy return of Chaudhry to the United States.  Moreover, the classified materials
reviewed ex parte further corroborate this conclusion.  See [Dkt. No. 169].

Because "[t]he government is not duty-bound to pursue futile legal gestures to return the defendant for trial," United States v. Mitchell, 957 F.2d 465, 469 (7th Cir. 1992), and because the government reasonably believed Pakistan would not release the defendant until the conclusion of his sentence, its failure to file a premature extradition request does not signify negligent conduct or a failure to act with reasonable diligence.[9] Accordingly, the second Barker factor weighs heavily in favor of the government.

### 3. Defendant's Assertion of the Right

Under the third Barker factor, the Court must weigh the timeliness of defendant's assertion of his Sixth Amendment right to a speedy trial. Barker, 407 U.S. at 531. A "defendant's assertion of his speedy trial right … is entitled to strong evidentiary weight in determining whether [he] is being deprived of the right." Id. at 531-32. Defendant argues that, because he filed his Motion to Dismiss the Indictment "within the time period set by the Court," he has timely asserted his constitutional right to a speedy trial. [Dkt. No. 165] at 10. In opposition, the government argues that the defendant's assertion of his Sixth Amendment right is tardy because he actively fought extradition to the United States once released from Pakistani custody, thereby delaying his prosecution for a year. Once he arrived in the United States, he knowingly and voluntarily waived the right to a speedy trial. [Dkt. No. 168] at 25-26.

---

[9] In its supplementary memorandum, defendant attaches a recent opinion from the United States District Court for the Southern District of Iowa, United States v. Palos, 2024 WL 1192315 (S.D. Iowa Mar. 20, 2024), in which the court found that the government's failure to seek the defendant's arrest for six-and-a-half years was negligent, [Dkt. No. 174]; however, as the court in Palos recognized, a government is not negligent in pursuing a defendant where "the [g]overnment continuously sought the defendant." Palo, 2024 WL 1192315, at *4. Here, the Court finds the government's repeated efforts to seek extradition of Chaudhry supports the conclusion that the government was not negligent and acted with reasonable diligence.

14

Chaudhry's conduct from the time of his release from Pakistani custody to the time in which he invoked his right to a speedy trial indicates that he "did not want a speedy trial;" rather, he was "only interested in delaying the trial or avoiding it altogether." United States v. Tranakos, 911 F.2d 1422, 1429 (10th Cir. 1990) ("We are unimpressed by a defendant who moves for dismissal on speedy trial grounds when his other conduct indicates a contrary desire."). Although Chaudhry quibbles about when he became aware of the criminal charges against him in the United States, see [Dkt. No. 172] at 8; [Dkt. No. 174-2], by August 2020 he affirmatively indicated that he would contest extradition to the United States, and as such, between his detention in Pakistan in August 2022 and July 2023, he engaged in myriad proceedings to avoid extradition. See United States v. Cavan, 2016 WL 4098582, at *5 (S.D.N.Y. July 28, 2016) ("Where, as here, 'it is manifestly apparent that a defendant has no serious interest in the speedy prosecution of the charges against him, a court need not ignore the defendant's fugitivity or recalcitrance in determining whether his sixth amendment rights have been violated.'"); United States v. Reumayr, 530 F. Supp. 2d 1200, 1206 (D.N.M. 2007) ("Courts have recognized that a defendant resisting extradition, or otherwise avoiding attempts to bring him to this country, is attempting to avoid going to trial at all in the United States.").

Chauhdry's conduct in the United States fares no better. After consenting to extradition and arriving in the United States, he knowingly and voluntarily waived the right to a speedy trial during his December 2023 arraignment in which he was represented by counsel. [Dkt. No. 163]. This "bolsters the fact that given several opportunities to specifically invoke the right, [defendant] and his counsel declined to do so." Thomas, 55 F.3d at 150. Although explicit waiver of the right to a speedy trial is not dispositive of a Sixth Amendment speedy trial claim, "it is a factor in determining whether the defendant's speedy-trial right has been violated." See

15

id. Accordingly, in considering defendant's conduct, the assertion-of-right factor weighs against defendant's claim of a speedy-trial violation. See United States v. Lozano, 962 F.3d 773, 781 (4th Cir. 2020) (explaining that the fact that a defendant "didn't assert his right to a speedy trial even after he was released from state custody, learned of the federal charge, and was appointed counsel" weighed against him).

### 4. Prejudice to the Defendant

Under the final Barker factor, the Court must consider whether the defendant was prejudiced by the government's delay. Barker, 407 U.S. at 531. As the Supreme Court has recognized, "we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify." Doggett, 505 U.S. at 655. In this case there has been no prejudice to Chaudhry, who pleaded guilty on May 2, 2024, under a plea agreement in which the government agreed to recommend a sentence of time-served followed by a 20-year term of supervised release and to allow Chaudhry to appeal the denial of his Motion to Dismiss the Indictment based on the alleged violations of his speedy trial right. Moreover, much like his co-defendants, as soon as he appeared in Court, Chaudhry was released on bond, and given that most of his co-defendants were sentenced to time-served, it appears likely that Chaudhry will be subject to the same sentence.[10]

Accordingly, defendant's vague assertions of harm are insufficient to show actual prejudice, and as such, the fourth Barker factor weighs in favor of the government. Barker, 407 U.S. at 534 (finding "absence of serious prejudice" although the defendant was incarcerated for

---

[10] According to the plea agreements reached with Minni and Zamzam, similarly to Chaudhry's plea agreement, the government agreed to recommend a 20-year term of supervised release for each defendant. All counts against Yemer were dismissed with prejudice due to his medical illness, and Khan is a fugitive who has not yet appeared before the Court.

16

ten months before trial and was forced to "liv[e] for over four years under a cloud of suspicion and anxiety" because "there [was] no claim that any of [the defendant's] witnesses died or otherwise became unavailable owing to the delay").

### III. CONCLUSION[11]

To prevail on a speedy trial claim, a defendant must establish that, "on balance, [the] four separate factors weigh in his favor." Thomas, 55 F.3d at 148. As discussed above, because defendant has failed to establish that the second, third, and fourth Barker factors support his speedy trial claim, his Motion to Dismiss the Indictment [Dkt. No. 165] has been denied.

The Clerk is directed to forward copies of this Order to counsel of record.

Entered this 5ᵗʰ day of June, 2024.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

---

[11] Defendant also briefly argues that the government has violated Fed. R. Crim. P. 48(b), which provides that a court "may dismiss an indictment … if unnecessary delay occurs in: (1) presenting a charge to a grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial." Defendant's claim is meritless because, as the Fourth Circuit has stated, "Rule 48(b) is 'limited to post-arrest situations.'" United States v. Ball, 18 F.4th 445, 453 (4th Cir. 2021) (quoting United States v. Marion, 404 U.S. 307, 319 (1971)). Even if defendant could invoke Rule 48(b), considering that the government's delay was reasonably justified and did not result in prejudice to defendant's case, there was no unnecessary delay under the Federal Rules of Criminal Procedure.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:17cr270-4(LMB) |
| | ) | |
| UMAR FAROOQ CHAUDHRY, | ) | |
| | ) | |
| Defendant. | ) | |

**UMAR FAROOQ CHAUDHRY'S POSITION ON SENTENCING**

By 2019, after spending almost ten years in Pakistani prisons, Umar Farooq Chaudhry was described by his father Khalid Chaudhry as "emotionally broken." Arrested by Pakistani authorities in December 2009, Umar was first detained at a local detention facility in Sargotha, Pakistan. Following a conviction for conspiring to attack Pakistani military facilities, Umar was imprisoned for five years at Faisalabad Central Jail. By 2019, Umar had been incarcerated for over four years at a high security prison in Sahiwal, Pakistan, reserved for inmates convicted of terrorist offenses, where he was held in solitary confinement in an 8 by 6 foot cell for 23 hours a day, and handcuffed during the remaining hour outside of his cell.

Umar's horrific experiences during the decade that he spent in prison in Pakistan are undoubtedly a principal reason that the United States and Umar have jointly recommended that the Court impose a sentence of no more than time-served, followed by a 20-year term of supervised release — and the government recommended similar sentences in the cases of Umar's similarly-situated co-defendants, Ramy Said Zamzam and Ahmed Ameer Minni. But it is not the whole story.

Umar was a pawn in a much larger narrative, first when he was seduced by slick internet propaganda videos to believe that he was obligated to go to Afghanistan to help oppressed Muslims – and potentially fight against the United States – and later when he was wrongly accused and convicted of plotting to attack Pakistani military installations in Pakistan.

Now 39 years old, married, the father of a five-month-old daughter, and working in his parents' computer store, Umar is optimistic about his future.



His only wish is to honor his parents, live a quiet law-abiding life in this country with his family, and he never wants to return to Pakistan again.

## I.   Background History and Characteristics

Born in Pakistan in 1985, Umar emigrated with his parents and three brothers to the United States when he was 6, and subsequently became a naturalized citizen.

J.A. 284

PSR ¶ 81. His father described him as "an obedient child [who] never gave him any issues," *id.* ¶ 82, and who remains in a close relationship with his parents (pictured below in their computer store):



While in high school, Umar was always a good student, a member of the National Honor Society, and participated as a member of his high school tennis team. *Id.*

Umar is also soft-spoken, thoughtful, and sensitive; one of his closest high-school friends described him in 2009 as timid and "easily manipulated by others to do things that he usually wouldn't do on his own."[1] Although he was raised in a Muslim household, Umar was not particularly religious in high school, and neither were his close high school friends, Aman Yemer, Ahmed Minni, Waqar Khan, and Ramy Zamzam. *Id.*

After graduating from high school, Umar and his friends became much more religious, and began to regularly attend a local mosque and Muslim youth group meetings. From 2003 until 2005, Umar also attended Northern Virginia Community

---

[1] FBI-2107.

College, and then transferred to George Mason University, where he made the Dean's List from the Fall of 2007 until the Spring of 2009.

Umar's years in college coincided with the United States' deepening involvement in armed conflicts in Iraq and Afghanistan. In 2009, Umar's high school friend Ahmed Minni first recruited Aman Yemer and Waqar Khan to leave their families and travel to Afghanistan to wage jihad and help oppressed Muslims. Those three then approached Umar, and after three to five days, Umar agreed to join them. The four then recruited Ramy Zamzam. As noted in Umar's statement accepting responsibility, Umar fully admits, and deeply regrets, engaging in this conspiracy and violating the material support statute. PSR ¶ 60.

## II.    <u>False Pakistani Prosecution</u>

At the same time that Umar and his friends were conspiring in secret to travel to Afghanistan with the vague objective of assisting oppressed Muslims – albeit with the knowledge that this assistance may well involve fighting against United States soldiers there – the United States was also criticizing Pakistan's intelligence service for supporting terrorist "attacks in Afghanistan against Afghan government, ISAF, and Indian targets." Thomas Joscelyn, *Admiral Mullen: Pakistani ISI Sponsoring Haqqani attacks*, Long War Journal (September 22, 2011) (describing leaked 2008 State Department cable detailing US accusations against ISI).[2] Why would Pakistan – ostensibly a U.S. ally – support terrorist groups attacking the Afghan government

---

[2] Available at:
https://www.longwarjournal.org/archives/2011/09/admiral_mullen_pakis.php (last visited Aug. 7, 2024).

that was also supported by the United States? The answer has to do with India. "[T]he way Pakistan sees it, ensuring the Afghan Taliban a prominent place in the post-U.S. Afghanistan landscape prevents India from building a powerful alliance with Kabul." Alex Rodriguez, *Cables Reveal U.S. Misgivings About Pakistan*, L.A. Times (Dec. 2, 2010).[3] In other words, anti-Indian terrorist groups like Jaish-e-Muhammad furthered Pakistan's interest in destabilizing the U.S.-backed Afghan government and supporting the Taliban, to avoid the establishment of a pro-Indian government on Pakistan's western border.

Faced with escalating criticism from the United States regarding its support of anti-Indian terrorist groups like Jaish-e-Muhammad and Lashkar-e-Tayyiba, the ISI recognized that the arrest of Umar and his friends in Pakistan could be used as propaganda to demonstrate that *United States citizens* had traveled to Pakistan to attack *Pakistani military targets*. *See* Declaration of Khalid Farooq Chaudhry 1-3 (attached as Exhibit 1). Indeed, the prosecution in Pakistan was widely reported by local Pakistani news outlets as evidence of U.S. aggression and interference in domestic Pakistani affairs. *Id.*

The ISI's interest in countering U.S. criticism explains why the Pakistani prosecution was premised on the baseless claim that Umar and his co-defendants conspired to engage in terrorist attacks at a Pakistani nuclear power plant and Pakistani air force bases. Def. Yemer's Mot. Emergency Relief (ECF 29) Attachment

---

[3] Available at: https://www.latimes.com/archives/la-xpm-2010-dec-02-la-fg-pakistan-warning-20101203-story.html (last visited Aug. 7, 2024).

1 (Pakistani judgment of conviction from court in Sargodha, Pakistan) at 45, 57. Indeed, the U.S. government has never contested that Umar's prosecution in Pakistan, and his ten years of imprisonment, were based on a false charge and false evidence.

None of that changes the fact that Umar violated United States law by agreeing with his friends to travel to Afghanistan for the purpose of waging jihad. But it helps to explain why he and his friends were treated so harshly in Pakistan, and underscores that the suffering each endured as a result of spending more than a decade in Pakistani prison was both unnecessary and unjust.

## III.   Statutory Sentencing Factors and U.S. Sentencing Guidelines

Congress directed the Court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing based on the statutory factors laid out in 18 U.S.C. § 3553(a). As the Court well knows, those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

6

**J.A. 288**

In this case, the aberrant nature of the offense, Umar's history and characteristics, the absence of quantifiable assistance provided to the designated terrorist group,[4] the sentences of time-served imposed in the cases of two co-defendants, and the harshness of the imprisonment that Umar endured for over a decade in Pakistan – justified or not – as a result of his decision to travel to Pakistan, all weigh in favor of imposing the jointly recommended sentence of time-served, followed by 20 years of supervised release.

To be sure, pursuant to the U.S. Sentencing Guidelines, the advisory sentencing range is 180 months based upon the applicable statutory maximum, an adjusted offense level of 35, and a criminal history category of VI, based upon U.S.S.G. § 2M5.3 and the terrorism enhancement in § 3A1.4. The advisory range set forth in the Guidelines does not deserve significant weight in this case.

But for the terrorism enhancement, the applicable guideline range would be 46 to 57 months based upon an adjusted offense level of 23 and a criminal history category of I. It is apparent, therefore, that the terrorism enhancement "'takes a wrecking ball' to the initial Guidelines range" by "both increasing the offense level at

---

[4] Umar indisputably conspired and attempted to travel to Afghanistan in 2009 to participate in the conflict there. But he failed. And an attempt – or a conspiracy that does not accomplish the goal of the conspiracy -- does not result in the same harms associated with a completed offense. For this reason, it is "generally recognized that attempts are less serious than completed crimes." *Solem v. Helm*, 463 U.S. 277, 293 (1983); *see also* U.S.S.G. § 2X1.1.  Indeed, sentences for an attempt are typically more lenient than sentences imposed for a completed offense. *See* George P. Fletcher, Rethinking Criminal Law § 6.6, at 474 (Oxford Univ. Press 2000) ("The consensus of Western legal thought is to punish attempts less severely than consummate offenses.").

least 12 levels and elevating the defendant to the highest Criminal History Category, irrespective of his or her actual criminal history." *United States v. Jumaev*, 2018 WL 3490886, at *5 (D. Colo. July 18, 2018), *aff'd*, 20 F.4th 518 (10th Cir. 2021). "This means that a defendant in a § 2339B case will usually face a range well in excess of the statutory maximum [], regardless of what he specifically did and regardless of whether he has no prior record or a terrible one." *United States v. Dais*, 482 F. Supp. 3d 800, 802 (E.D. Wis. 2020). As such, "it recommends sentences near or above the statutory maximum even in mine run cases….[which] is contrary to the purposes of sentencing in 18 U.S.C. § 3553(a), including the notion that sentences should be individualized and proportionate, and that we should distinguish between the worst offenders and those who are less dangerous." *Id.*

Moreover, the draconian punishment recommended as a result of the application of the terrorism enhancement was not devised through analysis of "empirical evidence." *Id.* at 803. Because the enhancement was not the result of "the Sentencing Commission's exercise of its characteristic institutional role," it thus warrants "less respect." *Id.* at 803.

Finally, even apart from the sentences of time-served imposed upon Umar's similarly-situated co-defendants, Mr. Zamzam and Mr. Minni, other courts have likewise rejected the application of the sentencing guidelines under appropriate circumstances in material support cases and imposed sentences of time served. See *United States v. Zakirov*, 2022 WL 2954161, at *6 (E.D.N.Y. July 26, 2022) (imposing time-served sentence amounting to 102 months of imprisonment); *United States v.*

*Abdullahi Yusuf*, Case No. 0:15-cr-46 (MJD), ECF 109 (D. Minn. Dec. 1, 2016) (imposing time-served sentence amounting to 20 months and 22 days, for conspiracy to provide material support to ISIL).

While the nature of the offense is indisputably serious, the decade-long period of incarceration that Umar served in Pakistan obviates any additional need for a sentence to afford deterrence or protect the public. Umar emerged from his imprisonment with a clear-eyed understanding that he wants to live a law-abiding life in the United States with his family. As noted above, he married once he was released from imprisonment in Pakistan, and is in the process of seeking lawful admission to the United States of his wife and daughter:



Nor is there any reason to distinguish Umar or impose a more severe punishment upon him than his co-defendants, Mr. Minni and Mr. Zamzam. As such, "the need to avoid unwarranted sentence disparities among defendants with similar

9

**J.A. 291**

records who have been found guilty of similar conduct," § 3553(a)(6), weighs strongly in favor of the jointly-recommended sentence in this case.

Indeed, the government's joint recommendation for time-served has only enhanced Umar's appreciation for the U.S. legal system and for his ability to build his life here. His expressions of remorse are genuine, as are his rejection of violence and his fervent desire to put this entire experience behind him.

Under the unique circumstances of this case, we respectfully request that the Court impose a sentence of time-served, followed by a period of 20 years of supervised release (subject to early termination if appropriate in accordance with 18 U.S.C. § 3583(e)(1) and the Guide to Judiciary Policy, Volume 8, Chapter 3 § 360.20 (Early Termination)).

Respectfully submitted,

_____/s/_____
Geremy C. Kamens
Federal Public Defender for the
Eastern District of Virginia
Counsel for Mr. Chaudhry
VA Bar No. 41596
1650 King Street, Suite 500
Alexandria, Virginia 22314
Telephone: (703) 600-0800
Facsimile: (703) 600-0880
Geremy_Kamens@fd.org

10

**J.A. 292**

# DECLARATION

**I, Khalid Farooq Chaudhry**, declare the following:

I am over the age of 18 and competent to make this declaration. I live in Alexandria, Virginia, but I was born in Pakistan.

The facts stated in this declaration are within my personal knowledge and are true and correct to the best of my knowledge, information, and belief.

I am the father of Umar Farooq Chaudhry, who is one of my four sons. In the Fall of 2009, my wife and I went to Pakistan to find a good match for my son Umar to marry. Someone introduced us to a very nice family. The parents and the girl showed interest in this proposed marriage. I asked Umar to come to Pakistan so that the girl and boy can meet with each other and approve of this proposed marriage.

But, without our knowledge, he came to Pakistan with his four friends. They were all arrested in Pakistan. All four boys and Umar Chaudhry were charged with false allegations of conspiracy to commit a crime of attacking places in Pakistan. I attended the court proceedings in Pakistan, and hired a lawyer to represent my son.

During the prosecution, the prosecutor presented fake emails supposedly written by these five boys. The defense attorney argued and proved in court that these emails were generated by the prosecution themselves.

Also, Umar was charged with providing material support to a banned organization in Pakistan. The prosecutors alleged that the boys including Umar paid money to the banned organization. As supposed proof of the payments, the prosecution presented receipts from the

banned organization. But the organization is banned in Pakistan – it would never issue receipts for money it receives. These receipts were fake. If they were actually real, they would have been used as evidence in the case in the United States. But they were not, because it was fake evidence.

The prosecution presented witnesses at the trial.  According to information provided by the Pakistani defense attorney, many of these witnesses were either criminals released on bail or they were paid to give false testimony. In fact, one witness claimed that he was family friends of Umar's parents (me and my wife). During cross-examination, the witness admitted that he did not know the whereabouts of Umar's family, i.e. where we live, who me and my wife are, and what we do for a living. Because this testimony was about me, and I witnessed the testimony myself, I saw how corrupt the proceeding in Pakistan was.

One example during the trial stands out in my memory. One witness said he talked with one of the boys, Rami Zamzam. Defense counsel then asked the witness how Rami communicated with you, when you do not know the English language and Rami does not know how to speak Urdu.  The witness was just silent, and the judge laughed.

During and before the prosecution, the United States had accused Pakistani authorities of supporting terrorist groups who were fighting against India and also fighting in Afghanistan. Consequently, there was a lot of media attention in Pakistan about this case.

The fake allegations were brought against the boys because a high ranking official in Pakistan's security service, the ISI, wanted to embarrass the United States and show that Americans had come to commit terrorism in Pakistan. It did not matter that the allegations were completely untrue.

I know and accept that my son violated United States law by trying to go to Afghanistan and participate in the conflict there. But that is not what the Pakistani case was about. The entire prosecution in Pakistan was a sham and based on fake evidence and testimony.

I declare under penalty of perjury that the foregoing is true and correct in accordance with 28 U.S.C. § 1746.

6/26/2024

Khalid Farooq Chaudhry

▮▮▮▮▮▮ VA 22306          Executed on: 26th June, 2024

```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
 2                        ALEXANDRIA DIVISION

 3   --------------------------x
     UNITED STATES OF AMERICA   :    Criminal Action No.:
 4                              :    1:17-cr-270
          versus                :
 5                              :    Wednesday, August 14, 2024
     UMAR FAROOQ CHAUDHRY,      :    Alexandria, Virginia
 6                              :
               Defendant.       :    Pages 1-19
 7   --------------------------x
          The above-entitled sentencing was heard before the
 8   Honorable Leonie M. Brinkema, United States District Judge.
     This proceeding commenced at 8:55 a.m.
 9
                     A P P E A R A N C E S:
10
     FOR THE GOVERNMENT:     JOHN GIBBS, ESQUIRE
11                           OFFICE OF THE UNITED STATES ATTORNEY
                             2100 Jamieson Avenue
12                           Alexandria, Virginia  22314
                             (703) 299-3700
13
                             JOHN SELLERS, ESQUIRE
14                           DEPARTMENT OF JUSTICE
                             NATIONAL SECURITY DIVISION
15                           1500 Pennsylvania Avenue, NW
                             Washington, D.C.  20220
16                           (202) 622-2000

17   FOR THE DEFENDANT:      GEREMY KAMENS, ESQUIRE
                             OFFICE OF THE FEDERAL PUBLIC DEFENDER
18                           1650 King Street
                             Suite 500
19                           Alexandria, Virginia  22314
                             (703) 600-0800
20
     ALSO PRESENT:           DAN ABRAMS, FBI
21
     COURT REPORTER:         STEPHANIE M. AUSTIN, RPR, CRR
22                           Official Court Reporter
                             United States District Court
23                           401 Courthouse Square
                             Alexandria, Virginia  22314
24                           (607) 743-1894
                             S.AustinReporting@gmail.com
25
          COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES      1
```

```
 1
 2              THE DEPUTY CLERK:  Criminal Number 1:17-cr-270,
 3   United States of America versus Umar Farooq Chaudhry.
 4              Will counsel please note their appearance for the
 5   record, first for the government.
 6              MR. GIBBS:  Good morning, Your Honor.  John Gibbs
 7   on behalf of the United States.  I also have Dan Abrams from
 8   the FBI, and John Sellers from the National Security
 9   Division here in court as well.  Thank you.
10              THE COURT:  Good morning.
11              MR. KAMENS:  Good morning, Your Honor.  Geremy
12   Kamens on behalf of Mr. Chaudhry, who's present.
13              THE COURT:  All right.  Mr. Kamens, as you know,
14   this matter comes on for sentencing.
15              Have you had enough time to go over the
16   presentence report yourself and with your client?
17              MR. KAMENS:  I have, Your Honor.
18              THE COURT:  Are there any factual corrections,
19   changes, additions or deletions you want made to the report
20   itself?
21              MR. KAMENS:  There are not.
22              THE COURT:  And did you carefully go over pages 19
23   through 21 with your client that have all of the potential
24   special and standard conditions of supervision?
25              MR. KAMENS:  Yes, Your Honor.
```

2

```
 1            THE COURT:  Did you have any objections to the
 2    proposed conditions?
 3            MR. KAMENS:  Your Honor, well --
 4            THE COURT:  And the reason I ask you that question
 5    is in the case of the two co-defendants who the Court has
 6    sentenced, I looked at their judgment orders, and neither of
 7    them included the recommendation about computer monitoring.
 8            MR. KAMENS:  Your Honor, we would ask that the
 9    Court impose the same conditions that the Court imposed on
10    Mr. Zamzam and Mr. Minni.
11            And you also know that Mr. Chaudhry works in his
12    parents' computer repair shop, and so we would ask that of
13    course the Court take that into account.  That is his
14    full-time job; he works there every day.  And we understand
15    the Court's interest in supervision, but given the
16    circumstances, we don't think that anything that would
17    interrupt with his employment should be imposed.
18            THE COURT:  And what about the bar on associating
19    with any of the co-defendants in this case, has your client
20    maintained a relationship with any of them?
21            MR. KAMENS:  No.  I think there are -- if I can
22    have the Court's indulgence.  I think they may attend the
23    same mosque, but let me just ask.
24                          (Pause.)
25            MR. KAMENS:  We have no objection to a condition
```

1  that continues concern with association.  I mean,

2  Mr. Chaudhry has no interest in -- that condition is not

3  objectionable, Your Honor.

4       THE COURT:  All right.  I mean, Standard Condition

5  Number 8 I think is you can't associate with known felons

6  anyway, so that would be an issue.  But certainly if they're

7  at the same mosque and they wind up standing or kneeling

8  next to each other, that's not going to be an issue.

9       MR. KAMENS:  Understood.  Thank you, Your Honor.

10      THE COURT:  All right.  Before I go any further,

11 Mr. Gibbs, do you have any objection?  I mean, I'm looking

12 at the other two judgment orders, and computer monitoring

13 was not imposed.

14      MR. GIBBS:  No.  Understood, Judge.

15      I think we did not get that particular condition

16 at the time that the other two co-defendants had their

17 initial appearances.  I think we did want it on -- you know,

18 and we hoped to get that during their supervision.  It was

19 not imposed.  And I understand that we got it in this case,

20 he's been -- you know, that condition has been applied to

21 him for the last however many months.  I have not heard

22 anything from pretrial to indicate there's been any

23 violation.

24      THE COURT:  Okay.

25      MR. GIBBS:  So we would leave it to the Court's

4

1    discretion.  Obviously if left to our own devices, we would

2    like to continue that condition, but I think that's sort of

3    where we stand at this point.

4         THE COURT:  All right.  Well, I mean, frankly

5    given what Mr. Chaudhry and frankly the other three

6    co-defendants have been through in their ten-year experience

7    in a Pakistani prison, I doubt he's going to want to get

8    anywhere close to the criminal justice system again.

9         So, in any case, I'm going to follow -- to be fair

10   and, you know, treat these defendants equally, I'm not going

11   to impose that particular recommended condition.  All right.

12        MR. GIBBS:  Understood.

13        THE COURT:  All right.  So with there being no

14   actual objection then to the report, the report does find a

15   criminal history of VI only because of the terrorism

16   enhancement which results in the guidelines getting skewed

17   in that respect.

18        The maximum penalty available under the statute is

19   180 months even though the guidelines would be 292 to 365,

20   but 180 is the possible maximum.  The period of supervised

21   release could be as much as life.  The fine range is 40,000

22   to $250,000, and there's a $100 special assessment.

23        And, again, those are not in dispute; correct?

24        MR. KAMENS:  Correct.

25        THE COURT:  All right.  Then I'll hear first from

5

1    the United States, Mr. Gibbs.

2            MR. GIBBS:  Thank you, Your Honor.

3            Obviously this is a case where we have an

4    agreed-upon sentence.  We have a plea agreement that

5    Mr. Chaudhry has pled to here before this Court.

6            We are not seeking any jail time in this case.

7    The primary sentence that we sought and that the defense

8    agreed to is the 20 years of supervised release.  And,

9    Judge, I think it's important just to point out from the

10   government's perspective just how unusual this case is.  The

11   Court just went through the guideline sentence and the

12   statutory maximum in this case, and, you know, I can't say I

13   ever thought I would speak at a sentencing where a defendant

14   has pled guilty to a material support charge like this and

15   the government is not seeking any jail time, especially

16   given where the calculation lands.

17           That being said, it's obviously due to the unique

18   facts of this case and the fact that Mr. Chaudhry was

19   arrested in Pakistan soon after arriving there after

20   traveling there with four other co-conspirators with the

21   intent of committing a 2339B offense.

22           We recognize that he spent ten years in a

23   Pakistani prison after being arrested and that the

24   conditions there were exceedingly harsh, and that obviously

25   all factored into the government's recommendation in this

                                                          6

case and the agreement that we came to with the defense.

Having said all of that, I think no one should be under the misimpression that this is not a serious offense and that the sentencing today is not a serious event.

You know, in terms of general and specific deterrence, you know, we think this case should still send an important message. I mean, the defendant is -- will be supervised for 20 years in part because we just need -- the government needs, the FBI needs an ability to be assured that having become radicalized and then spent that time in Pakistan that he's no longer radicalized.

So having said all that, Judge, we stand by the recommendation in the plea agreement. We believe the Court should impose the sentence of no jail with a 20-year supervised release term. But, again, I don't think that anyone should be -- you know, have the misimpression that this is not a serious case or that this is not a serious offense.

So that's really the government's position on this, Your Honor. Thank you very much.

THE COURT: All right. Well, it was interesting. Mr. Kamens' memo on behalf of the defendant was the first one that I recall in this case that went into some detail as to the nature of the Pakistani prosecution. And the -- and it further explains why the Pakistani authorities were so

7

1  unwilling to cooperate with the requests from the U.S.

2  government to turn these people over promptly.  You know,

3  that was an issue that played out in the defendant's motion

4  to dismiss the case for, you know, violation of the speedy

5  trial and due process rights.

6        It now is quite clear that the Pakistani

7  government was not going to cooperate with the United States

8  because of the information that was going on, and so I

9  thought that that part of the defense memo was quite

10  interesting and quite revealing.

11        The U.S. government, based upon the information

12  that I got, had absolutely no involvement in that, if

13  anything, wanted to get these men out sooner, which would

14  have avoided some of the catastrophic side effects of being

15  in that type of a prison setting for ten years.  But I agree

16  with the government.  I mean, obviously this is a very

17  serious offense, but these men paid an incredible price.

18        And so let me hear from you, Mr. Kamens, if

19  there's anything that you want to add to your memo.

20        MR. KAMENS:  Just briefly, Your Honor.  And I want

21  to express appreciation for the statement of the government

22  and their recognition of how extraordinary this case is.

23        There are certain cases like in *United States v.*

24  *Gall* where the events that occur after the charged conduct

25  are as important as the offense itself in terms of the

8

sentencing, and I think the Court has recognized that based
on the ten years of extraordinarily harsh imprisonment that
Mr. Chaudhry and his four co-defendants suffered in
Pakistan.

He is certainly similarly situated to Mr. Minni
and Mr. Zamzam as the two defendants that the Court has
already sentenced. But I want to emphasize that the
defendants are not all identical. They do share certain
characteristics. They were all excellent students in high
school. They had bright futures ahead of them. But they
weren't identical.

Mr. Zamzam, for example, tall, handsome, was very
popular in high school, outgoing. Mr. Chaudhry was not like
that. He was shy and quiet and more timid. Also equally
bright, but he was also not one of the first to be convinced
to go on this endeavor; he was the fourth out of five. It
took him a number of days. Three to five days I think he
had to think it over. He was ultimately convinced to go to
Pakistan. It was the worst decision of his life. He
regrets it. He is sincere in the letter that he submitted
to the Court in which he acknowledges his misconduct, he
acknowledges his responsibility for the charged offense.
But I think as the government's recommendation reflects, he
has suffered an extraordinary price for that decision, that
decision that he made when he was a very young man.

9

```
 1          He is not as young a man today, and he is focused

 2   on a different future, a future here in the United States.

 3   He works every day in his parents' computer store.  He has

 4   done extremely well even since he has come back in the

 5   store.  He gets wonderful reviews from customers, he has

 6   built websites.  He is a very bright man with a bright

 7   future.  He married when he was released from bond in --

 8   after serving a sentence in Pakistan, and he was arrested

 9   for the extradition proceedings.  His father hired a lawyer,

10   and he was able to obtain bond in Pakistan.  His father says

11   that is the first time that anyone has ever received bond in

12   Pakistan under those circumstances.

13          And during that time his parents arranged a

14   marriage, he married, he had a daughter, and he was able to

15   start building a life that he was focused on coming back to

16   this country and building here.  He is in the process of

17   seeking a legal avenue for his wife and daughter to come and

18   join him here in the United States.

19          And so that is ultimately the point of -- the

20   sentencing, in part, is to look to the future, and

21   Mr. Chaudhry is looking to a bright future here in the

22   United States, and that's why we ask the Court to accept a

23   joint recommendation of parties to time served and a period

24   of supervision.

25          Thank you.
```

10

```
 1          THE COURT:  All right.  Mr. Chaudhry, if you'll
 2    come up to the lectern.
 3          This is your chance to say -- and I have read the
 4    letter, but is there anything else you would like to say
 5    before the Court imposes sentence.
 6          THE DEFENDANT:  Yes.  I would like to say that I
 7    apologize for my behavior.  I regret it, and will devise
 8    [sic], I had a very bad experience in Pakistan.  I'm looking
 9    forward to a bright future for me, my wife and my daughter.
10    And I just want to become a law-abiding citizen and a role
11    model for the people now.
12          THE COURT:  Well, I hope you have a great deal of
13    patience, because I suspect it will take some time for you
14    to get your wife and daughter here.  The backlog of
15    applications for asylum or for visa adjustments is
16    incredible.  We have so many cases now that are coming into
17    our court because the administrative process is so long.
18    You need to understand, though, that it won't be because of
19    your background.  I mean, this is just a generalized
20    problem.
21          I think it would certainly be helpful for the
22    defendant's stability if he could get his family in place.
23    And I don't know if there's anything that the U.S.
24    Attorney's Office can do to help, but certainly no
25    impediment should be imposed because of the background here.
```
11

1          And, Mr. Chaudhry, you're now 39 years old, so,

2    you know, you're not a young teenager or a young man any

3    longer.  And I'm satisfied that you have learned a very

4    painful lesson, and hopefully you can use some of this

5    experience perhaps if you were to find some young men or

6    women in the community who are beginning to look as though

7    they might becoming interested in becoming radicalized, your

8    experience should be something that could perhaps, you know,

9    dissuade them from that.

10         But, you know, I am fully satisfied that your

11   sentence should be no different from that of the other

12   defendants.  So I'm sentencing you to time served, followed

13   by a period of 20 years of supervised release.  The terms

14   and conditions of supervision are, first of all, your

15   uniform good behavior, which means you cannot violate any

16   federal, state or local laws, and that includes traffic

17   laws; do you understand that?

18              THE DEFENDANT:  I understand that.

19              THE COURT:  And secondly, you have to follow all

20   the conditions of supervision that are printed on the

21   judgment order and that will be explained to you by

22   probation.

23         Now, as special conditions of supervision, I am

24   first of all requiring that you not associate with any -- or

25   communicate in any way with any known terrorists or

```
 1    terrorist organizations; do you understand that?

 2              THE DEFENDANT:  I understand that.

 3              THE COURT:  Number 2, I do want to make sure that

 4    your mental health is in good shape.  I think you've been

 5    getting some mental health treatment, have you not, from the

 6    time you've been on bond?

 7              THE DEFENDANT:  Yes.  Yes, ma'am.

 8              THE COURT:  We're going to continue that.  So you

 9    are to continue participating in a program approved by the

10    U.S. Probation Office for mental health treatment.  You

11    should take all the medications that are prescribed, if any

12    are, and you have to, again, continue to waive any privacy

13    rights to confidentiality concerning your mental health

14    treatment so that the probation office can monitor your

15    compliance.

16              MR. KAMENS:  Can I ask about that condition, Your

17    Honor?

18              THE COURT:  Yes.

19              MR. KAMENS:  Is that at the direction of

20    probation?

21              THE COURT:  Yes.

22              MR. KAMENS:  So probation, if they determine that

23    he has concluded the --

24              THE COURT:  If probation -- obviously they

25    wouldn't make that conclusion without the mental health
```

13

```
1   people doing that.  But if the mental health people have

2   recommended that you've reached the point where you don't

3   need any further help, the probation office then would be

4   able to file a memo with the Court, and we would take that

5   condition off.

6            MR. KAMENS:  Thank you, Your Honor.

7            THE COURT:  All right.

8            THE DEFENDANT:  Thank you.

9            THE COURT:  And is obviously the costs of any

10  evaluation or treatment are to be paid by you to the extent

11  you are able; do you understand that?

12           THE DEFENDANT:  Yes, ma'am.

13           THE COURT:  All right.  Secondly, I'm waiving the

14  mandatory drug testing.  There's no history of misuse of

15  alcohol or drugs.  So the probation office can still ask for

16  a random test, which you would have to comply with, but it's

17  not a requirement that you have regular testing.

18           Other than that, I don't think there are any other

19  special conditions that are needed.  The Court finds you do

20  not have the financial resources to pay any of the statutory

21  fines or any additional costs of supervision.  The $100

22  special assessment, however, is mandatory, and that must be

23  paid promptly if it hasn't already been paid.

24           I do want to advise you -- and I think,

25  Mr. Kamens, didn't you file an appeal on the pretrial
```

```
 1  motion, or have you not done that?

 2          MR. KAMENS:  No.  I think we would have to file it

 3  after the judgment order.

 4          THE COURT:  All right.  I just want you to know

 5  that you do have the right to appeal.

 6          MR. KAMENS:  Just solely that one issue, I think.

 7          MR. GIBBS:  Correct.

 8          THE COURT:  That one issue, that is my denial of

 9  the motion to dismiss.

10          If you are going to file an appeal, the notice of

11  appeal must be filed within 14 days of today's date.  You

12  have the right to be represented by counsel for that appeal.

13  If you are unable to afford to hire a lawyer yourself, we

14  will appoint counsel for you; do you understand that?

15          THE DEFENDANT:  I understand that, ma'am.

16          THE COURT:  Are there any other conditions of

17  supervision the government is requesting?

18          MR. GIBBS:  No, Your Honor.  That covers it.

19          THE COURT:  All right.  Mr. Kamens, anything

20  further?

21          MR. KAMENS:  Nothing further, Your Honor.

22          THE COURT:  All right.  Then, Mr. Chaudhry, as of

23  today, you will be off of the bond that you've been on.

24  Your supervision begins today, so when you leave the

25  courtroom, you need to go over to the probation office where
```

15

1   we will formally install you on supervision.  And the Court

2   wishes you well over the next 20 years.

3         And again, I will have an open mind to an early

4   termination if after, you know, 10 or so years.  I mean, you

5   won't necessarily be under control for 20 years.  Your good

6   behavior will be very important in terms of any request you

7   make for early release from supervision.  All right.

8         MR. KAMENS:  Can I just add on that, Your Honor?

9         THE COURT:  Yeah.

10        MR. KAMENS:  I just realized recently that the

11  Guide to Judiciary Policy provides recommendations for early

12  termination.  And with respect to people in high-risk

13  categories, they provide that after 18 months, such

14  individuals can be considered for early termination.  I'm

15  not suggesting necessarily that he would satisfy all the

16  conditions, but if he were completely in compliance,

17  technically after a period of 18 months, he can be

18  considered for early termination.

19        THE COURT:  I think given the length of time

20  that's being imposed and the government's position, it would

21  be much more judicious to wait --

22        MR. KAMENS:  I understand.

23        THE COURT:  -- several years.  But the 20 sounds

24  like it may not be necessary.  All right.

25        MR. KAMENS:  Thank you.

16

```
 1            THE COURT:  All right.  Is there anything further?
 2   Were there any motions to dismiss?
 3            MR. GIBBS:  There are, Judge.  I would like to
 4   hand it up.  I've shown it to Mr. Kamens.  I have a motion
 5   and proposed order to dismiss Counts 1, 2 and 4 pursuant to
 6   the plea agreement.
 7            THE COURT:  And, Mr. Gibbs, there's still one
 8   defendant outstanding; is that correct?
 9            MR. GIBBS:  There is.  That's Mr. Khan.  He's
10   represented by Mr. Brodnax.
11            THE COURT:  Is he in Pakistan, or is he back in
12   the States?
13            MR. GIBBS:  No, he is in Pakistan.  I had
14   conversations with Mr. Brodnax some time ago about his
15   client and about our interest in getting him returned to the
16   United States, and the last two or three times I reached
17   out, my sense is that he has lost contact with his client.
18   I've also spoken to individuals at the Office of
19   International Affairs at Main Justice.  They've indicated
20   that essentially he is out, he is not in custody in
21   Pakistan.  The Pakistani government would arrest him if they
22   found him, but they don't seem to be in any particular
23   urgency to try to locate him, so it's in a bit of an unknown
24   posture at this point.  I'm glad Your Honor raised it,
25   because I don't know if this is something we should set for
```
                                                              17

1    a status conference.

2            THE COURT:  There's nothing to be done until the

3    defendant is, you know, apprehended and brought to the

4    States.  There's no reason to have a status conference.

5            Is he a dual citizen?

6            MR. GIBBS:  He is a dual -- okay.  The FBI has

7    indicated he is, in fact, a dual citizen, Judge.

8            THE COURT:  The case stays open.  That's why I

9    asked the question.  I mean, there's still an outstanding

10   warrant for his arrest; right?

11           MR. GIBBS:  There is, Your Honor, and we're

12   prepared to bring him back, as we did with the other

13   defendants.

14           I'll reach out to Mr. Brodnax again and just see

15   if he's heard anything.  I'll also reach out to OIA again.

16   But the most recent answers I got were that he's in Pakistan

17   somewhere but nobody seems particularly energized to arrest

18   him.

19           THE COURT:  Was Mr. Brodnax Court-appointed or

20   retained, if you know?

21           MR. GIBBS:  I don't know.  I believe that when the

22   case was with Judge O'Grady, he did make sure that all of

23   the defendants did get appointed counsel.  So it's very

24   possible that he appointed him, but I just can't recall it's

25   been so long.

                                                        18

```
 1              THE COURT:  Mr. Kamens, do you know?

 2              MR. KAMENS:  I believe he's Court-appointed, Your

 3    Honor.

 4              THE COURT:  All right.  That's fine.

 5              All right.  Very good.  Well, if there's nothing

 6    further then, we'll recess court for the day.  Mr. Chaudhry

 7    will report to probation right now.

 8                   (Proceedings adjourned at 9:16 a.m.)

 9                   ---------------------------------

10    I certify that the foregoing is a true and accurate

11    transcription of my stenographic notes.

12

13                              Stephanie Austin

14                        Stephanie M. Austin, RPR, CRR

15

16

17

18

19

20

21

22

23

24

25
                                                              19
```

AO 245B (Rev. 09/19) (VAE 6/3)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| | ) | |
| v. | ) | Case Number:    1:17cr00270-004 |
| | ) | |
| UMAR FAROOQ CHAUDHRY | ) | USM Number:    90200-510 |
| | ) | Geremy Kamens, A.F.P.D |
| | ) | Defendant's Attorney |
| | ) | |
| | ) | |

The defendant pleaded guilty to Count 3 of the Indictment.

The defendant is adjudged guilty of:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 2339B | Conspiring to Provide Material Support and Resources to a Designated Foreign Terrorist Organization | 12/9/2009 | 3 |

The defendant is sentenced as provided in pages 2 through 6 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

Counts 1, 2, and 4 are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the Court and United States Attorney of material changes in economic circumstances.

August 14, 2024
Date of Imposition of Judgment

/s/

Leonie M. Brinkema
United States District Judge

August 14, 2024
Date

J.A. 315

**Case Number:**      **1:17cr00270-004**
**Defendant's Name:**   **Chaudhry, Umar Farooq**

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of TIME SERVED.

## RETURN

I have executed this judgment as follows: _____

_____

Defendant delivered on _____ to _____
at_____, with a certified copy of this Judgment.


_____
UNITED STATES MARSHAL


By      _____
DEPUTY UNITED STATES MARSHAL


**J.A. 316**

AO 245B (Rev. 09/19) (VAE 6/3) Judgment in a Criminal Case
Sheet 3 – Supervised Release

---

**Case Number:**          1:17cr00270-004
**Defendant's Name:**     Chaudhry, Umar FarooqError! Reference source not found.

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of TWENTY (20) YEARS.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

   ☒  The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4. ☐  You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☐  You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐  You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 09/19) (VAE 6/3) Judgment in a Criminal Case
    Sheet 3 – Supervised Release

Page 4 of 6

---

**Case Number:**          1:17cr00270-004
**Defendant's Name:**  Chaudhry, Umar FarooqError! Reference source not found.

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov

Defendant's Signature _____   Date

AO 245B (Rev. 09/19) (VAE 6/3) Judgment in a Criminal Case
Sheet 3A – Supervised Release

**Case Number:**   **1:17cr00270-004**
**Defendant's Name:**  **Chaudhry, Umar Farooq**

# SPECIAL CONDITIONS OF SUPERVISION

1. The defendant shall be barred from associating or communicating in any respect with any known terrorists or terrorist organizations.

2. The defendant shall continue participating in a program approved by the United States Probation Office for mental health treatment. The defendant shall take all medications as prescribed and waive all rights of confidentiality regarding mental health treatment in order to allow the release of information to the United States Probation Office and authorize communication between the probation officer and the treatment provider. The cost of testing and treatment to be paid by the defendant as able as directed by the probation officer.

3. Although mandatory drug testing is waived pursuant to 18 U.S.C. §3563(a)(4), defendant must remain drug free and his probation officer may require random drug testing at any time.

AO 245B (Rev. 09/19) (VAE 6/3) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

| | |
|---|---|
| **Case Number:** | **1:17cr00270-004** |
| **Defendant's Name:** | **Chaudhry, Umar Farooq** |

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | **Assessment** | **Fine** |
|---|---|---|
| **TOTALS** | $ 100.00 | $ 0.00 |

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**   ☒   Lump sum payment of $100.00 due immediately.

Unless the Court has expressly ordered otherwise, if this Judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the Clerk of the Court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 1:17-CR-270 (LMB)** |
| | ) | |
| **UMAR FAROOQ CHAUDHRY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## NOTICE OF APPEAL

The defendant in the above-captioned case hereby notes his appeal to the United States Court of Appeals for the Fourth Circuit from the judgment entered on August 14, 2024 (ECF No. 193), based upon the denial of his motion to dismiss the indictment on Sixth Amendment speedy-trial grounds.

Respectfully submitted this 28th day of August, 2024.

Umar Farooq Chaudhry,

By counsel,

_____/s/_____
Geremy C. Kamens
Federal Public Defender
Office of the Federal Public Defender
Va. Bar No. 41596
*Attorney for Defendant*
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0848
(703) 600-0880 Facsimile
Geremy_Kamens@fd.org

This page intentionally left blank for double-sided pagination and printing