IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 24-4471

———————————

UNITED STATES OF AMERICA,

*Appellee,*

v.

UMAR FAROOQ CHAUDHRY,

*Appellant.*

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Alexandria
*The Honorable Leonie M. Brinkema, District Judge*

———————————

RESPONSE BRIEF OF THE UNITED STATES

———————————

Erik S. Siebert
United States Attorney

John T. Gibbs
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314

Joseph Attias
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

*Attorneys for the United States of America*

# Table of Contents

**Page**

Table of Authorities ................................................................. iii

Introduction ..........................................................................1

Issue Presented ....................................................................2

Statement of the Case..........................................................2

    A.    Chaudhry leaves Virginia to wage jihad against United States
          forces in Afghanistan..............................................................2

    B.    Chaudhry is arrested in Pakistan. ........................................6

    C.    The government attempts to secure Chaudhry's return to the
          United States for prosecution. ...............................................6

    D.    Chaudhry is convicted of terrorism offenses in Pakistan...................12

    E.    A grand jury in the Eastern District of Virginia charges
          Chaudhry with material support offenses. ..........................12

    F.    The government prepares for the defendants' release from
          Pakistani prison. ..................................................................13

    G.    Chaudhry is released from prison and fights extradition to the
          United States........................................................................14

    H.    Chaudhry waives his right to a speedy trial and then moves to
          dismiss his indictment based on Sixth Amendment delay.................17

    I.    The district court denies Chaudhry's motion. .....................19

Summary of Argument ......................................................23

Argument..............................................................................25

The district court correctly denied Chaudhry's motion to dismiss under *Barker v. Wingo*....................................................................25

    A.     The length of the delay weighs in Chaudhry's favor. ........................26

    B.     The reason for the delay weighs in the government's favor. ..............28

    C.     Chaudhry's assertion of his right to a speedy trial weighs in the government's favor............................................................................46

    D.     Chaudhry has not demonstrated any prejudice. ..................................49

Conclusion ...........................................................................................................54

Statement Regarding Oral Argument ...................................................................55

Certificate of Compliance ....................................................................................55

# Table of Authorities

Page

## Cases

*Barker v. Wingo*, 407 U.S. 530 (1972) ............................................................ *passim*

*Beukes v. Pizzi*, 888 F. Supp. 465 (E.D.N.Y. 1995) ................................................46

*Doggett v. United States*, 505 U.S. 647 (1992).......................................................27

*Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307 (4th Cir. 2017).........................52

*In re Bramson*, 1997 WL 65499 (4th Cir. 1997) ....................................................48

*In re Kashamu*, 769 F.3d 490 (7th Cir. 2014).........................................................47

*Martinez v. United States*, 828 F.3d 451 (6th Cir. 2016).........................................27

*TikTok Inc. v. Garland*, No. 24-656, 2025 WL 222571 (U.S. Jan. 17, 2025) ...................................................................................................................21

*United States v. Chaudhry*, 2024 WL 2854266 (E.D. Va. 2024) ............................20

*United States v. Bagga*, 782 F.2d 1541 (11th Cir. 1986)............................ 38, 40, 45

*United States v. Cabral*, 979 F.3d 150 (2d Cir. 2020)..............................................39

*United States v. Carbarcas-A*, 1992 WL 158086 (4th Cir. 1992) .................... 40, 43

*United States v. Cavan*, 2016 WL 4098582 (S.D.N.Y. 2016)..................................48

*United States v. Corona-Verbera*, 509 F.3d 1105 (9th Cir. 2007) .............. 38-39, 45

*United States v. Demirtas*, 204 F. Supp. 3d 158 (D.D.C. 2016).............................29

*United States v. Diacolios*, 837 F.2d 79 (2d Cir. 1988)............................... 29, 38, 45

*United States v. Fernandes*, 618 F. Supp. 2d 62 (D.D.C. 2009) .............................30

*United States v. Grimmond*, 137 F.3d 823 (4th Cir. 1998)......................... 28, 50, 53

*United States v. Hall*, 551 F.3d 257 (4th Cir. 2009).................................... 26, 50, 53

*United States v. Heshelman*, 521 F. App'x 501 (6th Cir. 2013)....................... 40-42

*United States v. Hills*, 618 F.3d 619 (7th Cir. 2010) ...............................................27

*United States v. Hopkins*, 310 F.3d 145 (4th Cir. 2002)..........................................53

*United States v. Lozano*, 962 F.3d 773 (4th Cir. 2020) ..................................... 49, 51

*United States v. Manning*, 56 F.3d 1188 (9th Cir. 1995).........................................47

*United States v. Marquez-Charry*, 1997 WL 208403 (N.D. Ill. 1997)....................29

*United States v. Mitchell*, 957 F.2d 465 (7th Cir. 1992).................................. 38, 45

*United States v. Ogiekpolor*, 122 F.4th 1296 (11th Cir. 2024)..............................27

*United States v. Pair*, 84 F.4th 577 (4th Cir. 2023)......................................... *passim*

*United States v. Pomeroy*, 822 F.2d 718 (8th Cir. 1987)......................40-41, 44-45

*United States v. Reumayr*, 530 F. Supp. 2d 1200 (D.N.M. 2007) ..........................48

*United States v. Robinson*, 55 F.4th 390 (4th Cir. 2022).................................. 28, 53

*United States v. Shealey*, 641 F.3d 627 (4th Cir. 2011)..........................................53

*United States v. Thomas*, 55 F.3d 144 (4th Cir. 1995) .................................... 28, 49

*United States v. Tranakos*, 911 F.2d 1422 (10th Cir. 1990)..................................47

*United States v. Uribe-Rios*, 558 F.3d 347 (4th Cir. 2009) ...................................51

*United States v. Valencia-Quintana*, 136 F. App'x 707 (5th Cir. 2005)................30

*United States v. Villa*, 70 F.4th 704 (4th Cir. 2023) ...............................................26

*United States v. Walton*, 814 F.2d 376 (7th Cir. 1987) ............................... 29, 38-39

*United States v. Wangrow*, 924 F.2d 1434 (8th Cir. 1991) ....................................39

*United States v. Woolfolk*, 399 F.3d 590 (4th Cir. 2005)......................................27

## Constitutional Provisions

U.S. Const. amend. VI ...........................................................................................25

## Statutes

18 U.S.C. § 2339A ..............................................................................................13

18 U.S.C. § 2339B ..............................................................................................13

# Introduction

In 2009, the defendant, Umar Farooq Chaudhry, left his home in Northern Virginia and traveled to Pakistan with the intent of crossing into Afghanistan to wage jihad against United States forces. Before Chaudhry could complete his plan, Pakistani authorities arrested him. A Pakistani court later convicted Chaudhry of terrorism offenses and sentenced him to 10 years' incarceration.

From the moment of his arrest in Pakistan, the United States government sought to obtain custody of Chaudhry to try him on terrorism charges in the Eastern District of Virginia. Despite numerous requests to transfer his custody, Pakistan made sure to only release Chaudhry upon the completion of his 10-year sentence.

Chaudhry claims that his Sixth Amendment right to a speedy trial was violated because the government did not do enough to bring him back to the United States to face charges in Virginia. In a comprehensive opinion, the district court disagreed, holding that the government "made extensive reasonable efforts" to return Chaudhry to the United States and that, on balance, the factors articulated in *Barker v. Wingo*, 407 U.S. 530 (1972), weighed against Chaudhry.

Because neither the law nor the facts support Chaudhry's claims on appeal, this Court should affirm the district court's decision.

## Issue Presented

Whether the district court correctly denied Chaudhry's motion to dismiss alleging excessive pretrial delay under *Barker v. Wingo*, 407 U.S. 530 (1972).

## Statement of the Case

### A.  Chaudhry leaves Virginia to wage jihad against United States forces in Afghanistan.

The indictment in this case alleged a criminal conspiracy among five young men from the Northern Virginia area, Umar Farooq Chaudhry, the defendant, Ahmed Ameer Minni, Ramy Said Zamzam, Aman Hassan Yemer, and Waqar Hussain Khan. In November 2009, these five defendants left the United States in two groups and flew to Pakistan for the purpose of traveling onward to Afghanistan to defend Muslims against American and other foreign troops. The basic facts of the conspiracy are as follows.

Around May 2009, codefendant Ahmed Ameer Minni received a message on YouTube from a Pakistan-based recruiter named "Saifullah," or "Sword of Allah." JA255. Saifullah contacted Minni due to his jihadist posting on YouTube. JA255. Around the same time, Saifullah communicated with codefendant Aman Hassan Yemer. JA255. Through these communications, Saifullah advised Minni and Yemer on how to travel to Pakistan without arousing suspicion. JA255. Saifullah suggested, for example, that Minni and Yemer shave their beards before traveling. JA255.

In early September 2009, Minni informed Saifullah that he would decline his invitation to travel to Pakistan to wage jihad but that his friend "is really interested" and "recently got a very nice [] haircut and is ready to travel and spread [I]slam." JA255. Soon after, Yemer contacted Saifullah to express his interest in traveling to Pakistan to wage jihad, promising to "try to bring along some more brothers[.]" JA255–JA256. That month, Minni and Yemer recruited codefendant Khan to join them in traveling to Afghanistan to wage violent jihad. JA256. Thereafter, Minni, Yemer, and Kahn recruited the defendant, Umar Farooq Chaudhry. JA256. Minni, Yemer, Khan, and Chaudhry then recruited codefendant Ramy Said Zamzam, who agreed to travel with them to Afghanistan to wage violent jihad. JA256. The codefendants understood that while engaged in jihad in Afghanistan, they would likely encounter United States military forces. JA263. The codefendants intended to fight, and if necessary, to kill any United States military forces that opposed them or their fellow jihadists. JA263.

The codefendants spent the next four months preparing to travel overseas. During this time, they obtained passports, airline tickets, and withdrew thousands of dollars from various accounts. Zamzam used money he received from his educational aid and Khan withdrew approximately $20,000 from his relatives' accounts. JA260. During their preparations, the codefendants employed cryptic language and code words to communicate with one another. JA256–JA257.

Codefendant Chaudhry referred to their overseas trip as "our six flags trip." JA258. Sometimes, however, Chaudhry was more direct, quipping to codefendant Zamzam that he was "about to get 72 [wives] buddy," and that it was "a great trade, right?" JA257.

In late November 2009, Zamzam and Minni created an 11-minute "final message" video. The video included background music, graphics, text, and clips of civilian casualties and United States soldiers in Iraq. JA259. Speaking for the group, Zamzam declared that "when Muslim lands are invaded, when Muslim children are terrorized, when Muslim women are raped, when our brothers and sisters are attacked and killed, … jihad becomes, by the consensus of the scholars … an individual obligation … to defend his brothers and sisters and give them victory." JA259. The video also bore the following message: "physical jihad against the disbelievers becomes obligatory … [w]hen the Muslim is present in a jihad situation … [or] when the enemy has come and attacked a Muslim land." JA259.

After recording the video, the codefendants met at a computer shop owned by Chaudhry's family in Lorton, Virginia. JA259. Using a desktop computer inside the shop, Zamzam played the video for the other codefendants. JA259. After playing the video, Zamzam told another individual present in the shop to upload the video from the USB drive to a certain website. JA259. Zamzam also told the individual to create a link to the video and email the link to a list of individuals contained on a second

USB drive. JA259. On November 28, 2009, codefendant Khan gave another individual two USB drives, stating, "this is from Ramy. You'll know when to open it." JA259. One of the USB drives contained the "final message" video, which was ultimately uploaded to YouTube. JA259.

By November 30, 2009, all five codefendants had arrived in Pakistan. JA261. Because the codefendants had difficulty contacting Saifullah, they hatched their own plan to enter Afghanistan from Pakistan. JA262. Chaudhry and Khan traveled to Hyderabad, Pakistan to locate a mosque that could help them join in the jihad. JA262. Eventually, Chaudhry and Khan located a mosque associated with Jaish-e-Mohammed, a designated foreign terrorist organization, where they discussed joining the jihad with an unidentified individual. JA262. The individual directed Chaudhry and Khan to another mosque, where they then discussed becoming mujahideen and joining the jihad with another individual. JA262. The next day, Chaudhry and Zamzam met with the emir of the mosque, who directed the pair to Lahore, Pakistan where headquarters for a camp of mujahideen was based. JA262.

The next day, the codefendants left Hyderabad for Lahore in search of the location identified by the emir. JA261. The location was another mosque, this time affiliated with Jamaat-ud-Dawa. JA262. Those present in the mosque upon the codefendants' arrival questioned the defendants and urged them to get references before they could be "accepted." JA262. One Jamaat-ud-Dawa representative

suggested that the codefendants go to Sargodha, Pakistan and obtain references from Chaudhry's family members. JA262. The codefendants then traveled to Sargodha and contacted one of Chaudhry's relatives.

### B. Chaudhry is arrested in Pakistan.

On December 9, 2009, all five codefendants were arrested by Pakistani authorities in a house belonging to Chaudhry's cousin in Sargodha. JA263; JA267. On December 10, 2009, the United States' Assistant Legal Attaché in Pakistan (ALAT) interviewed the five defendants. JA267. The FBI also sent a team of agents to interview the codefendants and conducted nine interviews between December 10, 2009 and December 19, 2009. JA267. During the interviews, Minni and Khan made numerous admissions. JA267. During his interview, Chaudhry stated that "we came for the sake of Islam to work with Muslims," adding that "I am letting you know that I know about the video. We came here together and the video speaks for us. Whatever the video says, I am for that." JA267–JA268.

### C. The government attempts to secure Chaudhry's return to the United States for prosecution.

Around December 15, 2009, the ALAT met with the Director General from the Pakistani Ministry of the Interior concerning the five defendants and communicated the FBI's desire to see them promptly returned to the United States for prosecution. Specifically, the ALAT asked the Director General how to "ensure a smooth and quick transfer of the five into United States custody." JA114. The

Director General informed the ALAT that because the five defendants had received a consular visit,[1] their detention was now "formal" and "on the books," meaning that Pakistan would want the United States to follow the formal extradition process. JA114. The Director General also advised the ALAT that Pakistani intelligence and law enforcement had opened its own investigation into the defendants. JA114.

When asked whether, because the five defendants were United States citizens, Pakistan "would be willing to deport the five directly to a USG operated plan in Pakistan for immediate repatriation to the United States," the Director General responded that this was possible, but harder now that intelligence agencies were involved. JA114. The Director General further advised that "it may take a bit of time to arrange for their extradition/deportation/repatriation, and as such the USG should initiate a formal request soon." JA114. The Director General also stated that although a decision to "deport/repatriate the five" resided with the district police, the issue "ha[d] become a political decision." JA114. The Director General counseled that if "the USG wished to smooth the process of transferring the five into US custody" the U.S. Ambassador should "discuss th[e] matter directly with [the] Minister of the Interior" and "immediately following this discussion … issue its formal request." JA114–JA115.

---

[1] Throughout their time in custody, the defendants continued to receive consular visits from personnel working at the U.S. Embassy in Pakistan.

On December 23, 2009, the United States Attorney's Office in the Eastern District of Virginia (EDVA) filed a criminal complaint against the defendants and obtained arrest warrants for them. JA23; JA268. The next day, the government filed a motion seeking a limited unsealing order so that "summary information as to the defendants' offense conduct could be taken from the complaint and supporting affidavit and provided to INTERPOL, as required for issuance of a Red Notice/Wanted Person Diffusion Alerts with respect to the warrants issued by the Court for the defendants' arrest." JA268; JA24.

On December 24, 2009, the United States' Legal Attaché in Pakistan provided the Ministry of the Interior in Pakistan copies of the arrest warrants. JA269; JA119–JA121. In a letter accompanying the arrests warrants, the Legal Attaché advised the Ministry of the Interior that "[t]he US Government seeks custody of these individuals so that they may stand trial in the US for the charge above and any additional charges that may be added to the complaint. The Legat [Legal Attaché] office is prepared to facilitate the transfer of the five via air transport from Pakistan to the US within a timeframe of 72 hours." JA269; JA120. The letter further explained that the "Legat office is prepared to discuss the transfer of these five with appropriate officials of the Government of Pakistan as identified by the Ministry of Interior." JA120. That same day, Pakistan informed the Legat "that there was a court

order from the local court which ordered the [defendants'] detention, prohibiting their transfer to any foreign government." JA269; JA156–JA157.

On December 28, 2009, the Legal Attaché advised the United States government that an official request for the transfer of custody might carry more weight than simply providing Pakistan the arrest warrants. JA269; JA156. The Legal Attaché also advised that the five codefendants would likely be charged in Pakistan on January 4, 2010, for directing terrorist activities. JA269; JA156.[2]

In response, the Department of Justice's Office of International Affairs (OIA) and EDVA worked together to provide Pakistan with an official request to turn over the five defendants for prosecution in the United States. JA269; JA156. This request issued in the form of a diplomatic note from the United States Embassy in Islamabad, Pakistan to the Ministry of Foreign Affairs in Islamabad on January 8, 2010. JA269; JA156. Due to a typographical error, an amended diplomatic note was presented on January 15, 2010. JA269–JA270; JA156; JA408–JA410. The diplomatic note requested the transfer by "deportation, expulsion, or other lawful means" of the five

---

[2] On December 30, 2009, the Department of Justice approved Red Notice applications for all five defendants, which reinforced that "the Red Notice is a firm commitment by your office, and by the United States to request this fugitive's extradition in all but the most exceptional circumstances." JA268; JA124. Under the heading, "ACTION TO BE TAKEN IF TRACED," the Red Notice approval stated that "[a]ssurances are given that extradition will be sought upon arrest of the person, in conformity with national laws and/or the applicable bilateral and multilateral treaties." JA128; JA268–JA269.

defendants named in the complaint. JA270; JA157–JA158; JA408. The diplomatic note acknowledged Pakistan's impending prosecution of the five defendants but stressed that the ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ JA408. The note further urged Pakistan not to delay transferring the defendants, cautioning that ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ JA409. The diplomatic note concluded by specifically requesting that "the Government of Pakistan consider suspending or otherwise deferring its criminal proceedings against the defendants and deporting or expelling them as soon as possible to the United States." JA270; JA158; JA410. The note added that ███

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ JA410.

Over the next several months of 2010, the Legal Attaché continued communicating with Pakistani law enforcement authorities to try and obtain additional information on their investigation and prosecution of the five defendants. JA158. By at least early June 2010, the five defendants were on trial in Sargodha for

terrorism offenses. Around June 5, 2010, the United States Ambassador to Pakistan met with the Pakistani Minister of the Interior to reiterate the government's position that the five codefendants, then on trial, be returned to the United States. JA270; JA158. During that conversation, "it was communicated that the U.S. Government has a strong interest in seeing [the defendants'] custody transferred to the United States at the earliest opportunity." JA165.

On June 18, 2010, the Legal Attaché met with his counterpart in the Pakistani Ministry of the Interior. JA165. During the meeting, the Minister agreed to cancel the five codefendants' visas to ensure their continued detention in the event they were acquitted. JA165. The Minister further agreed to hold the five codefendants in custody "until a U.S. Government aircraft could arrive to transport those who are deported out of Pakistan." JA165. On June 23, 2010, the Legal Attaché sent a letter to the Pakistani Ministry of the Interior referencing the June 18 meeting and ruing the fact that the Minister's directives had not been conveyed to the prosecuting court in Sargodha or other officials in Sargodha. JA165. The Legal Attaché's letter stressed that "[t]his is a matter of serious concern to us as extensive coordination will be needed for us to assume custody of any or all of the Americans depending on the outcome of the trial and the deportation proceedings." JA165–JA166. The Legal Attaché also explained that "U.S. Passports for those being turned over to the U.S. Government will need to accompany them at the time of the transfer of

custody." JA166. The letter conveyed that it was "most urgent that the course of action agreed upon during our last meeting and directed by the Minister be communicated to the appropriate officials and the District Police Office in Sargodha," and concluded by requesting "a personal meeting" on June 24, 2010, "to finalize coordination in this matter." JA167.

### D. Chaudhry is convicted of terrorism offenses in Pakistan.

The very next day, on June 24, 2010, a Pakistani court found the five defendants guilty of terrorism offenses and sentenced each of them to 10 years' imprisonment. JA270; JA324–JA390.

Over the next ten years, the Legal Attaché "routinely inquired with the Pakistan government as to the completion of [the defendants'] sentences." JA270; JA159. For example, on March 4, 2013, while the defendants were serving their sentences, the Legal Attaché sent a letter to the Director General of the Federal Investigative Agency in Pakistan regarding the five defendants. JA270; JA169–JA170. The letter stressed that the United States government was "interested in discussing a number of pending requests for extradition in Pakistan to the United States, such as [the five named defendants in this case]." JA270; JA169–JA170.

### E. A grand jury in the Eastern District of Virginia charges Chaudhry with material support offenses.

On November 16, 2017, while the defendants were still serving their sentences in Pakistan, a grand jury in the Eastern District of Virginia charged the five

defendants in a four-count indictment with providing material support to terrorism and to a designated foreign terrorist organization, in violation of 18 U.S.C. §§ 2339A, 2339B. JA28–JA33. On the same day, the district court issued new arrest warrants for the defendants.

### F. The government prepares for the defendants' release from Pakistani prison.

In early November 2019, Jefferey M. Olson, Associate Director at OIA, traveled to Pakistan to discuss several matters with Pakistani counterparts, including this case. JA159. Soon after, Olson learned that the five defendants would be released from Pakistani prison in early 2020. JA159.

On November 22, 2019, in anticipation of the defendants' release from prison in Pakistan, the government filed a motion in the Eastern District of Virginia to appoint the defendants counsel. JA271. The government explained that it expected the defendants' sentence in Pakistan to conclude in early January 2020, and that "[i]t [wa]s unclear what the Pakistan government will do upon the defendants' release, including whether the Pakistanis will release the defendants directly to the U.S. State Department." JA271. The government explained, however, that it did "not expect that the defendants will be released into the custody of the U.S. law enforcement authorities based upon the outstanding warrant for the U.S. indictment." JA87. Because the defendants' families had begun asking "the FBI what criminal justice consequences the defendants might face if they were to return to the United States,"

the government suggested "that it would be helpful to the defendants to have representation during these discussions." JA87.[3] The district court granted the government's motion and appointed the Federal Public Defender's Office to represent Chaudhry. JA271.

In early December 2019, Olson requested that the Department of State and United States Embassy in Islamabad "send a cable to the Pakistan Ministry of Foreign Affairs, noting that it was our understanding that the sentences of the [defendants] were due to expire imminently, and asking for confirmation of that fact so that the U.S. could proceed with extradition or deportation." JA159.

### G. Chaudhry is released from prison and fights extradition to the United States.

Pakistan released Chaudhry from prison on June 9, 2020. JA272. On June 22, 2020, the Pakistani Ministry of Foreign Affairs sent the United States Embassy a diplomatic note requesting extradition documents for Chaudhry and Khan, both of whom held dual U.S.-Pakistani citizenship. JA272. As for Minni, Zamzam, and Yemer, Pakistan only required travel documents and an airline ticket to facilitate their deportation. JA272. On August 17, 2020, Chaudhry's defense counsel confirmed that Chaudhry would contest extradition from Pakistan. JA272.

---

[3] The government also asked the district court to appoint counsel with national security experience and identified two specific attorneys who met that criteria and were either interested in the case or had already communicated with one of the families. JA87.

On August 24, 2020, OIA received two sworn copies of approved extradition requests for Chaudhry and Khan from EDVA. JA272. On October 22, 2020, the government filed a motion in the Eastern District of Virginia for certified copies of the defendants' arrest warrants "to effect the foreign transfer of custody of the defendants to the United States Government and to secure their appearance in this District." JA272. Because of COVID-19 related delays, OIA sent the certified extradition package to the Department of State on October 27, 2020. JA272.

On that same day, the Legal Attaché advised that the December 2009 Pakistani court order prohibiting the defendants' transfer to any foreign government (*see* JA156–JA157) was still in effect. JA272; JA161. Legat advised that they were working with the Pakistani Ministry of Interior to petition the local court to lift the order to facilitate the deportation and extradition of the defendants. JA272; JA161.

Around November 9, 2020, the United States Department of State sent the extradition requests to the United States Embassy in Pakistan. The requests were presented to the Pakistani Ministry of Foreign Affairs around November 12, 2020. JA272.

On March 2, 2021, the Pakistani Ministry of Interior informed the United States Charge d'Affaires in Islamabad that one of the extradition requests had been approved by the Pakistani Cabinet and that the other would be considered shortly. JA272; JA161. This approval, however, only confirmed that the individual was

eligible for extradition and permitted the request to proceed to judicial review. JA161. Because Chaudhry had been released from prison in June 2020, Pakistani authorities had to rearrest him for the extradition proceedings to begin. JA161–JA162. On May 16, 2021, the Pakistani Federal Secretary of the Ministry of the Interior informed the Legal Attaché that arrest warrants had been issued for Chaudhry and Khan and that extradition proceedings would begin once they were detained. JA162. Pakistani authorities arrested Chaudhry around August 17, 2022, after which extradition proceedings commenced. JA273; JA162.

Thereafter, the Legal Attaché regularly updated OIA on Chaudhry's extradition proceedings, including on Pakistani court sittings held on November 29, 2022; December 13, 2022; January 12, 2023; March 16, 2023; April 18, 2023; May 24, 2023; and June 13, 2023. JA273.

Around July 5, 2023, Chaudhry finally consented to extradition. JA273. On September 11, 2023, the Cabinet of Pakistan approved Chaudhry's extradition request. JA273. Due to "great challenges" in securing transportation for Chaudhry, he was not extradited from Pakistan until December 6, 2023. JA273. That same day, Chaudhry arrived at Dulles International Airport. JA273. Chaudhry appeared in the Eastern District of Virginia for an arraignment on December 12, 2023. JA273.

**H. Chaudhry waives his right to a speedy trial and then moves to dismiss his indictment based on Sixth Amendment delay.**

At the December 2023 arraignment, Chaudhry, represented by counsel, knowingly and voluntarily waived his right to a speedy trial. JA280; JA64–JA65. Chaudhry was released on bond (JA67) and remained so for the duration of the proceedings in this case.

Soon after, Chaudhry moved to dismiss his indictment, arguing that the government violated his Sixth Amendment right to a speedy trial by not immediately seeking his extradition from Pakistan in 2010. JA68–JA79.

The government opposed, arguing that it promptly sought Chaudhry's transfer to the United States in 2010 and diligently continued pursuing that end in the many months and years after his arrest. JA80–JA111. The government also rejected Chaudhry's proposed legal rule, which held that the only way the government could demonstrate a diligent, good-faith effort to secure custody of an overseas defendant is to submit a formal extradition request. As the government explained, not only is a formal extradition request not necessary, but Pakistan's extradition treaty with the United States provides that any extradition "shall be deferred until the conclusion of the trial and the full execution of any punishment." JA158.[4] Given Chaudhry's 10-

_____

[4] "Extradition between the U.S. and Pakistan is governed by the Extradition Treaty Between the United States and the United Kingdom [JA172–JA178], which

year sentence, the government was not required to undertake futile efforts to prematurely seek his release through extradition. Moreover, independent of Pakistan's extradition treaty, an independent Pakistani court order barred transferring Chaudhry to any foreign country.

As part of its response, the government included a declaration from Jefferey M. Olson, Associate Director of OIA. As relevant, Olson described that apart from extradition, there exists "another route to removing a fugitive from Pakistan to the United States" and that "in certain cases" Pakistan will "agree to deport another country's nationals in lieu of extradition." JA154. Olson explained that "this method is typically faster than extradition proceedings" and because all the defendants in this case were United States citizens, OIA "believed this option was available if Pakistan consented to proceed this way." JA154. Olson also explained that the United States "faced significant challenges in its extradition relationship with Pakistan. Extradition requests that the United States submitted to Pakistan often were not addressed in a timely manner by the Government of Pakistan, or simply were not addressed at all." JA154–JA155. As Olson described, "[o]n some occasions, original extradition documents were misplaced or destroyed, which then had to be

---

entered into force in 1935 and was adopted by Pakistan upon independence." https://2009-2017.state.gov/j/inl/rls/nrcrpt/2015/vol1/239002.htm.

reassembled and retransmitted, significantly delaying the extradition process." JA155.

Olson stated that during his time as OIA Associate Director, "most of the United States' extradition requests to Pakistan have failed to receive any official response from Pakistan, despite diplomatic efforts to advance them" and that "OIA has had difficulty communicating with its counterparts in the Pakistani government even to obtain status updates regarding these extradition requests." JA155. Putting a finer point on things, Olson explained that between January 2010 and June 2021, the United States successfully extradited only one defendant from Pakistan. JA155. Olson stated that instances of extradition from Pakistan are "exceptional" and that the United States has made many extradition requests to Pakistan over the past 15 years, "none of which resulted in the surrender of the fugitives sought." JA155.

## I. The district court denies Chaudhry's motion.

In April 2024, the district court held a hearing on Chaudhry's motion and denied it in an oral ruling, finding that Chaudhry could not demonstrate a Sixth Amendment violation under *Barker v. Wingo*, 407 U.S. 530 (1972). *See* JA198–JA216. Soon after, Chaudhry pleaded guilty to one count of providing material support to a foreign terrorist organization, while preserving his right to appeal the district court's denial of his motion to dismiss. After Chaudhry pleaded guilty, the district court issued a memorandum opinion explicating its denial of his Sixth

Amendment claim. *See* JA273–JA282; *United States v. Chaudhry*, 2024 WL 2854266 (E.D. Va. 2024).

As to *Barker*'s first factor, the district court held that the length of the delay weighed in Chaudhry's favor. JA274–JA275.[5]

As to the second *Barker* factor, the district court held that the reason for the delay weighed in the government's favor. JA275–JA279. Relying on this Court's precedent, the district court held that the government was permitted to allow Pakistan to pursue its case against Chaudhry and was not obligated to file a premature extradition request to secure his Sixth Amendment rights. The district court found that "the government made extensive reasonable efforts to obtain custody of Chaudhry upon his arrest in Pakistan and continued to make numerous requests to Pakistani authorities for the speedy extradition or deportation of Chaudhry and his co-defendants." JA277.

Relying on OIA Associate Director Olson's testimony, the district court held that "there was a pattern of United States extradition requests not being 'addressed

---

[5] The district court found it unnecessary to resolve the parties' dispute as to the precise length of the delay. JA275. Chaudhry argued that his Sixth Amendment right attached in December 2009, when the government filed a complaint and obtained a Red Notice. The government argued that the right attached in November 2017, when a grand jury in the Eastern District of Virginia returned an indictment. The district court declined to resolve tension between this Court's jurisprudence and subsequent Supreme Court doctrine, because under either view, the first *Barker* factor weighed in Chaudhry's favor. JA275.

in a timely manner by the Government of Pakistan, or simply were not addressed at all.'" JA277. Moreover, the district court found that OIA knew that "in certain cases" Pakistan had agreed to "deport another country's nationals in lieu of extradition," a method that "is typically faster than extradition proceedings." JA277. Thus, the district court found that the government properly pursued an "expedited option" to obtain custody of Chaudhry through informal transfer requests. JA277.

The district court further held that proceeding in this manner was reasonable given that Pakistan's extradition treaty with the United States provides that extradition "shall be deferred until the conclusion of the trial and the full execution of any punishment." JA158. The district court found the government's various attempts to secure Chaudhry's custody "clearly demonstrate reasonable diligence, even in the absence of a formal extradition request before 2020." JA276. The district court also agreed that the government was not obligated to pursue futile efforts to secure custody of Chaudhry. JA278.[6]

---

[6] The district court also concluded that while the "facts in the public record" were "more than sufficient to establish the government's diligence in seeking the speedy return of Chaudhry to the United States," a classified declaration submitted by the government "further corroborate[d]" that conclusion. JA278 n.8. For purposes of this appeal, the government agrees that the public record is sufficient for affirmance but can provide the Court with the classified materials upon request. *See TikTok Inc. v. Garland*, No. 24-656, 2025 WL 222571, at *6 n.3 (U.S. Jan. 17, 2025) ("Our holding and analysis are based on the public record, without reference to the classified evidence the Government filed below.").

As to the third *Barker* factor, the district court held that the timeliness of Chaudhry's assertion of his speedy trial right weighed against him. JA279–JA281. The district court explained that "Chaudhry's conduct from the time of his release in Pakistan to the time he invoked his right to a speedy trial indicates that he did not want a speedy trial; rather, he was only interested in delaying the trial or avoiding it altogether." JA279 (internal citation and quotation marks omitted). The district court found that by August 2020, Chaudhry affirmatively indicated he would contest extradition to the United States, and that for almost a year, he "engaged in myriad proceedings to avoid extradition." JA280. The district court further explained that after finally consenting to extradition and arriving in the Eastern District of Virginia, Chaudhry knowingly and voluntarily waived his right to a speedy trial during his counseled arraignment. JA280.

As to the fourth and final *Barker* factor, the district court held that Chaudhry could not demonstrate any prejudice. JA281. As the district court explained, Chaudhry has been on bond since arriving in the Eastern District of Virginia and recently pleaded guilty through a plea agreement in which the government agreed to recommend a time-served sentence. JA281. The district court also held that Chaudhry's vague assertions of harm were insufficient to demonstrate actual prejudice. JA281.

Finding three of the four *Barker* factors weighed against Chaudhry, the district court denied his motion. In August 2024, the district court sentenced Chaudhry to time served. JA315–JA316.

This appeal followed. JA321.

## Summary of Argument

The district court correctly denied Chaudhry's motion to dismiss under *Barker v. Wingo*.

*First*, the district court correctly held that the length of the delay weighed in Chaudhry's favor. Here, the length of the delay, under either of the parties' calculations, is enough to trigger further inquiry under *Barker*.

*Second*, the district correctly held that the reason for the delay weighed in the government's favor. From the moment of his arrest in Pakistan in 2009, the United States government sought to obtain custody of Chaudhry to face charges in the Eastern District of Virginia. The government did so immediately after Chaudhry's arrest—through in person meetings, diplomatic letters, and formal diplomatic notes—during his trial, and during his incarceration. The United States Ambassador even addressed the subject with her Pakistani counterpart. But, as dictated by the extradition treaty between Pakistan and the United States, Pakistan insisted on ensuring that Chaudhry serve his entire 10-year sentence before releasing him.

Contrary to Chaudhry's assertions on appeal, there is no requirement in the

law that the government submit a formal extradition request to preserve a defendant's Sixth Amendment speedy trial right. Nor does the government need to pursue futile ventures, when it knows, based on experience, that there are quicker and less troublesome ways of obtaining custody of an incarcerated defendant from a foreign country. Based on its understanding of the governing extradition treaty and its poor experience seeking extradition from Pakistan, the government pursued a less formal means of obtaining custody and was not required to submit an extradition request that was likely doomed to fail. The district court concluded that the government made a diligent, good faith effort to return Chaudhry to the United States. On appeal, Chaudhry lodges several competing theories but never attempts to show that the district court's finding is clearly erroneous.

*Third*, the district court correctly held that Chaudhry's assertion of his right to a speedy trial weighed in the government's favor. The centerpiece of this appeal is Chaudhry's claim that the government infringed on his speedy trial right by not seeking his extradition from Pakistan. But once Chaudhry was released from Pakistani prison, the government formally sought his extradition. Chaudhry then spent almost a year contesting extradition to the United States. Then, once he finally consented to extradition and arrived in the Eastern District of Virginia, Chaudhry waived his right to a speedy trial. The district court correctly concluded that Chaudhry's actions belie the notion that he was truly interested in a speedy trial.

*Fourth*, and finally, the district court correctly concluded that Chaudhry's vague assertions of harm were insufficient to demonstrate actual prejudice. Other than one conclusory assertion of prejudice, Chaudhry has consistently failed to show how the delay in bringing him to trial prejudiced his defense. As was the case in the district court, Chaudhry has failed to identify on appeal a single piece of evidence or anticipated testimony that was unavailable to him when he finally arrived in the Eastern District of Virginia.

Because the district court correctly concluded that three of the four *Barker* factors weighed in the government's favor, this Court should affirm.

## Argument

### The district court correctly denied Chaudhry's motion to dismiss under *Barker v. Wingo*.

The Sixth Amendment guarantees the "right to a speedy and public trial" for all criminal defendants. U.S. Const. amend. VI. "[A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case." *Barker v. Wingo*, 407 U.S. 514, 522 (1972). To conduct this functional analysis, "the Supreme Court in *Barker* specified four factors courts must balance when determining whether a defendant's constitutional right to a speedy trial has been violated: the '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'" *United States v. Pair*, 84 F.4th 577, 588–589 (4th Cir. 2023) (quoting *Barker*, U.S. at 530). To prevail on a speedy

trial claim, a defendant must "establish that on balance, [the] four separate [*Barker*] factors weigh in his favor." *United States v. Hall*, 551 F.3d 257, 271 (4th Cir. 2009) (alteration in original) (internal quotation marks omitted). Here, the district court denied Chaudhry's motion to dismiss after concluding that three of the four *Barker* factors weighed against him. This Court reviews the district court's factual findings for clear error, and its legal conclusions de novo. *See Pair*, 84 F.4th at 588.

## A.    The length of the delay weighs in Chaudhry's favor.

Under the first *Barker* factor, this Court considers the length of the delay. *Barker*, 407 U.S. at 531. "The length of the delay is both the [*Barker*] balancing test's first factor and a threshold requirement because the defendant must establish that the length of the delay is at least presumptively prejudicial to trigger the balancing inquiry." *United States v. Villa*, 70 F.4th 704, 713 (4th Cir. 2023) (internal quotation marks and citation omitted). Here, the length of the delay is enough to trigger further inquiry under *Barker*. *See id*. ("Courts generally have found a delay presumptively prejudicial as it approaches one year, depending on the nature of the charges.") (internal quotation marks and citation omitted).[7]

---

[7] As noted above, the district court declined to calculate the exact duration of the delay. *See* JA275. In Chaudhry's view, his Sixth Amendment right attached in December 2009, when the government filed a complaint and obtained a Red Notice. The government disagrees and maintains that Chaudhry's Sixth Amendment right attached in November 2017, when a grand jury indicted him. *See* JA90–JA92. Like the district court, this Court need not decide the issue or resolve the tension between its older precedent and more recent Supreme Court decisions, because however

But even though Chaudhry "has satisfied the threshold requirement, that fact by no means ends [the] *Barker* inquiry." *United States v. Woolfolk*, 399 F.3d 590, 598 (4th Cir. 2005). This is because "[a] criminal defendant cannot win a Sixth Amendment challenge by pointing to a calendar and counting off the days. He instead must show that, by balancing the four factors the Supreme Court has instructed [courts] to consider in speedy-trial cases, he should receive relief." *Martinez v. United States*, 828 F.3d 451, 458 (6th Cir. 2016). The Supreme Court has repeatedly explained that "presumptive prejudice [from a lengthy delay] cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria." *Doggett v. United States*, 505 U.S. 647, 655–656 (1992); *see also id.* at 652 n.1 ("'[P]resumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the [four-factor] enquiry."). Because the remaining *Barker* factors weigh in the government's favor, the length of the delay is insufficient to merit dismissal. *See United States v. Hills*, 618 F.3d 619, 632 (7th Cir. 2010) ("[A]s long as the government shows reasonable diligence in prosecuting its case, a defendant who cannot demonstrate prejudice with specificity will not show a Sixth Amendment violation, no matter how long the delay.").

---

calculated, the first *Barker* factor weighs in Chaudhry's favor. *See* JA275; *see also United States v. Ogiekpolor*, 122 F.4th 1296, 1305 n.3 (11th Cir. 2024) (declining to resolve same academic issue).

**B.    The reason for the delay weighs in the government's favor.**

Under the second *Barker* factor, this Court considers the reason for the delay. *Barker*, 407 U.S. at 531. Here, the delay in bringing Chaudhry to trial was due to the fact that he was arrested, convicted, and imprisoned in Pakistan between December 2009 and June 2020.

This Court has repeatedly held that "waiting for another sovereign to finish prosecuting a defendant is without question a valid reason for delay." *United States v. Grimmond*, 137 F.3d 823, 828 (4th Cir. 1998). And "[v]alid reasons for delaying a trial are weighed in favor of the [g]overnment." *Id*. This Court has characterized "[t]he need to allow [a defendant] to be prosecuted by the State without interference by the federal government" as "an obvious additional reason for [] delay[.]" *United States v. Thomas*, 55 F.3d 144, 150 (4th Cir. 1995). And this Court recently explained that, "[b]ecause the government was awaiting Georgia's prosecution of [a defendant], the reason for delay weighs in its favor." *United States v. Robinson*, 55 F.4th 390, 400 (4th Cir. 2022). In so holding, this Court continued to hold that "[i]t's immaterial whether … the government 'had the ability to secure [a codefendant's] appearance and set a trial date'" because the "need to allow [a defendant] to be prosecuted by the State without interference by the federal government is an obvious reason to delay federal proceedings." *Id*. (quoting *Thomas*, 55 F.3d at 150) (internal citation omitted).

The crux of Chaudhry's argument on appeal is that, notwithstanding his conviction and decade-long sentence in Pakistan, the United States government should have immediately sought his extradition, and absent that, any other steps the government took to secure his custody were insufficient under the Sixth Amendment. *See* Def. Br. 19–35. In Chaudhry's view, the only hallmark of government diligence under the Sixth Amendment is a formal extradition request. Yet Chaudhry cites no authority for this sweeping and unreasonable proposition.

Courts have held that the government must make a diligent, good faith effort to obtain custody of a defendant when he is being held in a foreign country. But "there is no case law to support [the] argument[] … that absent a formal request for extradition from one government to another, there has been no diligent good faith effort." *United States v. Walton*, 814 F.2d 376, 379 (7th Cir. 1987); *United States v. Diacolios*, 837 F.2d 79, 83 (2d Cir. 1988) ("[W]e are aware of no case that holds that a formal request for extradition must be made before due diligence can be found to have existed."). Thus, courts have held that "[w]hile a formal extradition request is not required, some effort on the part of the Government is necessary to satisfy the due diligence requirement." *United States v. Marquez-Charry*, 1997 WL 208403, at *2 (N.D. Ill. 1997); *United States v. Demirtas*, 204 F. Supp. 3d 158, 180 (D.D.C. 2016) ("The Court, accordingly, finds that the government held a good-faith belief that a formal extradition request to the Netherlands would be denied."). And "the

government usually satisfies its diligence obligation if it shows that it attempted extradition informally." *United States v. Fernandes*, 618 F. Supp. 2d 62, 69 (D.D.C. 2009); *see also United States v. Valencia-Quintana*, 136 F. App'x 707, 709 (5th Cir. 2005) (holding that "[a]lthough the government did not formally request extradition," it satisfied its diligence obligation by "procur[ing] an agreement from Dominican officials to notify [it] prior to [defendant's] release" from a Dominican jail).

Here, as the district court found, "the government made extensive reasonable efforts to obtain custody of Chaudhry upon his arrest in Pakistan and continued to make numerous requests to Pakistani authorities for the speedy extradition or deportation of Chaudhry and his co-defendants." JA277. The "uncontested record" (JA277) more than supports the district court's conclusion, and on appeal Chaudhry has not even attempted to demonstrate that this conclusion is clearly erroneous. *Cf. Pair*, 84 F.4th at 588.

Chaudhry and his codefendants were arrested in Pakistan on December 9, 2009. JA263; JA267. The next day, the ALAT interviewed the five defendants. JA267. The FBI also sent a team of agents to interview the codefendants and conducted nine interviews between December 10, 2009, and December 19, 2009. JA267.

Around December 15, 2009, the ALAT met with the Director General from the Pakistani Ministry of the Interior and communicated the FBI's desire to see the five defendants promptly returned to the United States for prosecution. Specifically, the ALAT asked the Director General how to "ensure a smooth and quick transfer of the five into United States custody." JA114. The Director General informed the ALAT that because the five defendants had received a consular visit, their detention was now "formal" and "on the books," meaning that Pakistan would want the United States to follow the formal extradition process. JA114. At this meeting, the ALAT learned that Pakistani intelligence and law enforcement had opened its own investigation into the defendants. JA114.

When asked whether, because the five defendants were United States citizens, Pakistan "would be willing to deport the five directly to a USG operated plan in Pakistan for immediate repatriation to the United States," the Director General responded that this was possible, but harder now that intelligence agencies were involved. JA114. The Director General further advised that "it may take a bit of time to arrange for their extradition/deportation/repatriation, and as such the USG should initiate a formal request soon." JA114.

The government did just that. On December 23, 2009—eight days after the Director General's recommendation—EDVA charged all five codefendants by criminal complaint and obtained arrest warrants for them. JA23; JA268. The next

day, on December 24, 2009, the United States' Legal Attaché in Pakistan provided the Ministry of the Interior in Pakistan copies of the arrest warrants. JA269; JA119–JA121.

In a letter accompanying the arrests warrants, the Legal Attaché advised the Ministry of the Interior that "[t]he US Government seeks custody of these individuals so that they may stand trial in the US for the charge above and any additional charges that may be added to the complaint. The Legat office is prepared to facilitate the transfer of the five via air transport from Pakistan to the US within a timeframe of 72 hours." JA269; JA120. The letter further explained that the "Legat office is prepared to discuss the transfer of these five with appropriate officials of the Government of Pakistan as identified by the Ministry of Interior." JA120.

That same day, Pakistan informed the Legat "that there was a court order from the local court which ordered the [defendants'] detention, prohibiting their transfer to any foreign government." JA269; JA156–JA157. About four days later, on December 28, 2009, the Legal Attaché advised the United States government that an official request for the transfer of custody might carry more weight than simply providing Pakistan the arrest warrants. JA269; JA156.

In response, OIA and EDVA worked together to provide Pakistan with an official request to turn over the five defendants for prosecution in the United States. JA269; JA156. This request issued in the form of a diplomatic note from the United

States Embassy in Islamabad to the Ministry of Foreign Affairs in Islamabad on January 8, 2010, and January 15, 2010. *See* JA156; JA269–JA270; JA408–JA410. The diplomatic note requested the transfer by "deportation, expulsion, or other lawful means" of the five defendants named in the criminal complaint. JA270; JA157–JA158; JA408. The diplomatic note acknowledged Pakistan's impending prosecution of the five defendants but stressed that the ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ JA408. The note further urged Pakistan not to delay transferring the defendants, cautioning that ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ JA409. The diplomatic note concluded by specifically requesting that "the Government of Pakistan consider suspending or otherwise deferring its criminal proceedings against the defendants and deporting or expelling them as soon as possible to the United States." JA270; JA158; JA410. The note added that ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ JA410.

Over the next several months of 2010, the Legal Attaché continued communicating with Pakistani law enforcement authorities to try and obtain additional information on their investigation and prosecution of the five defendants. JA158. By at least early June 2010, the five defendants were on trial in Sargodha for terrorism offenses. Around June 5, 2010, the United States Ambassador to Pakistan met with the Pakistani Minister of the Interior to reiterate the government's position that the five codefendants, then on trial, be returned to the United States. JA270; JA158. During that conversation, "it was communicated that the U.S. Government has a strong interest in seeing [the defendants'] custody transferred to the United States at the earliest opportunity." JA165.

On June 18, 2010, the Legal Attaché met with the Pakistani Minister of the Interior. JA165. During the meeting, the Minister agreed to cancel the five codefendants' visas to ensure their continued detention in the event they were acquitted. JA165. The Minister further agreed to hold the five codefendants in custody "until a U.S. Government aircraft could arrive to transport those who are deported out of Pakistan." JA165. On June 23, 2010, the Legal Attaché sent a letter to the Pakistani Ministry of the Interior referencing the June 18 meeting and lamenting the fact that the Minister's directives had not been conveyed to the prosecuting court in Sargodha or other officials in Sargodha. JA165. The Legal Attaché's letter stressed that "[t]his is a matter of serious concern to us as extensive

coordination will be needed for us to assume custody of any or all of the Americans depending on the outcome of the trial and the deportation proceedings." JA165–JA166. The letter conveyed that it was "most urgent that the course of action agreed upon during our last meeting and directed by the Minister be communicated to the appropriate officials and the District Police Office in Sargodha," and concluded by requesting "a personal meeting" on June 24, 2010, "to finalize coordination in this matter." JA167.

The very next day, on June 24, 2010, a Pakistani court found the five defendants guilty of terrorism offenses and sentenced each of them to 10 years' imprisonment. JA270; JA324–JA390.

Over the next ten years, the Legal Attaché "routinely inquired with the Pakistan government as to the completion of [the five defendants'] sentences." JA270; JA159. For example, on March 4, 2013, while the defendants were serving their sentences, the Legal Attaché sent a letter to the Director General of the Federal Investigative Agency in Pakistan regarding the five defendants. JA270; JA169–JA170. The letter stressed that the United States government was "interested in discussing a number of pending requests for extradition in Pakistan to the United States, such as [the five named defendants in this case]." JA270; JA169–JA170.

In November 2019, OIA Associate Director Olson traveled to Pakistan to discuss several matters, including this case, with Pakistani counterparts. JA159.

Soon after, Olson learned that the defendants would be released from Pakistani prison in early 2020. JA159. In response, the government filed a motion in the Eastern District of Virginia to appoint the defendants counsel, explaining that it was unlikely Pakistan would release the five defendants to United States custody upon the completion of their sentence and that it would behoove them to obtain domestic counsel. JA271.

In early December 2019, Olson requested that the Department of State and United States Embassy in Islamabad "send a cable to the Pakistan Ministry of Foreign Affairs, noting that it was our understanding that the sentences of the [defendants] were due to expire imminently, and asking for confirmation of that fact so that the U.S. could proceed with extradition or deportation." JA159.

Pakistan released Chaudhry from prison on June 9, 2020. JA272. On June 22, 2020, the Pakistani Ministry of Foreign Affairs sent the United States Embassy a diplomatic note requesting extradition documents for Chaudhry and Khan, both of whom held dual United States-Pakistani citizenship. JA272. On August 17, 2020, Chaudhry's defense counsel confirmed that Chaudhry would contest extradition from Pakistan. JA272.

On August 24, 2020, OIA received two sworn copies of approved extradition requests for Chaudhry and Khan from EDVA. JA272. On October 22, 2020, the government filed a motion in the Eastern District of Virginia for certified copies of

the defendants' arrest warrants "to effect the foreign transfer of custody of the defendants to the United States Government and to secure their appearance in this District." JA272.

On October 27, 2020, the Legal Attaché advised that the December 2009 Pakistani court order prohibiting the defendants' transfer to any foreign government (*see* JA156–JA157) was still in effect. JA272; JA161. The Legal Attaché advised that they were working with the Pakistani Ministry of Interior to petition the local court to lift the order to facilitate the deportation and extradition of the defendants. JA272; JA161. Around November 9, 2020, the United States Department of State sent the extradition requests to the United States Embassy in Pakistan.

*    *    *

As is evident, the government's repeated requests to Pakistan to return Chaudhry to the United States clearly demonstrate due diligence, even in the absence of a *formal* extradition request prior to 2020. The government repeatedly voiced its commitment to securing custody of Chaudhry. The government did so immediately after Chaudhry's arrest—through in person meetings, diplomatic letters, and formal diplomatic notes—during his trial, and during his incarceration. The United States Ambassador even addressed the subject with her Pakistani counterpart by reiterating the government's position that Chaudhry be returned to the United States.

Notwithstanding the government's "extensive reasonable efforts to obtain custody of Chaudhry" (JA277), Chaudhry insists that the government's alleged failure to initially seek his formal extradition is dispositive of his Sixth Amendment claim. But as explained above, "there is no case law to support [the] argument[] … that absent a formal request for extradition from one government to another, there has been no diligent good faith effort." *Walton*, 814 F.2d at 379; *Diacolios*, 837 F.2d at 83 (same). Moreover, "[t]he government is not duty-bound to pursue futile legal gestures to return the defendant for trial." *United States v. Mitchell*, 957 F.2d 465, 469 (7th Cir. 1992); *Diacolios*, 837 F.2d at 83 ("Due diligence surely does not require the government to pursue that which is futile."); *United States v. Bagga*, 782 F.2d 1541, 1543 (11th Cir. 1986) (same). Instead, "where [the] government has a good faith belief supported by substantial evidence that seeking extradition from a foreign country would be futile, due diligence does not require our government to do so." *United States v. Corona-Verbera*, 509 F.3d 1105, 1114 (9th Cir. 2007).

Here, the district court credited OIA Associate Director Olson's view that "there was a pattern of United States extradition requests not being 'addressed in a timely manner by the Government of Pakistan, or simply were not addressed at all.'" JA275. Moreover, the district court found that OIA knew that "in certain cases" Pakistan agreed to "deport another country's nationals in lieu of extradition," a method that "is typically faster than extradition proceedings." JA275. Thus, the

district court found, the government reasonably pursued an "expedited option" to obtain custody of Chaudhry through informal transfer requests. JA275.

Not only was it reasonable for OIA to rely on its own unrebutted experience attempting extraditions from Pakistan and opt for a more expedited course, but this approach was mandated by the treaty governing extraditions between the United States and Pakistan. Pakistan's extradition treaty with the United States provides that extradition "shall be deferred until the conclusion of the trial and the full execution of any punishment." JA158. As OIA Associate Director Olson explained, because the treaty "required that the 'full execution of any punishment' be completed in Pakistan, and there being no prisoner transfer treaty in place between the United States and Pakistan, the United States was obliged to wait until the defendants had completed the sentences they were given." JA158–JA159. Thus, the district court found that the "government reasonably believed Pakistan would not release [Chaudhry] until the conclusion of his sentence." JA279.[8]

Given this reasonable belief, the government was not obligated to file a premature extradition request. *See United States v. Cabral*, 979 F.3d 150, 158–59 (2d Cir. 2020); *Corona-Verbera*, 509 F.3d at 1112; *United States v. Wangrow*, 924 F.2d 1434, 1437 (8th Cir. 1991); *Blanco*, 861 F.2d at 778; *Walton*, 814 F.2d at 379–

---

[8] This is, of course, exactly what happened when Chaudhry completed his sentence: Pakistan sent a diplomatic note to United States counterparts asking for extradition documents for Chaudhry. JA160.

80; *Bagga*, 782 F.2d at 1543. This point is reinforced not just by the sequence of events in this case, the fact that Chaudhry was incarcerated on foreign charges and serving a decade-long sentence, the independent court order barring his transfer to foreign custody, and the governing treaty requiring deferral until the completion of his sentence, but also by the fact that during the period of his arrest and incarceration in Pakistan, Pakistan successfully extradited only one person to the United States despite multiple other requests. JA155. Given the availability of deportation as a route to secure Chaudhry's custody from Pakistan—a route "typically faster than extradition proceedings"—the government was not obligated to prematurely pursue a course of action with little chance of success.

The district court concluded that given the specifics of the governing extradition treaty, the government's attempt at "proceeding informally … clearly demonstrate[d] reasonable diligence." JA278; *see United States v. Carbarcas-A*, 1992 WL 158086, at *2 (4th Cir. 1992) (unpublished) (crediting testimony from OIA regarding Columbian extradition practice). On appeal, Chaudhry has failed to demonstrate that this finding is clearly erroneous. *Cf. Pair*, 84 F.4th at 588.

Instead, Chaudhry lodges a series of unsubstantiated claims and theories, none of which are persuasive. First, Chaudhry cites *United States v. Pomeroy*, 822 F.2d 718 (8th Cir. 1987), and *United States v. Heshelman*, 521 F. App'x 501 (6th Cir. 2013), as supporting his theory that the government failed to act diligently in seeking

his return to the United States. *See* Def. Br. 29–33. But both cases are inapposite. In *Pomeroy*, the government made no attempt at facilitating the defendant's transfer to the United States, despite knowing his whereabouts for two years. Moreover, the defendant in *Pomeroy* twice requested to be brought to the United States. Contrary to Chaudhry's reading of the case, *Pomeroy* did not establish a per se rule that *only* an extradition request will satisfy the government's due-diligence obligation. The government in *Pomeroy* did nothing to facilitate the defendant's transfer, so the Eighth Circuit never grappled with a scenario where the government reasonably pursued alternative—and in its experience, quicker—means of obtaining custody of a defendant. The same holds true for *Heshelman*, where the government made only one attempt to inquire as to the conditions of the defendant's extradition.

Nor did *Pomeroy* confront a situation where an independent court order barred the defendant's transfer to another country during the pendency of the defendant's imprisonment, as was the case here. Similarly, there is no indication from *Pomeroy* that the government had any reasoned basis on which to believe that Canada would decline its extradition request. Here, however, the government provided unrebutted evidence concerning the many difficulties it faces extraditing defendants from Pakistan and its poor record of doing so. Unlike *Pomeroy*, the government's approach to securing Chaudhry's custody was not just based on the governing treaty, but also on its long and unsuccessful history of pursuing extraditions from Pakistan.

Unlike *Pomeory* and *Heshelman*, as the district court explained, the government in this case "made repeated efforts to locate and extradite the defendant despite the provision in Article 4 of the United States extradition treaty with Pakistan, deferring extradition until 'the full execution of [defendant's] punishment,' and despite the local court in Pakistan having barred defendant's transfer to any foreign state's custody." JA278.[9]

Next, Chaudhry asserts that extradition was the "only viable mechanism" of securing his return to the United States because he was a dual citizen of the United States and Pakistan. Def. Br. 27. But Chaudhry provides no support for this claim, which, in any event, is contradicted by the record. As the district court found in crediting OIA Associate Director Olson's affidavit, "there was a pattern of United States extradition requests not being 'addressed in a timely manner by the Government of Pakistan, or simply were not addressed at all.'" JA275. Moreover, OIA knew that "in certain cases" Pakistan agreed to "deport another country's nationals in lieu of extradition," a method that "is typically faster than extradition proceedings." JA275. While Chaudhry claims—without any supporting evidence—

---

[9] Chaudhry characterizes the Pakistani charges as "fraudulent," "manufactured," and "illegitim[ate]." Def. Br. 5, 20, 24. But he fails to substantiate this contention. And in any event, as the district court explained, Chaudhry provides no support for the assertion that these allegations have any bearing on the *Barker* analysis (JA276), particularly when Chaudhry has already disclaimed any claim that there was improper collusion between the United States and Pakistan. *See* JA212.

that extradition was the only "viable" or "effective" way of obtaining his custody (Def. Br. 25, 27), those with expertise in this arena reasonably opted to pursue what they viewed as the "expedited option" for securing Chaudhry's return. JA275. *See Carbarcas-A*, 1992 WL 158086, at *2 (unpublished) (crediting testimony from OIA regarding Columbian extradition practice).

OIA Associate Director Olson explained that the United States "faced significant challenges in its extradition relationship with Pakistan" and that "[e]xtradition requests that the United States submitted to Pakistan often were not addressed in a timely manner by the Government of Pakistan, or simply were not addressed at all." JA154–JA155. Olson explained that during his time as OIA Associate Director, "most of the United States' extradition requests to Pakistan ha[d] failed to receive any official response from Pakistan, despite diplomatic efforts to advance them" and that "OIA has had difficulty communicating with its counterparts in the Pakistani government even to obtain status updates regarding these extradition requests." JA155. "On some occasions," Olson explained, "original extradition documents were misplaced or destroyed, which then had to be reassembled and retransmitted, significantly delaying the extradition process." JA155. Chaudhry's claim that extradition was the only "viable" or "effective" way of obtaining his custody (Def. Br. 25, 27) is impossible to square with this unchallenged record,

which clearly demonstrates that in most instances, Pakistan was non-responsive and that successful extraditions were the "exception[]," not the norm. JA155.

Without any supporting evidence, Chaudhry further asserts that Article 4 of the governing extradition treaty between the United States and Pakistan reflects a "signatory's discretion to defer extradition once a person has been found to be extraditable." Def. Br. 32. Then, relying on *Pomeroy*, Chaudhry argues that the government should have immediately sought his extradition on the theory that just because Pakistan had the "discretion to deny" the extradition request does not mean it would have done so. Def. Br. 33. But the whole premise of Chaudhry's theory is flawed. The governing treaty between the United States and Canada at issue in *Pomeroy* provided that the defendant's "surrender *may* be deferred until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded." *Pomeroy*, 822 F.2d at 721 n.7 (emphasis added). Based on this language, the Eighth Circuit concluded that the treaty "contains no provision that would have *required*" Canada "to deny a request for Pomeroy's extradition" and that "the only treaty article bearing on this question gives the Canadian authorities the *discretion* to either honor or deny such a request." *Id*. (emphases added). Here, however, the treaty between the United States and Pakistan provides that a defendant's extradition "*shall* be deferred until the conclusion of the trial and the

full execution of any punishment awarded to him." JA174. Chaudhry's entire theory of discretion is based on a fact in *Pomeroy* that is absent from this case.

As explained above, "[t]he government is not duty-bound to pursue futile legal gestures to return the defendant for trial." *Mitchell*, 957 F.2d at 469; *Diacolios*, 837 F.2d at 83 (same); *Bagga*, 782 F.2d at 1543 (same); *Corona-Verbera*, 509 F.3d at 1114. The government knew that in the past extradition from Pakistan had proven time-consuming and fruitless, and believed, based on actual experience, that it could obtain custody of Chaudhry through a less formal, quicker process. That belief, the district court concluded, was not only reasonable and based on experience, but it was also based on the governing extradition treaty. As OIA Associate Director Olson explained, because the treaty "required that the 'full execution of any punishment' be completed in Pakistan, and there being no prisoner transfer treaty in place between the United States and Pakistan, the United States was obliged to wait until the defendants had completed the sentences they were given." JA158–JA159.

Finally, even if Pakistan had the discretion to waive the terms of the treaty, Chaudhry provides no support for the proposition that it would have done so. To the contrary, everything in the record supports the notion that Pakistan was highly invested in prosecuting Chaudhry and his codefendants and ensuring they served their full sentences. Having ignored repeated written and oral requests to transfer Chaudhry to the United States, there is no reason to believe that Pakistan would

simply have relented if only the United States had repackaged its diplomatic note into an extradition request.[10]

Because the United States took "extensive reasonable efforts to obtain custody of Chaudhry" (JA277), the second *Barker* factor weighs in the government's favor.

### C. Chaudhry's assertion of his right to a speedy trial weighs in the government's favor.

Under the third *Barker* factor, this Court considers the timeliness of the defendant's assertion of his speedy trial right. *Barker*, 407 U.S. at 531. This factor, the district court concluded, weighs in the government's favor. *See* JA279–JA281.

The bulk of Chaudhry's argument on appeal is that the government failed to timely seek his extradition from Pakistan. The irony of this claim is that when the

---

[10] Chaudhry relies on one 30-year-old example to support the proposition that Pakistan might have chosen to waive the terms of its extradition treaty. *See* Def. Br. 31–32 (citing *Beukes v. Pizzi*, 888 F. Supp. 465 (E.D.N.Y. 1995)). But being a case about the United States and South Africa, *Beukes* proves nothing about Pakistani extradition practice. Moreover, the United States not only declined to enforce its extradition treaty in *Beukes* but "pursued" the petitioners' extradition on behalf of South Africa. *Beukes v. Pizzi*, 888 F. Supp. at 469. The same can hardly be said of Pakistan in this case. Finally, Chaudhry's reliance on *Beukes* ignores the fact that South Africa submitted an extradition request to the United States as the petitioner "neared [the] completion" of his sentence, a fact that might explain why the United States declined to enforce the terms of the treaty. *Id*. at 467. Here, however, Chaudhry speculates that Pakistan, despite having granted only a single extradition request in the last decade (JA155) and ignoring multiple transfer requests in this case, might have immediately granted a request for his extradition in 2010, thereby nullifying the 10-year sentence it had just secured. On this record, the possibility of such an occurrence is fanciful.

46

government *did* submit a formal extradition request to Pakistan, Chaudhry spent almost a year contesting it.

Pakistan released Chaudhry from prison on June 9, 2020. JA272. By August 2020, Chaudhry indicated through United States counsel that he would contest extradition to the United States. JA280. Pakistani authorities rearrested Chaudhry around August 17, 2022, after which extradition proceedings commenced. JA273; JA162. Chaudhry then spent the next year making good on his promise to fight extradition, thereby attempting to shirk the speedy trial he claims to have wanted all along. Chaudhry finally relented in July 2023. JA273.

"Chaudhry's conduct from the time of his release from Pakistani custody to the time in which he invoked his right to a speedy trial," the district court concluded, "indicates that he did not want a speedy trial; rather, he was only interested in delaying the trial or avoiding it altogether." JA280 (cleaned up). "How then can he argue with a straight face that the failure of the United States to extradite him entitles him to dismissal of the charges?" *In re Kashamu*, 769 F.3d 490, 494 (7th Cir. 2014); *see also United States v. Tranakos*, 911 F.2d 1422, 1429 (10th Cir. 1990) ("We are unimpressed by a defendant who moves for dismissal on speedy trial grounds when his other conduct indicates a contrary desire."); *United States v. Manning*, 56 F.3d 1188, 1195 (9th Cir. 1995) (defendant cannot "avoid a speedy trial by forcing the government to run the gauntlet of obtaining formal extradition and then complain

about the delay that he has caused by refusing to return voluntarily to the United States."). By the time Chaudhry was rearrested for extradition purposes, he had already completed his sentence and was "not being held in [Pakistan] for any violation of the laws of that principality, but rather pursuant to that country's extradition treaty with the United States for violations of this country's laws." *In re Bramson*, 1997 WL 65499, at *1 (4th Cir. 1997) (unpublished). He therefore could have returned "to this country [to] stand trial of his own volition at any time. Because [Chaudhry] is responsible for the delay of his trial, his Constitutional right to a speedy trial has not been violated." *Id.*[11]

Moreover, in addition to attempting to avoid the instant charges for almost a year, "Chaudhry's conduct in the United States fares no better." JA280. Upon arriving in the Eastern District of Virginia, Chaudhry, with the help of counsel, knowingly and voluntarily waived his right to a speedy trial. JA280. Though not strictly dispositive, this Court has held that "[f]ailure to assert the right to a speedy

---

[11] *See also United States v. Cavan*, 2016 WL 4098582, at *5 (S.D.N.Y. 2016) ("Rather than consenting to his extradition, Cavan contested his extradition for more than two years. Where, as here, it is manifestly apparent that a defendant has no serious interest in the speedy prosecution of the charges against him, a court need not ignore the defendant's fugitivity or recalcitrance in determining whether his sixth amendment rights have been violated.") (internal quotations and citation omitted); *United States v. Reumayr*, 530 F. Supp. 2d 1200, 1206 (D.N.M. 2007) ("Courts have recognized that a defendant resisting extradition, or otherwise avoiding attempts to bring him to this country, is attempting to avoid going to trial at all in the United States. This is the opposite of insisting on a speedy trial.").

trial, and even the explicit waiver of that right … is a factor in determining whether the defendant's speedy-trial right has been violated … and the failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." *Thomas*, 55 F.3d at 150 (citing *Barker*, 407 U.S. at 531–32) (cleaned up); *see also United States v. Lozano*, 962 F.3d 773, 781 (4th Cir. 2020) (holding that third *Barker* factor weighed against the defendant where the defendant "didn't assert his right to a speedy trial even after he was released from state custody, learned of the federal charge, and was appointed counsel").

Because Chaudhry fought extradition to the United States for almost a year and then waived his right to a speedy trial upon his return, the third *Barker* factor weighs in the government's favor.

### D. Chaudhry has not demonstrated any prejudice.

Under the fourth *Barker* factor, this Court considers whether the defendant is prejudiced by the delay in bringing him to trial. *Barker*, 407 U.S. at 531. Like the second and third *Barker* factors, this fourth and final factor weighs in the government's favor.

When analyzing prejudice, this Court considers three interests of defendants: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. The third interest is the "most serious … because the

inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id*. Here, the district court found that Chaudhry's "vague assertions of harm [were] insufficient to show actual prejudice." JA281. On appeal, Chaudhry has not even attempted to show that this finding is clearly erroneous. *Cf. Pair*, 84 F.4th at 588.

Instead, Chaudhry argues that he was prejudiced by his conditions of confinement in Pakistan. Def. Br. 40–41. But the purported conditions of which he complains cannot be attributed to the United States Government and are irrelevant for purposes of the *Barker* analysis. *See Grimmond*, 137 F.3d at 830 ("When, as here, a defendant is lawfully incarcerated for reasons not related to the pending charges and makes no credible showing that either his present or potential sentence will be substantially affected by the delay, we hold that there is simply no way the pretrial incarceration can be deemed oppressive.") (internal citation omitted); *see also Hall*, 551 F.3d at 272–73 ("The Defendants contend that, when awaiting trial, they were subjected to an oppressive four-year pretrial incarceration, plus eighteen months of pretrial house arrest during the Maryland proceedings. Of significance, their incarceration occurred during the time of their prosecution in the District of Columbia."). Moreover, Chaudhry has repeatedly claimed that he was unaware of the United States charges during the decade he spent in prison in Pakistan. *See* Def. Br. 35 (Chaudhry had "no knowledge of the pending charges"); JA186 (same). It is

therefore impossible for him to allege "oppressive pretrial incarceration" or "anxiety and concern," *Barker*, 407 U.S. at 532, from the pending charges in the Eastern District of Virginia. *See Lozano*, 962 F.3d at 781 ("Lozano didn't know of the pending federal charge until he was arrested in 2018. Thus, he didn't experience oppressive pretrial incarceration or anxiety during the delay.").

Next, Chaudhry rues the purportedly lost opportunity to serve a concurrent sentence. *See* Def. Br. 40. But this claim is too speculative to succeed. *See Lozano*, 962 F.3d at 781 (rejecting similar argument); *United States v. Uribe-Rios*, 558 F.3d 347, 358 (4th Cir. 2009) (rejecting argument in the context of challenge to pre-indictment delay). Chaudhry fails to support the proposition that he could have served a concurrent sentence in the United States on Pakistani charges or explain how, or on what authority, such a sentence would have been structured. Furthermore, Pakistan's insistence on prosecuting Chaudhry and ensuring the completion of his sentence belies the notion that such a result could have occurred. *See Lozano*, 962 F.3d at 781 ("[T]he record doesn't show a credible possibility that [the defendant] would have received a concurrent sentence"). Moreover, Chaudhry, like the other codefendants who pleaded guilty, was released on bond at his arraignment and received a time-served sentence. He has therefore not missed any opportunity. Indeed, his 10-year sentence in Pakistan is exactly why the government sought a time-served sentence in the United States.

As a final bid at showing prejudice, Chaudhry claims that the delay in prosecuting him hampered his ability to mount a defense. But as the district court concluded, this "vague assertion[] of harm [is] insufficient to demonstrate actual prejudice." JA281. Chaudhry claims that codefendant Yemer's intervening mental health issues barred him from functioning as a witness in the United States. *See* Def. Br. 41. But even if that were true, Chaudhry fails to explain what Yemer could have possibly said to defend him at trial. Chaudhry fails to identify a single piece of testimony Yemer would have offered to rebut the government's charge that Chaudhry provided material support to a foreign terrorist organization. Chaudhry's undeveloped claim also fails to account for the fact that had this case gone to trial, the government—or Chaudhry—could have called codefendants Minni and Zamzam, both of whom previously pleaded guilty. Did Yemer possess information unknown to Minni and Zamzam? Chaudhry fails to explain what it is that Yemer knew that would have helped his defense.[12]

And for good reason. Chaudhry admitted upon arrest that "[w]e came here together and the video speaks for us. Whatever the video says, I am for that." JA267–

---

[12] This is the third time Chaudhry has claimed that Yemer's purported unavailability hampered his defense. *See* JA78 (motion to dismiss); JA188 (reply motion). Beyond this conclusory statement, Chaudhry has never elaborated on this theory with any sort of specificity. Should Chaudhry attempt to develop this claim in reply, this Court should not permit him to do so. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (recognizing that issues raised for first time in reply briefs are waived).

JA268. That video was a reference to the codefendant's 11-minute "final message" video extolling jihad against non-believers. Chaudhry never explains how Yemer would have undermined that admission.

All told, Chaudhry's prejudice argument is too vague and unsubstantiated to succeed. Under this Court's precedent, this showing is plainly insufficient to satisfy his burden under *Barker*'s fourth prong. *See Robinson*, 55 F.4th at 400 ("Robinson fails to provide a single example of something relevant to his case that he or another witness couldn't remember. Without such an example, Robinson merely alleges a generalized prejudice common to all cases and all delays."); *Hall*, 551 F.3d 257, 272–73 (rejecting prejudice argument where "[d]efendants are unable to point to any evidence that their defense was impaired by the delay. Indeed, they have not identified any witnesses that were unavailable as a result of the delay; they have not shown that any witness was unable to accurately recall the relevant events; they do not contend that exculpatory evidence was lost; nor have they identified any evidence that was rendered unavailable by the delay."); *United States v. Shealey*, 641 F.3d 627, 634 (4th Cir. 2011) (same); *United States v. Hopkins*, 310 F.3d 145, 150 (4th Cir. 2002); (same); *Grimmond*, 137 F.3d at 830 (same). Moreover, as this Court recently explained, Chaudhry's inability to show prejudice undercuts the significance of the other interests he asserts under *Barker*'s fourth prong. *See Pair*, 84 F.4th at 590–591; *see also Barker*, 407 U.S. at 534 (finding "absence of serious

prejudice" although defendant was incarcerated for ten months before trial and was forced to "liv[e] for over four years under a cloud of suspicion and anxiety" because "there [was] no claim that any of *Barker*'s witnesses died or otherwise became unavailable owing to the delay.").

Because Chaudhry cannot demonstrate any prejudice from the delay, the fourth *Barker* factor weighs in the government's favor.

## Conclusion

For the reasons explained above, this Court should affirm the district court's denial of Chaudhry's motion to dismiss.

Respectfully submitted,

Erik S. Siebert
United States Attorney

_____/s/_____
Joseph Attias
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

John T. Gibbs
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314

## Statement Regarding Oral Argument

The United States is prepared to present oral argument should the Court request it.

## Certificate of Compliance

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 13,000 words (and is specifically 12,981 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

/s/
_____
Joseph Attias
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
